1 │ ROBBINS GELLER RUDMAN
  │   & DOWD LLP
2 │ LAURIE L. LARGENT (153493)
  │ MATTHEW I. ALPERT (238024)
3 │ 655 West Broadway, Suite 1900
  │ San Diego, CA  92101
4 │ Telephone:  619/231-1058
  │ 619/231-7423 (fax)
5 │ llargent@rgrdlaw.com
  │ malpert@rgrdlaw.com
6 │
  │ Lead Counsel for Plaintiff
7 │
  │ [Additional counsel appear on signature page.]
8 │
                     UNITED STATES DISTRICT COURT
9 │
                     CENTRAL DISTRICT OF CALIFORNIA
10 │
                          SOUTHERN DIVISION
11 │

| 12 | In re BANC OF CALIFORNIA | ) | No. SACV 17-00118 AG (DFMx) |
| 13 | SECURITIES LITIGATION | ) | consolidated with |
|  | ――――――――――――――――― | ) | SACV 17-00138 AG (DFMx) |
| 14 | This Document Relates To: | ) | CLASS ACTION |
| 15 | ALL ACTIONS. | ) | CONSOLIDATED AMENDED |
| 16 | ――――――――――――――――― | ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| 17 |  |  | DEMAND FOR JURY TRIAL |

18
19
20
21
22
23
24
25
26
27
28

1    Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Iron Workers" or
2  "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's
3  undersigned attorneys, for Plaintiff's complaint against defendants, alleges the
4  following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and
5  upon information and belief as to all other matters based on the investigation
6  conducted by and through Plaintiff's attorneys, which included, among other things, a
7  review of United States Securities and Exchange Commission ("SEC") filings by
8  Banc of California, Inc. ("Banc" or the "Company"), as well as Company press
9  releases and conference call transcripts and other media reports and public documents.
10 Plaintiff believes that substantial additional evidentiary support will exist for the
11 allegations set forth herein after a reasonable opportunity for discovery.

12                    **NATURE OF ACTION AND OVERVIEW**

13    1.    This is a securities class action on behalf of all persons who purchased
14 Banc publicly traded securities between October 29, 2015 and January 20, 2017,
15 inclusive (the "Class Period"), seeking to pursue remedies under the Securities
16 Exchange Act of 1934 ("1934 Act").  These claims are asserted against Banc and
17 certain of its former officers who made materially false and misleading statements
18 during the Class Period.

19    2.    Banc is a financial holding company operating in commercial banking,
20 mortgage banking, financial advisory and corporate banking.  Banc is the parent of
21 Banc of California, National Association, a national bank.

22    3.    In 2010, an investment firm known as COR Capital LLC ("COR") was a
23 lead investor in the recapitalization of Banc's predecessor, First Pactrust ("FPB").  In
24 2010, defendant Steven Sugarman ("Sugarman"), COR's owner and managing
25 member, joined FPB's Board of Directors ("Board"), and in 2012 became Chief
26 Executive Officer ("CEO") of FPB.  In July 2013, FPB renamed itself Banc of
27 California touting itself as a "community reinvestment" lender.  Under Sugarman's

28

1  direction, Banc grew from less than $1.5 billion in assets to more than $10 billion in
2  assets in 2016.

3      4.    Throughout the Class Period, defendants violated the federal securities
4  laws by making materially false and misleading statements and omissions to the
5  investing public.  In particular, during the Class Period, defendants: (1) omitted
6  material information from their public statements about numerous connections CEO
7  Sugarman and other top Banc executives and directors had with convicted securities
8  fraudster Jason Galanis ("Galanis"); (2) misled investors about the independence of
9  Banc's "disinterested directors" in its SEC filings in connection with their approval of
10  related-party transactions that put millions in the pockets of Sugarman and his family;
11  and (3) failed to disclose that Banc's management was in the midst of an internal
12  investigation into the Company's ties with Galanis.  These materially misleading
13  omissions caused Banc's stock to trade at artificially inflated prices during the Class
14  Period, reaching a high of $23.12 per share on August 8, 2016.

15      5.    On October 18, 2016, the truth about connections between Banc insiders
16  and a convicted fraudster began to be revealed when a *SeekingAlpha.com* contributor
17  published an article entitled, "*BANC: Extensive Ties to Notorious Fraudster Jason*
18  *Galanis Make Shares Un-Investible*."  The article laid out an intricate web of ties
19  between Galanis, convicted of running multi-million dollar securities fraud Ponzi
20  schemes, and Banc's senior most officers and directors, including CEO Sugarman.  It
21  further identified Galanis as having a "long history of secretly gaining control of
22  banks and public companies via front men, looting assets, and leaving unsuspecting
23  investors and taxpayers with hundreds of millions in losses."

24      6.    The *SeekingAlpha* article, based on extensive research of public records,
25  concluded that: (1) Galanis, through a network of related corporations and limited
26  liability companies, had indisputable ties to Sugarman, COR and other Banc insiders;
27  (2) an off-balance sheet lender controlled by Sugarman and other Banc senior
28  executives was used as a means to finance Galanis amidst his fraudulent schemes and

1    transfer fraudulently obtained assets; and (3) Banc's Lead Independent Director, Chad

2    Brownstein ("Brownstein") had material financial ties to Sugarman and COR, which

3    raised concerns about Brownstein's independence as a Banc director with regard to his

4    approval of related-party transactions that financially benefitted Sugarman and his

5    family.[1]

6         7.    In response to the *SeekingAlpha* article, Banc's stock price plummeted

7    29%, from a close of $15.87 on October 17, 2016 to a close of $11.26 per share on

8    October 18, 2016, on a volume of 17.2 million shares.

9         8.    On October 18, 2016, after market close, Banc publicly addressed the

10   *SeekingAlpha* article, admitting it had been aware of the allegations concerning

11   Galanis's ties to Banc and its executives *for more than a year* and that Banc's Board,

12   acting through "disinterested directors," had already conducted an "independent"

13   investigation into the matter.  While Banc publicly touted that its investigation failed

14   to uncover any ties between Galanis and the Company or Sugarman, defendants knew,

15   but failed to disclose, that the investigation was anything but independent; in truth, it

16   was being directed by management who had a stake in the investigation's outcome

17   and a law firm (Winston & Strawn LLP) who was personal counsel for both Sugarman

18   and Banc.

19        9.    Fallout from the revelations in the *SeekingAlpha* article began

20   immediately.  On October 24, 2016, one of Banc's largest shareholders sent a letter to

21   Sugarman chastising him for failing to heed previous warnings about Banc's

22   "corporate governance weaknesses" and "questionable related-party transactions [that]

23   were placing [Banc] and its shareholders at risk."  The letter also demanded that Banc

24   replace Winston & Strawn LLP with an independent law firm to conduct the

25   investigation into ties with Galanis.

---

26   [1]   Following publication of the *SeekingAlpha* article, and in response to Banc's denial
     of the allegations, the article's author created a website where all of the author's
27   research was downloaded.  The website is www.bancexposed.com and includes links
     to hundreds of pages of documents that support the author's conclusions.
28

- 3 -

1        10.    On January 23, 2017, more bad news was publicly disclosed.  Banc
2   announced that its response to the *SeekingAlpha* article triggered an SEC investigation
3   and publicly admitted it misled investors about the nature of its "independent"
4   investigation into the ties with Galanis.  Banc admitted its investigation was not
5   directed by disinterested board members as originally represented, but rather by
6   Company "management."  Banc also announced it hired WilmerHale to replace
7   Winston & Strawn due to conflicts of interest.  While Banc disclosed WilmerHale's
8   preliminary findings in the press release, stating that its inquiry had not found any
9   evidence that Galanis had any direct or indirect control over Banc, tellingly, ***Banc did***
10  ***not confirm management's previous conclusion that there were no ties between***
11  ***Galanis and Sugarman and/or other Banc executives or directors***.  Sugarman's
12  resignation was announced the same day.  And just two weeks later, Brownstein
13  stepped down as Banc director.

14       11.    On this news, Banc shares fell $1.50 per share, or nearly 10%, to close on
15  January 23, 2017 at $14.65 per share.

16       12.    Shortly after the Class Period, Banc publicly admitted that during the
17  Class Period, it had a material weakness in its internal controls over financial
18  reporting stemming from an inadequate "tone at the top," rendering Banc's disclosure
19  controls and procedures ineffective.  The Company announced an extensive
20  remediation plan, including approval of a new policy to tighten controls on the outside
21  business activities of Banc's executives and board members, such as those engaged in
22  by Sugarman, and a new policy to "add rigor" to the review of related-party
23  transactions.  Banc also disclosed that the CEO and Chairman positions previously
24  held by Sugarman were being separated, that Brownstein's former role as lead
25  independent director was being eliminated and that the Compensation, Nominating
26  and Corporate Governance Committee ("CNCG Committee"), which Brownstein
27  chaired, was being separated into two separate committees.

28

13.    As a result of defendants' material omissions, which made their public statements materially false and/or misleading during the Class Period, Banc's common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the Company's share price down and causing economic harm and damages to members of the Class.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

16.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Banc maintains its headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## THE PARTIES

18.    Iron Workers purchased Banc common stock during the Class Period as set forth in its previously filed certification (Dkt. No. 18-2) and was damaged thereby. On May 1, 2017, this Court appointed Iron Workers to serve as Lead Plaintiff.  Dkt. No. 39.

19.    Defendant Banc is a financial holding company organized under the laws of the United States with its principal executive offices located in Santa Ana,

- 5 -

1   California.  The Company's stock is traded under the ticker "BANC" on the NYSE, an

2   efficient market.

3         20.     Defendant Sugarman was, at all relevant times, President, CEO and

4   Chairman of the Board of Banc, before his departure in January 2017.  Before and

5   during the Class Period, Sugarman owned and controlled COR, the entity that led the

6   2010 recapitalization of Banc.  Before and during the Class Period, Sugarman also

7   owned and/or controlled COR Securities Holdings, Inc. ("COR Securities"), its

8   subsidiary COR Clearing LLC ("COR Clearing") and COR Advisors LLC ("COR

9   Advisors").[2]  In 2006, Sugarman co-authored a book called *The Forewarned Investor:*

10  *Don't Get Fooled Again By Corporate Fraud*, in which Sugarman detailed common

11  red flags for financial fraud.

12        21.     Defendant James J. McKinney ("McKinney") joined Banc in July 2015

13  as Chief Accounting Officer ("CAO") and was named Banc's Chief Financial Officer

14  ("CFO") in November 2015.  After less than a year as CFO, Banc announced

15  McKinney's resignation on September 20, 2016.  During the Class Period, McKinney

16  as CAO and CFO reviewed, approved and signed Banc's SEC Form 10-Q and 10-K

17  filings, which contained false and misleading statements and omissions.

18        22.     The defendants referenced above in ¶¶20-21 are collectively referred to

19  herein as the "Individual Defendants."  During the Class Period, the Individual

20  Defendants omitted material information from investors that made their public

21  statements false and misleading causing the prices of Banc common stock to be

22  artificially inflated during the Class Period.

23        23.     The Individual Defendants, because of their positions with Banc,

24  possessed the power and authority to control the contents of Banc's quarterly reports,

25  press releases and presentations to securities analysts, money and portfolio managers

26  and institutional investors, *i.e.*, the market.  They were provided with copies of Banc's

27

28  [2]   "COR" will also refer to COR Securities, COR Clearing and COR Advisors.

1   reports and press releases alleged herein to be misleading prior to or shortly after their

2   issuance and had the ability and opportunity to prevent their issuance or cause them to

3   be corrected.  Because of their positions with Banc, and their access to material non-

4   public information available to them but not to the public, the Individual Defendants

5   knew that the adverse facts specified herein had not been disclosed to and were being

6   concealed from the public and that the positive representations being made were then

7   materially false and misleading.  The Individual Defendants are liable for the false and

8   misleading statements pleaded herein.

9                           **SUBSTANTIVE ALLEGATIONS**

10   **Sugarman Was the Face of Banc of California**

11         24.    Banc of California was the brainchild of longtime associates Brownstein

12   and Sugarman.  In 2010, Brownstein and Sugarman led a $60 million recapitalization

13   of Banc's predecessor, FPB, with Sugarman's COR as the lead investor.

14         25.    In 2010, Sugarman became a FPB board member and, in 2012, became

15   CEO.  At 38, and with no experience ever running a bank, Sugarman was the youngest

16   CEO of a bank with a market value exceeding $500 million.  Brownstein was brought

17   in as a non-executive, independent director in 2011.  In July 2013, under Sugarman's

18   direction, FPB re-launched itself as Banc of California.

19         26.    Since 2010, Banc's growth has been staggering, with assets growing

20   from $1 billion in 2010 to over $10 billion during the Class Period.   Under

21   Sugarman's direction, Banc's growth was fueled by acquisitions, many of which were

22   related-party transactions, and loan growth.  From Banc's start, Sugarman sought to

23   raise Banc's profile by promoting it as "California's bank" and trying to establish its

24   reputation as a community leader around the state.  Banc, through Sugarman's

25   relentless promotional efforts, created a "community" friendly reputation by

26   cultivating relationships with politicians and celebrities in order to project an air of

27   success and credibility as "California's bank."

28

- 7 -

27.     For example, inside Banc's 2015 Annual Report to shareholders, entitled "California Strong," Sugarman was pictured with former President Bill Clinton and former Los Angeles Mayor Antonio Villaraigosa, and Sugarman's face was also featured on a billboard entitled "California Strong."  There were also images of former Los Angeles Dodgers and Hall of Fame Sports Broadcaster Vin Scully and of famed chef and restauranteur, Wolfgang Puck.  Investors increasingly adopted Sugarman's promotional narratives and Banc's shares doubled during his tenure.

28.     During the Class Period, Sugarman publicly and repeatedly stressed to investors the importance of talented personnel and management to achieve financial growth and success, proudly emphasizing that "[t]he quality of our value proposition and our success is founded in the quality of our people."  That the public perception and reputation of Banc's top executives and overall leadership was a consistent point of emphasis in Sugarman's public statements to investors and the market at large should come as no surprise since Sugarman himself wrote in his 2006 book that "[t]he question of who's in charge is . . . an important one to ask when considering an investment, because many investors will be surprised to find that not all CEOs are exactly who they say they are."

**Banc Insiders Had Undisclosed Ties to Securities Fraudster**
**Jason Galanis Through COR, Camden and Prospect Global**

29.     "Any CEO with a questionable past should raise immediate alarm bells among investors, who should demand increased safeguards for any future activities if they are to stay with the company."  Brett S. Messing and Steven A. Sugarman, *The Forewarned Investor: Don't Get Fooled Again by Corporate Fraud* (2006) ("Messing & Sugarman").

30.     During the Class Period, defendants knew but failed to disclose numerous ties between Galanis and Banc's CEO Sugarman, Lead Independent Director Brownstein and Executive Vice President and Vice Chair Jeffrey Seabold ("Seabold").  From 2011 through the Class Period, Sugarman owned COR, the entity

that led the 2010 recapitalization of Banc predecessor, FPB.  According to research conducted by the *SeekingAlpha* article's author, before and during the Class Period, COR was part of a group of companies and investment-related entities controlled by Galanis, a known securities fraudster.

31.  Although investors were unaware of Galanis's ties to Banc and its top leadership, Galanis's white collar criminal activities were no secret.  On September 24, 2015, prior to the start of the Class Period, the United States Department of Justice ("DOJ") and the SEC charged Galanis with orchestrating multiple schemes to defraud investors of millions of dollars.  From 2009 to 2011, Galanis, along with six others, engaged in a scheme to defraud the shareholders of a publicly-traded company called Gerova Financial Group, Ltd. ("Gerova") by obtaining secret control over millions of shares of Gerova stock and then manipulating the market for the stock as the defendants caused their secretly held shares to be sold. As part of the scheme, Galanis fraudulently generated demand for Gerova stock by bribing investment advisers to purchase for client accounts the Gerova stock that was sold by Galanis and others, thereby enabling Galanis to cash out from the scheme and make millions in illegal profits.  Galanis pled guilty to these charges in July 2016 and was sentenced to a six-year prison term in February 2017.

32.  In May 2016, while out on bail for the Gerova fraud, the DOJ and SEC again criminally and civilly charged Galanis with securities fraud, this time in connection with orchestrating a Ponzi scheme to defraud investors and a Native American tribal entity of tens of millions of dollars ("Tribal Bond Scheme").  A former director of Sugarman's COR Securities, Hugh Dunkerly ("Dunkerly"), was also charged with securities fraud in connection with the Tribal Bond Scheme. Between 2014 and 2016, Galanis, Dunkerly and other co-conspirators induced a Native American tribal entity to issue bonds based on lies about how the bond proceeds would be invested.  Galanis and the others pocketed the bond proceeds to pay for their own personal expenses, homes, cars, travel, and jewelry.  Galanis also

- 9 -

1   allegedly defrauded unwitting investors into buying the bonds by hiding material facts

2   about them, including their lack of liquidity.  Galanis pled guilty to the Tribal Bond

3   Scheme in January 2017.

4           33.    As disclosed in the *SeekingAlpha* article, Sugarman's COR and Galanis

5   controlled the same offshore insurance company, Valor Group ("Valor"), a Bermuda-

6   based insurance holding company.  Valor and its subsidiaries were central to the

7   Tribal Bond Scheme and were controlled by Galanis to carry out the fraud.  According

8   to the SEC, Galanis controlled Valor and its subsidiaries to finance the purchase of

9   investment managers, who in turn purchased the Tribal Bonds on behalf of their

10  clients.  Sugarman's brother, Jason Sugarman, who was also a consultant with one of

11  Banc's subsidiaries, was chairman and CEO of Valor during the Tribal Bond Scheme.

12  Dunkerly, a former COR director, incorporated Valor while still at COR, and served

13  as President of Valor while still at COR.

14          34.    As disclosed in the *SeekingAlpha* article, and confirmed by public

15  records, Valor's subsidiary Wealth-Assurance, who also played a role in the Tribal

16  Bond Scheme, was part of COR.  Wealth-Assurance's website confirms that in 2014 it

17  was "majority-owned by the strong US financial group COR Capital."  Burnham

18  Securities, who acted as the placement agent in the Tribal Bond Scheme, was also part

19  of COR and, according to documents obtained by the SEC, operated out of the same

20  building as Banc's corporate headquarters during the fraud.

21          35.    In addition to his control over Valor, as disclosed in the *SeekingAlpha*

22  article, documents obtained by the SEC in their investigation of the Tribal Bond

23  Scheme, show that Galanis used COR to demonstrate his financial backing to acquire

24  the investment firms used to perpetrate the fraud.  A June 2014 email from Galanis to

25  a co-conspirator attached a document titled "Introduction to COR Capital," which

26  Galanis used to demonstrate his financial backing for acquisition of the investment

27  firms.    During the Tribal Bond Scheme, Galanis also represented to his co-

28

- 10 -

1  conspirators that he controlled companies associated with COR, including COR itself.

2  According to the SEC, Galanis installed officers at COR to conceal his control.

3      36.    Before and during the Class Period, Sugarman also held a majority

4  interest in an entity named JAS Partners 1, LLC ("JAS Partners").  JAS Partners,

5  along with Banc's Vice-President Seabold, controlled Camden Capital Partners, LLC

6  and its off-balance sheet lender Camden Real Estate Opportunity Fund I (collectively

7  "Camden").  According to the *SeekingAlpha* article, and based on public records, in

8  2014 and 2015, Camden was used to finance Galanis amidst the Tribal Bond Scheme

9  and was utilized for transactions with Galanis during the Gerova securities fraud.

10      37.    The research conducted by the *SeekingAlpha* article also revealed ties

11  between Galanis and Banc's Lead Independent Director Brownstein.  In 2011, a

12  private investment firm run by Brownstein was a major investor in Prospect Global

13  Resources Inc. ("Prospect Global") and Brownstein served as Vice Chair of the

14  company.  According to the SEC complaint in the Gerova fraud, Galanis transferred

15  proceeds he fraudulently obtained from Gerova to Prospect Global, which the SEC

16  identified as a company Galanis controlled.  As disclosed in the *SeekingAlpha* article,

17  Brownstein, through his investment company, along with Galanis's wife, were

18  shareholders of Prospect Global's 2011 reverse merger entity.

19      38.    By the start of the Class Period, defendants were aware of the above-

20  alleged ties between Galanis and Sugarman, Brownstein and Seabold.  In 2015,

21  Banc's management became aware of and initiated an internal investigation into

22  Galanis's control over COR.  Not only were defendants aware of Galanis's lengthy

23  history of white collar financial crime, including indictments for taking control of

24  Gerova and defrauding shareholders, they were also aware that Galanis was using

25  Banc's name in connection with the Tribal Bond Scheme and was controlling COR to

26  run that scheme out of the same building as Banc's headquarters.  Although

27  defendants knew of Galanis's ties to Sugarman, Brownstein and Seabold, and

28  Galanis's control of COR, they were motivated to conceal these facts from investors,

- 11 -

as well as Banc's internal investigation, because of the impact such material information would have on Banc's integrity and reputation, including the reputation Sugarman had built for Banc as a community leader.

**Brownstein's Director Independence Was Impaired Due to His Material Financial Relationships with Sugarman**

> Surrounding themselves with lackeys and "yes-men" is common behavior among rogues: without a strong board to veto dubious business, a CEO can act however he pleases.  A board stacked with cronies not only gives a potentially crooked CEO free rein, it also can create conflicts of interest, which increases the likelihood of misconduct by creating competing loyalties.  Watch for directors who are also service-providers, for family members in key executive positions, and for former employees who now serve on the board.  Disclosure does not cleanse the problems associated with conflicts of interest.  It simply alerts investors that there may be trouble down the road.

Messing & Sugarman, *Don't Get Fooled Again by Corporate Fraud*.

39.     Beginning in 2012, long-time associates, Brownstein, who served as Banc's Lead Independent Director and Chairman of the CNCG Committee, and Sugarman were Banc's top leadership.

40.     As Chairman of the CNCG Committee, Brownstein was responsible for determining executive compensation, including Sugarman's as CEO, and reviewing and approving related-party transactions, including several transactions that personally benefitted Sugarman and his family.

41.     One of the deals approved by Brownstein as chair of the CNCG Committee was Banc's 2013 acquisition of an asset management firm, the Palisades Group ("Palisades"), which leased space from COR and had months before the acquisition, signed a five-year $600,000 consulting contract with Sugarman's brother, Jason Sugarman.  As part of the Palisades acquisition, Brownstein also approved

1266459_1

1   reimbursement of over $90,000 in lease payments to COR for Palisades' occupancy of

2   the office space leased by COR.

3        42.   Another related-party transaction approved by Brownstein was Banc's

4   2013 acquisition of CS Financial, which was owned by Seabold and Sugarman's

5   family: his brother Jason, sister-in-law Elizabeth and father Michael.  Banc acquired

6   CS Financial for $10 million.  Over half the proceeds from the sale (in the form of

7   Banc stock) went to Sugarman's family and a portion of the proceeds were used to

8   repay a debt owed by CS Financial to Sugarman's sister-in-law.

9        43.   As Lead Independent Director and Chairman of the CNCG Committee,

10   Brownstein was subject to the NYSE director independence standards for listed

11   companies.  Under the NYSE listing standards, Brownstein could only be considered

12   independent if he had no material relationship with Banc or Banc's management.

13   However, before and during the Class Period, Brownstein's director independence

14   was impaired because of material financial relationships he had with Sugarman and

15   COR.

16        44.   According to the *SeekingAlpha* article, and based on public records,

17   Brownstein received loans from Camden, an entity owned and controlled by

18   Sugarman and Seabold.  The research of public records conducted by the

19   *SeekingAlpha* author, shows that in 2013 Brownstein received an undisclosed loan via

20   Camden, secured by Brownstein's Los Angeles mansion.

21        45.   Brownstein also had undisclosed financial ties to Sugarman through

22   Prospect Global.  Following Prospect Global's reverse merger in 2011, COR engaged

23   in a variety of complex transactions with Prospect, with COR owning 9% of Prospect

24   Global.  In a 2011 agreement signed by Sugarman, COR was awarded additional

25   shares in exchange for becoming Prospect Global's investor relations consultant.

26        46.   Defendants knew but failed to disclose that because of Brownstein's

27   financial ties with Sugarman, he did not meet the NYSE listing standards for director

28

- 13 -

independence when the related-party transactions concerning Palisades and CS Financial were reviewed and approved by the CNCG Committee and the Board.

**During the Class Period Banc's Top Management Lacked Any Regard for the Company's Internal Controls**

> The latest brick in the wall of agencies and legislation that's meant to hold back boardroom thieves is the Sarbanes-Oxley Act of 2002. Passed in the wake of the scandals at Enron, WorldCom, and other high-flying companies of the late 1990s, Sarbanes-Oxley is designed to compel more corporate accountability from top executives at publicly traded companies. Among other things, it requires chief executives to personally sign off on a company's financial statements, making it harder for them to dodge responsibility and pass the buck, as it were, to their subordinates.

Messing & Sugarman, *Don't Get Fooled Again by Corporate Fraud*.

47. During the Class Period, Banc's management was able to conceal from investors the ties between Sugarman and Galanis and Brownstein's lack of independence due to Banc's admittedly materially deficient internal controls. On March 1, 2017, in the late-filed 3Q16 10-Q and the FY16 10-K, Banc acknowledged "material weaknesses" in its internal controls over financial reporting. As Banc admitted:

(a) an inadequate "tone at the top" regarding the importance of internal controls over financial reporting gave rise to a material weakness in Banc's control environment;

(b) Banc's "tone at the top" did not appropriately prioritize its internal controls over financial reporting; and

(c) ineffective "tone at the top" impacted a number of processes resulting in an ineffective risk assessment process, ineffective monitoring activities

- 14 -

1  and insufficient resources or support which caused the Company to experience an
2  increase in the number of control deficiencies across multiple processes.

3      48.   Banc's lack of controls permitted defendants to conceal during the Class
4  Period the truth about the ties between Galanis and the Company's most senior
5  executives and directors, which included its CEO and Lead Independent Director.
6  Banc subsequently took the following remedial actions to correct its material
7  weaknesses in its internal controls:

8          (a)   separated Sugarman's positions of Chairman of the Board and
9  CEO into two positions following his termination;

10         (b)   created an "Office of the CEO/President" following Sugarman's
11  termination to improve "tone at the top" and place a renewed emphasis on compliance
12  and control;

13         (c)   eliminated the lead independent director and vice chair role
14  previously held by Brownstein;

15         (d)   enhanced the efficiency and transparency of Banc's Board
16  committees by eliminating the Executive Committee and separating the CNCG
17  Committee into two separate committees one focused on compensation and the other
18  focused on corporate governance;

19         (e)   implemented a new policy to tighten controls on outside business
20  activities, such as those engaged by Sugarman, including limiting outside business
21  activities by officers and employees and requiring non-employee directors to avoid
22  outside business activities which would create a conflict of interest or appearance of
23  such; and

24         (f)   implemented a policy to limit related-party transactions and require
25  a more rigorous review prior to any approval.

26      49.   Banc's lack of internal controls and inadequate "tone at the top" during
27  the Class Period is also confirmed by Banc's admission that it misled investors in its
28  October 18, 2016 press release concerning its purported "independent" investigation

- 15 -

into the *SeekingAlpha* article allegations.  In truth, the purported "independent" investigation amounted to nothing more than a ruse because it was directed by Banc's management, who was implicated in the article, and a law firm that had conflicts of interest because it was personal attorney for both Banc and Sugarman.

50.  During the Class Period, defendants made false and misleading statements and material omissions in their earnings press releases and conference calls, Banc's 2015 Annual Report to Shareholders, Banc's SEC filings, including its 10-Qs, 10-Ks and April 16, 2016 Proxy Statement ("Proxy"), that artificially inflated the price of Banc common stock that Plaintiff and other members of the Class purchased.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**October and November 2015 Misleading Statements and Omissions**

51.  "In the new atmosphere of heightened scrutiny, you'd think that a rogue would have to be crazy to try to fool regulators or carry off an elaborate scam.  But as we've seen throughout this book, the hubris of the corporate fraudster knows no bounds."  Messing & Sugarman, *Don't Get Fooled Again by Corporate Fraud*.

52.  The Class Period begins on October 29, 2015, when Banc issued an earnings press release reporting its third quarter 2015 financial results.  In the press release Sugarman acknowledged that Banc's positive results for the third quarter were attributed to Banc's success in growing client relationships and reorganization of Banc's Board and management team.  Sugarman, Chairman and CEO, was quoted, stating:

> "The third quarter was highlighted by strong core deposit growth and accelerating loan originations in our commercial banking segment . . . .  We are especially pleased with the growth of noninterest bearing deposits during the quarter which reflect our team's success growing and deepening client relationships."

1        \*  \*  \*

2    "The third quarter results mark the sixth straight quarter since the

3 reorganization of our bank's Board of Directors and management team in

4 which the Company has executed consensus earnings estimates, and we

5 are on pace to exceed analysts' full year 2015 consensus earnings

6 estimates . . . ."

7   53.  On the same day, Banc held a conference call for analysts, media

8 representatives and investors. During the conference call Sugarman emphasized the

9 importance of building trust with Banc's shareholders, clients and the community, but

10 failed to disclose his ties to Galanis:

11    We at Banc of California are proud to have partnered with

12 California, its diverse businesses, entrepreneurs and homeowners to

13 support and benefit the state's bright economic future. Our goal is to

14 serve California, its thriving communities and great customers

15 effectively and consistently throughout the spectrum of market and

16 business cycles. We seek to empower our client streams. We're excited

17 by our prospects and our 1,600 employees work hard every day to

18 exceed our customer and ultimately our investor expectations.

19        \*  \*  \*

20    The strength and stability of earnings is even more impressive

21 given that over the past six quarters we have continued to invest in and

22 grow the Company from $4 billion in assets to $7.3 billion today. These

23 financial returns put us on track to deliver against our run rate targets of

24 1% return on assets and 15% return on tangible common equity by year-

25 end. We are laser focused on delivering on these commitments we have

26 made to our stakeholders. We believe one of the most important thing[s]

27 we can do is to do what we say we're going to do. This holds true not

28

- 17 -

1266459_1

1    only for our shareholders, but for our clients, communities and
2    employees as well.

3    54.    During the conference call, Sugarman also acknowledged Banc's
4    management as an essential component in Banc's success, stating: "As we look
5    forward to 2016, we remain aware that our results will reflect the talents and
6    commitments of our people.  To this end, we've been relentlessly pursuing top talent
7    to oversee our business at every level."  When responding to questions about the
8    Company's search for a new CFO, Sugarman stated:

9        I think that we have a very thoughtful and positive process. We've seen
10       very strong candidates both externally and internally and have been very
11       happy with our progress. What I think I'm most pleased about is in going
12       through the process, you get to really look at the talent and strength of
13       your team and think through needs and opportunities and what's really
14       kind of emerged is clarity on the real talented, experienced and strong
15       financial team we have that focuses on our capital markets activities, our
16       treasury activities, our accounting and our strategic planning and with
17       that, as I mentioned in my comment, we believe our transition is going to
18       be seamless. We don't see risks and we're proceeding apace and expect
19       to have an announcement for you in the near term.

20   55.    On November 6, 2015, Banc filed its 10-Q with the SEC, which
21   contained Banc's third quarter 2015 financial results ("3Q15 10-Q"). The 3Q15 10-Q
22   was signed by Sugarman and McKinney.  Under the "Related-Party Transactions"
23   section of this 10-Q, several "Transactions Involving Steven A. Sugarman" were
24   identified as approved and reviewed by Brownstein as an ostensibly independent
25   director, including "The Palisades Lease Payment Reimbursements," "The Palisades
26   Consulting Agreement" and the "CS Financial Acquisition."

27   56.    According to the 3Q15 10-Q, in 2013, Banc acquired Palisades, an asset
28   management firm, which leased space from COR and had months before the

- 18 -

1   acquisition signed a five-year $600,000 consulting contract with Sugarman's brother,

2   Jason Sugarman.  Brownstein as an ostensibly independent director approved the

3   acquisition and ratified the consulting agreement with Jason Sugarman.  Brownstein

4   also approved reimbursement of over $90,000 in lease payments to COR for the

5   Palisades' occupancy of office space leased by COR.

6       57.    The "Related-Party Transactions" section of the 3Q15 10-Q also

7   identified the CS Financial Acquisition as one of the "Transactions Involving

8   Steven A. Sugarman."  In 2013, Banc acquired CS Financial, which was owned by

9   Seabold and Sugarman's family, including his brother Jason and his wife Elizabeth,

10   and Sugarman's father Michael.  Banc acquired CS Financial for $10 million.  The CS

11   Financial transaction was approved by Brownstein in his capacity as an ostensibly

12   independent director.  Over half of the proceeds Banc paid for CS Financial (in the

13   form of Banc stock) went to Sugarman's family and a portion was used to repay a debt

14   owed by CS Financial to Sugarman's sister-in-law.

15       58.    The 3Q15 10-Q also incorporated risk factors identified in Banc's Annual

16   Report on Form 10-K for the year ended December 31, 2014 ("FY14 10-K"), which

17   included the following risk disclosure:

18       **Managing reputational risk is important to attracting and**

19       **maintaining customers, investors and employees**.

20           Threats to our reputation can come from many sources, including

21       adverse sentiment about financial institutions generally, unethical

22       practices, employee misconduct, failure to deliver minimum standards of

23       service or quality, compliance deficiencies and questionable or

24       fraudulent activities of our customers.  We have policies and procedures

25       in place to promote ethical conduct and protect our reputation.  However,

26       these policies and procedures may not be fully effective.  Negative

27       publicity regarding our business, employees, or customers, with or

28       without merit, may result in the loss of customers, investors and

1   employees, costly litigation, a decline in revenues and increased
2   governmental oversight.

3       59.    The statements made on October 29, 2015 and in Banc's 3Q15 10-Q, as
4   set forth in ¶¶52-58, were materially false and/or misleading when made because
5   defendants knew or recklessly disregarded, and failed to disclose, the following:

6       (a)    By October 29, 2015, defendants knew, or were reckless in not
7   knowing, that Galanis had been charged with criminal and civil securities fraud and
8   Banc was undertaking an internal investigation into ties between Galanis and Banc
9   insiders.  When the statements in ¶¶52-58 were made, defendants were aware, or
10  recklessly disregarded, that Sugarman, Seabold and Brownstein all had ties to Galanis
11  and that Galanis was using COR to perpetrate the Tribal Bond Scheme.  Defendants
12  also knew, or recklessly disregarded, that Camden, which was owned and/or
13  controlled by Sugarman and Seabold, was used to finance Galanis amidst the Tribal
14  Bond Scheme and engaged in transactions with Galanis during the Gerova Fraud.
15  Defendants knew or recklessly disregarded that these facts would adversely affect
16  Banc's reputation and concealment of the facts was placing shareholders at risk;

17      (b)    With regard to the "Related-Party Transactions" section of the
18  3Q15 10-Q, defendants knew, or recklessly disregarded and failed to disclose, that
19  Brownstein, who was responsible for reviewing and approving Banc's related-party
20  transactions, was not independent.  Defendants knew, but failed to disclose, that
21  because of Brownstein's material financial ties with Sugarman, he did not meet the
22  NYSE Corporate Governance Listing Standards for director independence when the
23  related-party transactions concerning Palisades and CS Financial were reviewed and
24  approved by the CNCG Committee and Board; and

25      (c)    Banc's "tone at the top," for which Sugarman as Banc's CEO had
26  ultimate ownership responsibility, was not one that emphasized best business practices
27  or honest and complete disclosures.  Banc's admitted material weaknesses in Banc's

28

1266459_1

1  internal controls meant that defendants were able to conceal Sugarman, Brownstein

2  and Seabold's relationships with Galanis.

3  **December 2015 Misleading Statements and Omissions**

4      60.    On December 31, 2015, Banc issued its 2015 Annual Report to

5  shareholders.  In a letter to shareholders, Sugarman emphasized the Company's strong

6  leadership and a Company culture focused on "driving shareholder value."  In the

7  letter to shareholders Sugarman stated:

8              We Are California Strong.

9              Just over two years ago, the Board of Directors made difficult changes in

10             the leadership of the Company.  At the recommendation of our

11             independent Governance Committee comprised of Vice Chair Chad

12             Brownstein, Risk Committee Chair Jonah Schnel, and Community

13             Development Committee Chair Eric Holoman, the Board took decisive

14             action to restructure the Company's leadership team and governance for

15             the benefit of shareholders.  The Board not only replaced several

16             members of the executive team, but several members of the Board itself.

17             This strategic action marked a key turning point for Banc of

18             California, setting the foundation for the strong results we achieved in

19             2015.  That transaction also marked my appointment as Chairman,

20             President and Chief Executive Officer of our bank subsidiary.

21             Since this transition, we have built a culture focused on

22             empowering California and driving shareholder value. . . .

23                          *        *        *

24             We are successful at building businesses, in part, because our leadership

25             team is comprised of seasoned entrepreneurs with the experience of

26             starting and building their own businesses.

27                          *        *        *

28

- 21 -

In closing, I would like to thank our valued clients who have chosen Banc of California as their financial partner, our employees who dedicate themselves to delivering on our mission every day, our dedicated Board who works tirelessly on behalf of our stakeholders, our shareholders who have entrusted us to be stewards of their capital, and our communities which make California a great place to conduct business and grow California's Bank.

61.     The statements in ¶60 were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants were as described in ¶59.

**January and February 2016 Misleading Statements and Omissions**

62.     On January 28, 2016, Banc issued a press release announcing its fourth quarter and full year 2015 financial results.  In the press release Sugarman touted the quality of Banc's employees and boasted about Banc's No. 1 ranking for total shareholder return in 2015, stating in part:

"Banc of California finished 2015 with accelerating growth and profitability across our businesses," said Steven Sugarman, Chairman and Chief Executive Officer.  "Our return on tangible common equity over 15% and return on assets over 1% demonstrates the long-term earnings power of our franchise.  Combining these returns with our industry leading growth continues to yield significant value creation for shareholders.  Our strong results are a testament to the hard work and dedication of our talented employees, who as employee-shareholders take pride in the shared success in growing the long-term value of the franchise.  I am also particularly proud that Banc of California ranked #1 for total shareholder return in 2015 of all west coast banks included on Forbes Magazine's list of America's Top 100 banks."

- 22 -

1266459_1

1    63.    On the same day, Banc held a conference call for analysts, media

2  representatives and investors.  During the conference call Sugarman reiterated Banc's

3  ranking on *Forbes* Magazine list of America's Top 100 Banks and praised Banc's

4  independent directors for their performance stating:

5         These strong results [for 2015] led [to] the Banc of California

6         being recognized as one of America's Top 100 Banks by Forbes

7         Magazine this month.  On that list, we ranked number four in terms of

8         total shareholder return in 2015 and I'm proud to say that we were

9         number one amongst West Coast banks in terms of total shareholder

10        return.  These accomplishments are a result of the strategic investments

11        the Company has made over the last two plus years, since I took the

12        helm as CEO of our Bank during the fourth quarter of 2013.  I am

13        thankful to our strong and independent Board of Directors for providing

14        the Company the capital, the strategic oversight and the resources needed

15        to build California's top performing bank in terms of total return to

16        shareholders in 2015.

17       64.    On February 18, 2016, Banc filed its Annual Report on Form 10-K with

18  the SEC which contained Banc's 2015 year-end financial results ("2015 10-K").  The

19  2015 10-K was signed by Sugarman and McKinney.  Under "Risk Factors," Banc's

20  2015 10-K contained a risk disclosure titled, "Managing reputational risk is important

21  to attracting and maintaining customers, investors and employees," which was

22  identical to the one incorporated into its 3Q15 10-Q as set forth in ¶58.

23       65.    The "Related-Party Transaction" section of the 2015 10-K contained the

24  identical statements concerning related-party "Transactions Involving Steven A.

25  Sugarman," which are set forth in ¶¶55-57.

26       66.    The statements in ¶¶62-65 were materially false and materially

27  misleading when made.  The true facts which were then known to or recklessly

28  disregarded by defendants were as described in ¶59.

- 23 -

1266459_1

**April 15, 2016 Misleading Statements and Omissions in Banc's Proxy Statement**

67.   On April 15, 2016, Banc filed its Proxy with the SEC, which was signed by Sugarman.  Banc was using the Proxy to solicit proxies from shareholders for use at Banc's annual meeting.  Among the items up for vote at the meeting was the re-election of Sugarman as Banc director.

68.   The Proxy contained a materially false and misleading biography of Sugarman.  Sugarman's biography touted his involvement with COR but failed to disclose the ties Sugarman and those companies had to Galanis.  The Proxy states in relevant part:

> Mr. Sugarman is the Chair, President and Chief Executive Officer of the Company.  Mr. Sugarman has served as a director of the Company and the Bank since November 2010, Chief Executive Officer of the Company since September 2012 (and for a month prior, acted as co-Chief Executive Officer of the Company) and President of the Company and President and Chief Executive Officer of the Bank since November 2013.  Mr. Sugarman continues as the Chief Executive Officer and director of COR Securities Holdings Inc., the parent company of COR Clearing LLC (of which he is Chair of the Board), a national securities clearing firm, and remains the Managing Member of COR Capital LLC, a Southern California-based firm that was a lead investor in the November 2010 recapitalization of the Company.  Prior to that, Mr. Sugarman was a founding partner of GPS Partners LLC, a $2 billion investment firm.  Previously, Mr. Sugarman worked at Lehman Brothers; founded and serves as Chief Executive Officer of Sugarman Enterprises, Inc.; and founded The Law Offices of Steven Sugarman, Inc. Mr. Sugarman began his career as a management consultant at

- 24 -

1266459_1

1 McKinsey & Company and is a graduate of the Yale Law School and
2 Dartmouth College.

3                              *        *        *

4       Mr. Sugarman's experience in running the day-to-day operations
5 of the Bank and in capital markets and investment matters makes him a
6 valued member of the Board.

7       69.    The Proxy also contained a materially false and misleading biography of
8 Brownstein. Brownstein's biography touted his involvement with Prospect Global but
9 failed to disclose his ties to Galanis through that company and failed to disclose his
10 material financial relationship with Sugarman, which impaired his independence as
11 Lead Independent Director.

12      70.    The "Corporate Governance Matters" section of the Proxy stated the
13 following with regard to the purported independence of the Board's directors:

14      In accordance with the NYSE Corporate Governance Listing
15      Standards and the Company's Corporate Governance Guidelines, the
16      Board conducted an annual review of all relationships between the
17      Company and each Director and Director Nominee and has affirmatively
18      determined that, with the exception of Mr. Sugarman, who is a Company
19      employee, each non-employee director (Messrs. Benett, Brownstein,
20      Holoman, Karish, Schnel and Sznewajs) has only immaterial
21      relationships with the Company, and accordingly each has been
22      determined by the Board to be independent under these standards.

23      71.    The "Transactions With Related Persons" section of the Proxy contained
24 the identical statements concerning related-party "Transactions Involving Steven A.
25 Sugarman," which are set forth in ¶¶55-57.

26      72.    The statements made in the Proxy, set forth in ¶¶68-71, were materially
27 false and misleading because defendants knew, or recklessly disregarded, and failed to
28 disclose the following:

                              - 25 -

1266459_1

1    (a) Sugarman's biography failed to disclose that before and during the

2 Class Period, he had ties to Galanis and that as reported in the *SeekingAlpha* article,

3 Galanis was using COR and its related entities in his Tribal Bond Scheme.

4 Defendants also failed to disclose the ties Sugarman had with Galanis through

5 Camden and Prospect Global;

6    (b) Brownstein's biography failed to disclose his ties with Galanis

7 through Prospect Global and his material financial ties with Sugarman.  Sugarman and

8 Brownstein's material financial relationship and their involvement with Galanis, a

9 convicted securities law violator, bore directly on their honesty and integrity in

10 serving in their positions as Banc's top leadership, and defendants were aware that

11 such information was material to investors;

12    (c) Defendants knew, or recklessly disregarded, and failed to disclose

13 that Brownstein, who was responsible for reviewing and approving the related-party

14 transactions, was not independent as represented in the Proxy.  Defendants knew but

15 failed to disclose that because of Brownstein's material financial ties with Sugarman,

16 he did not meet the NYSE Corporate Governance Listing Standards for director

17 independence; and

18    (d) Banc's "tone at the top" for which Sugarman as Banc's CEO had

19 ultimate ownership responsibility, was not one that emphasized best business practices

20 or honest and complete disclosures.  Banc's admitted material weaknesses in Banc's

21 internal controls meant that defendants were able to conceal Sugarman's and

22 Brownstein's relationships with Galanis.

23 **April and May 2016 Misleading Statements and Omissions**

24    73. On April 21, 2016, Banc issued a press release announcing its first

25 quarter 2016 financial results.  The release stated in part:

26     "Based on total shareholder return since the beginning of 2015,

27    Banc of California is the #1 performing bank stock amongst Forbes'

28    Magazine's list of America's Top 100 Banks," said Steven Sugarman,

Chairman and Chief Executive Officer of Banc of California. "In the first quarter of 2016 alone, Banc of California's 21% return outperformed the next closest bank by 7%. As all our employees are shareholders, we are proud and excited by this accomplishment. The continued strength of our financial performance showcases our strategy, focus and execution quarter-over-quarter as we are winning market share and top talent. Banc of California is a business built for the long-term."

\*   \*   \*

"Banc of California has meaningfully deleveraged and simplified its balance sheet, increased its liquidity and streamlined its businesses and organizational structure during 2016," said James McKinney, Chief Financial Officer of Banc of California. "We expect these actions will not only make us a safer and stronger financial institution, but they will be accretive to the holders of our debt, preferred stock and common stock. These actions are part of our strategy to strengthen, and increase the durability of, our balance-sheet and liquidity in advance of our growth beyond $10 billion in assets. We will continue to seek opportunities to strengthen our franchise for the benefit of all our clients and other stakeholders."

74. On the same day, Banc held a conference call for analysts, media representatives and investors during which defendant Sugarman represented the following:

We believe we are in the midst of a secular realignment of top banking talent from which Banc of California is uniquely well positioned to take advantage of. The addition of talented individuals and teams such as these further validates that our value proposition is taking hold and driving increasing market share gains.

1266459_1

As California's bank, our value proposition differentiates itself from banks owned or managed out of state or out of country. California's diverse clients and most talented employees appear increasingly clear in their preference for California's bank.

\* \* \*

As always, we continue to ensure that our governance, corporate structure, policies, and strategic planning best positions us for success. This process has been a heightened focus, given our approaching $10 billion in assets. To that end, during 2016, we liquidated PTB Property Holdings LLC and announced the sale of the Palisades Group.

This leaves our bank as the only subsidiary of our holding company and simplifies our organizational structure and therefore simplifies regulatory considerations at the holding company level. Also, we have simplified our capital structure and delevered our balance sheet by paying off $42 million of SBLF and $85 million of senior debt.

75. On May 4, 2016, Banc filed its Quarterly Report on Form 10-Q with the SEC which contained Banc's first quarter 2016 financial results ("1Q16 10-Q"). The 1Q16 10-Q was signed by Sugarman and McKinney. The "Related-Party Transactions" section of the 1Q16 10-Q contained the identical statements concerning related-party "Transactions Involving Steven A. Sugarman," which are set forth in ¶¶55-57.

76. Under "Risk Factors," Banc's 1Q16 10-Q incorporated the risk disclosures from its 2015 10-K, including a risk disclosure titled, "Managing reputational risk is important to attracting and maintaining customers, investors and employees." *See* ¶58.

77. The statements in ¶¶73-77 were materially false and materially misleading when made. The true facts which were then known to or recklessly disregarded by defendants were as described in ¶59.

**July and August 2016 Misleading Statements and Omissions**

78.   On July 21, 2016, Banc issued a press release announcing its second quarter 2016 financial results.  The release stated in part:

> "Our strong second quarter performance is the direct result of our differentiated value proposition as California's Bank.  Based on total shareholder return since the beginning of 2015, Banc of California is the #1 performing bank stock amongst Forbes' Magazine's list of America's Top 100 Banks," said Steven Sugarman, Chairman and Chief Executive Officer of Banc of California.  "Banc of California's scale as a $10 billion bank is enabling the achievement of our long-term financial targets.  This includes a return on tangible common equity over 15% and a return on assets over 1%.  We are proud of these accomplishments. The consistent and strong financial performance showcases our strategy, focus and execution quarter-over-quarter.  We are winning market share and we are winning top talent.  Banc of California is a business built for the long-term."

79.   On the same day, Banc held a conference call for analysts, media representatives and investors during which defendant Sugarman represented the following:

> To all our investors who entrusted us with their capital over the past several years, our announcement is a sign that their confidence in us was not misplaced and that our strategy is on track.  I want to thank each of them again today for their confidence in the Banc of California vision.
>
> With the support of key investors and our Board of Directors, we have built what is now the only midsized bank focused on California. We have distinguished ourselves from peers based on our size and our California focus, and we are thrilled to be so well positioned to serve

what we believe is the most attractive banking market in the country, California.

80.     On August 4, 2016, Banc filed its Quarterly Report on Form 10-Q with the SEC which contained Banc's second quarter financial results ("2Q16 10-Q").  The 2Q16 10-Q was signed by Sugarman and McKinney.   The "Related-Party Transactions" section of the 2Q16 10-Q contained the identical statements concerning related-party "Transactions Involving Steven A. Sugarman, which are set forth in ¶¶55-57.

81.     Under "Risk Factors," Banc's 2Q16 10-Q incorporated the risk disclosures from its 2015 10-K, including a risk disclosure titled "Managing reputational risk is important to attracting and maintaining customers, investors and employees."  *See* ¶58.

82.     The statements in ¶¶78-81 were materially false and materially misleading when made. The true facts which were then known to or recklessly disregarded by defendants were as described in ¶59.

## THE TRUTH BEGINS TO EMERGE

83.     "The signs of fraud are often uncovered by a small number of people who have been watching a company closely.  When those people start to make their findings public, they may be the voice of the minority, but they may have important information to share.  Even if a stock is still on the rise, don't discount skeptics out of hand, especially if they're people with knowledge of the industry in question." Messing & Sugarman, above.

84.     On October 18, 2016, an article published by *SeekingAlpha* revealed the ties between Galanis and Banc insiders.  The article stated in part:

> ***Our research establishes that BANC's senior-most officers and board members have a broad mosaic of extensive and indisputable ties to Jason Galanis.   We believe this introduces a significant un-***

1  *discounted risk that notorious criminals gained control over the $10*
2  *billion taxpayer guaranteed Banc of California*.

3       Jason Galanis and his infamous father, John Galanis, have a ***long***
4  ***history of secretly gaining control of banks and public companies via***
5  ***front men***, looting assets, and leaving unsuspecting investors and
6  taxpayers with hundreds of millions in losses.  The mere presence of a
7  bank leadership team associated with Galanis should send diligent
8  investors running for the hills.

9       We see striking similarities between BANC and Gerova Financial,
10  a $1 Billion NYSE listed financial institution that collapsed on the
11  revelation of Galanis's secret control.  Like BANC, Gerova's executives
12  had significant ties to Galanis and touted their community reinvestment
13  efforts with politicians to establish credibility.  In the end, the promotion
14  was a diversion from a giant fraud that left investors with devastating
15  losses.

16       ***As a result, we believe Banc Of California is simply un-***
17  ***investible***.

18       A summary of key research conclusions we are releasing in this
19  report include:

20  •       **Jason Galanis Controlled COR, BANC's Founding**
21  **Shareholder**.  SEC documents detail how Galanis gained control of
22  COR portfolio companies to orchestrate the Tribal Bonds Ponzi Scheme.
23  Galanis laid claim to Banc of California to display his financial
24  wherewithal and even managed the scheme out of an office in the same
25  building as BANC's headquarters.

26  •       **An Off-Balance Sheet Lender Controlled By BANC's Senior-**
27  **Most Officers Financed Galanis**.   Steven Sugarman holds an
28  undisclosed interest in Camden Capital, an off-balance sheet lender

controlled by BANC's Vice Chairman, Jeffrey Seabold. Camden was used to finance Galanis amidst the recent Tribal Bond Scheme and engaged in transactions with Galanis during the Gerova Financial fraud.

• **BANC's Lead "Independent" Director Has Strong Ties To Galanis**. BANC's Lead "Independent" Director, Chad Brownstein, has strong ties to Jason Galanis, his indicted associates, and COR Capital. Mr. Brownstein also accepted an undisclosed loan from Camden that is secured by his Los Angeles Mansion but appears to finance his outside business ventures.

• **We See Similarities Between BANC And Galanis's Gerova Financial fraud**. In wrapping BANC in the flag of "community reinvestment," Steven Sugarman has recycled a nearly identical narrative to what Galanis propagated at Gerova Financial. Further parallels include a leadership team and founding shareholder with undisclosed ties to Galanis, a bevy of suspect related party transactions, and the use of opaque assets as regulatory capital.

(Emphasis in original.)

85. In response to the *SeekingAlpha* article, on October 18, 2016, Banc issued a press release in which Banc admitted it had been aware of allegations relating to Galanis for over a year and that Banc's Board, acting through its "disinterested directors," had already initiated a "thorough independent investigation" led by Winston & Strawn and had received regular reports from regulators over the past year concerning the matter.

86. In the October 18, 2016 press release, Banc also disclosed the results of the purported "independent" investigation, denying that Galanis had any control over it, or any entity owned or affiliated with Sugarman. Defendants, however, knew, but failed to disclose, the investigation was anything but independent because it was being

1266459_1

1  directed by management (who had a stake in the investigation's outcome) and
2  Winston & Strawn who had served as personal counsel for both Sugarman and Banc.

3        87.    On November 16, 2016, Banc issued a press release announcing a delay
4  in the filing of its 3Q16 10-Q with the SEC in order to allow the Company's Special
5  Committee to finish its investigation "into certain purported improper relationships
6  and related party transactions and related matters."

7        88.    Then on January 23, 2017, Banc announced more bad news.  In a press
8  release, Banc admitted it misled investors about the independence of its investigation
9  into the ties between Galanis and Banc insiders and had overstated the degree of
10  contact between Banc and regulators.  Banc disclosed that the SEC launched a formal
11  investigation against Banc.

12        89.    On January 23, 2017, Banc also announced it hired WilmerHale to
13  investigate the ties between Galanis and Banc insiders.  Although Banc disclosed
14  WilmerHale's preliminary findings in the press release, stating that its inquiry had not
15  found any evidence that Galanis had any direct or indirect control over Banc, Banc did
16  not confirm management's previous conclusion that there were no ties between
17  Galanis and Sugarman and/or other Banc executives or directors.  Sugarman's
18  "resignation" was announced the same day.  Two weeks later, Banc announced
19  Brownstein also stepped down as Banc director.

20        90.    As a result of the January 23, 2017 news, shares of Banc stock dropped
21  $1.50 per share, to close at $14.65 per share, a decline of 9% on volume of nearly 6.5
22  million shares.

23        91.    As a result of defendants' material misstatements and omissions, Banc
24  common stock traded at artificially inflated prices during the Class Period.  However,
25  after the above revelations seeped into the market, Banc's shares were hammered by
26  massive sales, sending the price of Banc's shares down and causing economic harm
27  and damages to Class members.

28

## POST CLASS PERIOD EVENTS AND ADMISSIONS

92.     On March 1, 2017, Banc released its delayed 3Q16 10-Q and 2016 10-K acknowledging that during the Class Period it had material weaknesses in its internal controls over financial reporting stemming from an inadequate "tone at the top," which rendered Banc's disclosure controls and procedures ineffective.  The 3Q16 10-Q stated:

> Based on this evaluation, management concluded that the disclosure controls and procedures were not effective as of September 30, 2016 due to a material weakness in the design and operating effectiveness of our internal control over financial reporting as it relates to our control environment. . . .   We determined that an inadequate tone at the top regarding the importance of internal control over financial reporting gave rise to the material weakness. . . .  This ineffective tone at the top adversely impacted a number of processes resulting in an ineffective risk assessment process, ineffective monitoring activities, and insufficient resources or support which caused the Company to experience an increase in the number of control deficiencies across multiple processes.

93.     The 3Q16 10-Q and 2016 10-K also identified the remedial actions Banc was taking to correct its material weaknesses in its internal controls:

(a)     separated Sugarman's positions of Chairman of the Board and CEO into two positions following his termination;

(b)     created an "Office of the CEO/President" following Sugarman's termination to improve "tone at the top" and place a renewed emphasis on compliance and control;

(c)     eliminated the lead independent director and vice chair role previously held by Brownstein;

- 34 -

1    (d)    enhanced the efficiency and transparency of Banc's Board
2 committees by eliminating the Executive Committee and separating the CNCG
3 Committees into two separate committees one focused on compensation and the other
4 focused on corporate governance;

5    (e)    implemented a new policy to tighten controls on outside business
6 activities, such as those engaged by Sugarman, including limiting outside business
7 activities by officers and employees and requiring non-employee directors to avoid
8 outside business activities which would create a conflict of interest or appearance of
9 such; and

10    (f)    implemented a policy to limit related-party transactions and require
11 a more rigorous review prior to any approval.

### ADDITIONAL SCIENTER ALLEGATIONS

13    94.    As alleged herein, defendants acted with scienter in that: (1) they knew,
14 or recklessly disregarded, that the public documents and statements issued or
15 disseminated on behalf of Banc (or in their own name) were materially false and
16 misleading; (2) they knew or recklessly disregarded that such statements or documents
17 would be issued or disseminated to the investing public; and (3) they knowingly and
18 substantially participated or acquiesced in the issuance or dissemination of such
19 statements or documents as primary violations of the federal securities laws.
20 Defendants, by virtue of their receipt of information reflecting the true facts regarding
21 Banc, their control over, and/or receipt and/or modification of Banc's allegedly
22 materially misleading misstatements, were active and culpable participants in the
23 fraudulent scheme alleged herein.

24    95.    Defendants knew or recklessly disregarded the false and misleading
25 nature of the information that they caused to be disseminated to the investing public
26 and their omissions of material facts.  The fraud alleged herein, and concealment of
27 material information from investors, could not have been perpetrated during the Class
28

- 35 -

1   Period without the knowledge and complicity or, at least, the reckless disregard of the

2   personnel at the highest levels of Banc, including the Individual Defendants.

3       96.     The fraud alleged herein relates to Sugarman's ties to Galanis through

4   entities and limited liability companies he controlled and owned, therefore, knowledge

5   of the fraud may be imputed to Sugarman individually and to Banc based on

6   Sugarman's position as CEO.

7       97.     Both Banc and Sugarman were motivated to hide the latter's connections

8   with Galanis from investors because, as Sugarman once wrote in his book on how to

9   spot corporate fraud, "the background of the person at the top can be one of the most

10  important factors in the health of a company" and therefore, "[a]ny CEO with a

11  questionable past should raise immediate alarm bells among investors."  Sugarman

12  also knew that "a close look at an executive's history can give a clue to potential

13  problems, no matter how aggressive a company's public relations clean-up job has

14  been."  Messing & Sugarman, above.

15      98.     Knowledge of the fraud alleged herein can also be imputed to defendants

16  based on their admission that before the Class Period, the Company had initiated an

17  investigation into the ties between Galanis, Banc and Banc's officers and directors.

18  Banc admitted that by 2015 it was aware of Galanis's indictment in the Gerova fraud

19  and of the same allegations as those raised in the *SeekingAlpha* article, which included

20  Galanis's ties to Banc and its executives and directors and Galanis's control of certain

21  entities in the COR Group of companies.  Banc also admitted that it began an internal

22  investigation into these matters when it became aware of them.

23      99.     A strong inference of scienter is supported by other admissions and facts

24  surrounding the circumstances of Banc's internal investigation into the ties with

25  Galanis, including that:

26      •    In their October 18 and 19, 2016 statements, defendants knowingly

27          misled investors about the independence of the internal investigation;

28

- 36 -

- As admitted by defendants, Banc's initial internal investigation was not independent as it was led by management who had a stake in the outcome and was directed by conflicted counsel who had a relationship with both Banc and Sugarman;

- Banc initially told investors that the results of the internal investigation failed to disclose any ownership interest by Galanis in Banc, and affirmatively confirmed that he exercised no direct or indirect control over Banc "or any entity owned or affiliated with Sugarman or any other member of the Board of Directors." In contrast, when Banc announced the results of the independent investigation led by WilmerHale, Banc stated that the inquiry did not find evidence that Galanis had any direct or indirect control or undue influence over Banc but did not confirm the previous finding that Galanis exercised no direct or indirect control over entities owned or affiliated with Sugarman or any other member of the Board of Directors.

- Although defendants knew of Galanis's alleged ties to Banc, and his alleged control of COR Group companies, defendants concealed these facts from investors, as well as the fact that Banc was conducting an internal investigation into these matters, during the Class Period.

100. Defendants also possessed substantial motive for concealing the internal investigation and Galanis's ties to Banc's executives and officer, in particular Sugarman, as they knew such information would be material to investors. Shortly after the start of the Class Period, defendants received a letter from one of Banc's largest shareholders, PL Capital, LLC, expressing concern about misleading statements contained in Sugarman's biography published on Banc's website and in Banc's publicly filed proxy statements. In a November 30, 2015 letter to Lead Independent Director Brownstein, PL Capital pointed out that while Sugarman's biography touted he was a founding partner of GPS Partners LLC ("GPS"), the

1  biography failed to disclose that GPS (and the co-author of Sugarman's book) was the

2  subject of a SEC Cease and Desist Order relating to securities law violations that

3  occurred while Sugarman was owner, partner, member and Chief Compliance Officer

4  of GPS.  Noting the materiality of the omitted information, the shareholder demanded

5  that such "material information . . . should be fully disclosed in the Company's SEC

6  filings and on the Company's website."[3]

7      101.   On May 20, 2016, PL Capital sent Sugarman a letter raising concerns

8  about his employment outside of Banc, including his position as CEO of COR

9  Securities.  The letter also raised concerns about Brownstein's independence as Lead

10  Independent Director and that too much control was vested in Brownstein as both

11  Lead Independent Director and Chair of the CNCG Committee.[4]

12      102.   On September 19, 2016, Banc announced the resignation of CFO

13  McKinney stating that McKinney was "resigning for personal reasons."  The next day,

14  *Bloomberg* reported that McKinney was hired by Kemper Corporation in Chicago to

15  be its CFO.  McKinney was CFO of Banc for less than a year and his resignation

16  followed the departure of six other key financial officers who had resigned since 2011.

17  As Sugarman once wrote in his book, such corporate turnover is a "danger sign if ever

18  there was one."

19      103.   On January 23, 2017, Banc simultaneously announced the preliminary

20  results of WilmerHale's inquiry into the ties between Galanis, Banc and Banc

21  executives and directors and that Sugarman was stepping down as Banc's CEO and

---

[3]   The November 30, 2015 letter can be found at https://www.sec.gov/Archives/ edgar/data/1169770/000089706915000537/cg646ex7.pdf.

[4]   The May 20, 2016 letter can be found at https://www.sec.gov /Archives/edgar/data/ 1169770/000089706916001029/cg801ex9.pdf.  Additionally, on May 29, 2017, Banc publicly announced that it was advised by Glass, Lewis & Co., LLC, a leading independent provider of corporate governance services, that another one of its purported independent directors, Halle J. Benett, was not independent during the Class Period based on Benett's previous employment with an investment banking firm that provided underwriter services in certain public offerings of Banc's securities.  This further demonstrates, that during the Class Period, Banc's ostensibly independent Board members were not independent as represented.

- 38 -

1266459_1

Chairman.  In the same press release.  Banc acknowledged that it misled investors as to the independence of the internal investigation and that the SEC had opened a formal investigation into Banc's misleading response to the *SeekingAlpha* article.

104.   On February 8, 2017, Banc announced the final results of the WilmerHale independent investigation and the next day announced that Brownstein was also stepping down as a Banc director.

105.   Banc also admitted that there were "material weaknesses" in the Company's internal controls over its financial reporting.  Banc admitted these weaknesses existed in 2016 and were the result of the aggregation of control deficiencies relating to Banc's "tone at the top," a term explained in the Committee of Sponsoring Organizations Framework for Internal Controls ("COSO Framework") that implicates the top-level of an organization's management, including the CEO and CFO – the roles Sugarman and McKinney occupied at Banc.[5]

106.   In an attempt at remediation of Banc's internal control weaknesses and failures, Banc began implementing a host of changes targeted at the weaknesses that led to the fraud alleged herein, including approval of a new policy to tighten controls

[5]   The COSO Framework was developed and published in 1992 by COSO of the former Treadway Commission.  The 1992 publication included a section entitled "Reporting to External Parties," and in 1997 COSO issued an addendum to this section.  The Framework was revised and reissued in 2013.  According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity.  The COSO Framework summarizes the control environment as follows:

> The control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization.  The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct.  Management reinforces expectations at the various levels of the organization.  The control environment comprises the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; the organizational structure and assignment of authority and responsibility; the process for attracting, developing, and retaining competent individuals; and the rigor around performance measures, incentives, and rewards to drive accountability for performance. The resulting control environment has a pervasive impact on the overall system of internal control.

1266459_1

on the outside business activities of Banc's executives and board members and a new policy to "add rigor" to the review of related-party transactions. Banc also disclosed that the CEO and Chairman positions previously held by Sugarman were being separated, that Brownstein's former role as lead independent director was being eliminated and that the CNCG Committee, which Brownstein chaired, was being separated into two separate committees.

107.    Taken collectively, the facts alleged herein support a strong inference of scienter.

## LOSS CAUSATION/ECONOMIC LOSS

108.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Banc common stock and operated as a fraud or deceit on Class Period purchasers of Banc common stock. When defendants' prior misrepresentations, omissions and fraudulent conduct began to be disclosed on October 18, 2016, the price of Banc common stock fell precipitously as the prior artificial inflation began to come out. As a result of their purchases of Banc common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

109.    Plaintiff and the class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

110.    Plaintiff will also rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- 40 -

1266459_1

1          (b)    The omissions and misrepresentations were material;

2          (c)    The Company's shares traded in an efficient market;

3          (d)    The misrepresentations alleged would tend to induce a reasonable

4   investor to misjudge the value of the Company's shares; and

5          (e)    Plaintiff and other members of the Class purchased Banc securities

6   between the time defendants misrepresented or failed to disclose material facts and the

7   time the true facts were disclosed, without knowledge of the misrepresented or

8   omitted facts.

9       111.   At all relevant times, the market for Banc stock was efficient for the

10   following reasons, among others:

11          (a)    Banc stock met the requirements for listing, and was listed and

12   actively traded on the NYSE, a highly efficient and automated market;

13          (b)    As a regulated issuer, Banc filed periodic public reports with the

14   SEC; and

15          (c)    Banc regularly communicated with public investors via established

16   market communication mechanisms, including through the regular dissemination of

17   press releases on the major news wire services and through other wide-ranging public

18   disclosures, such as communications with the financial press, securities analysts and

19   other similar reporting services.

20   **NO SAFE HARBOR**

21       112.   Many (if not all) of defendants' false and misleading statements during

22   the Class Period were not forward-looking statements ("FLS") and/or identified as

23   such by defendants, and thus did not fall within any "Safe Harbor."

24       113.   Banc's verbal "Safe Harbor" warnings accompanying its oral FLS issued

25   during the Class Period were ineffective to shield those statements from liability.

26       114.   Defendants are also liable for any false or misleading FLS pleaded

27   because, at the time each FLS was made, the speaker knew the FLS was false or

28   misleading and the FLS was authorized and/or approved by an executive officer of

- 41 -

1   Banc who knew that the FLS was false.  Further, none of the historic or present tense

2   statements made by defendants were assumptions underlying or relating to any plan,

3   projection or statement of future economic performance, as they were not stated to be

4   such assumptions underlying or relating to any projection or statement of future

5   economic performance when made.

6                          **CLASS ACTION ALLEGATIONS**

7          115.   Plaintiff brings this action as a class action pursuant to Rule 23 of the

8   Federal Rules of Civil Procedure on behalf of all persons who purchased Banc

9   publicly traded securities during the Class Period (the "Class").  Excluded from the

10  Class are defendants and their families, the officers and directors of the Company, at

11  all relevant times, members of their immediate families and their legal representatives,

12  heirs, successors or assigns, and any entity in which defendants have or had a

13  controlling interest.

14         116.   The members of the Class are so numerous that joinder of all members is

15  impracticable.  The Company's stock is actively traded on the NYSE and there are

16  49.5 million shares of Banc stock outstanding.  While the exact number of Class

17  members is unknown to Plaintiff at this time and can only be ascertained through

18  appropriate discovery, Plaintiff believes that there are hundreds of members in the

19  proposed Class.  Record owners and other members of the Class may be identified

20  from records maintained by Banc or its transfer agent and may be notified of the

21  pendency of this action by mail, using the form of notice similar to that customarily

22  used in securities class actions.

23         117.   Common questions of law and fact predominate and include: (i) whether

24  defendants violated the 1934 Act; (ii) whether defendants omitted and/or

25  misrepresented material facts; (iii) whether defendants knew or recklessly disregarded

26  that their statements were false; and (iv) whether defendants' statements and/or

27  omissions artificially inflated the prices of Banc securities and the extent and

28  appropriate measure of damages.

118.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

119.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

120.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

121.   Plaintiff incorporates ¶¶1-120 by reference.

122.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 43 -

1
2
3

      (c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Banc securities during the Class Period.

4
5
6
7
8

    124.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Banc securities. Plaintiff and the Class would not have purchased Banc securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

9
10
11

    125.   As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Banc securities during the Class Period.

12

**COUNT II**

13
14

**For Violation of §20(a) of the 1934
Act Against All Defendants**

15

    126.   Plaintiff incorporates ¶¶1-125 by reference.

16
17
18
19
20
21

    127.   During the Class Period, defendants acted as controlling persons of Banc within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Banc, the Individual Defendants had the power and ability to control the actions of Banc and its employees.  Banc controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

22

**PRAYER FOR RELIEF**

23

    WHEREFORE, Plaintiff prays for judgment as follows:

24
25
26

    A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

27

    B.    Awarding Plaintiff and the members of the Class damages and interest;

28

    C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

- 44 -

1          D.      Awarding such equitable/injunctive or other relief as the Court may deem

2 just and proper.

3                                    **JURY DEMAND**

4          Plaintiff demands a trial by jury.

5 DATED:  May 31, 2017                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
6                                         LAURIE L. LARGENT
                                          MATTHEW I. ALPERT
7

8                                              s/ LAURIE L. LARGENT
9                                           LAURIE L. LARGENT

10                                        655 West Broadway, Suite 1900
                                          San Diego, CA  92101
11                                        Telephone:  619/231-1058
                                          619/231-7423 (fax)
12
                                          Lead Counsel for Plaintiff
13
                                          SULLIVAN, WARD, ASHER
14                                            & PATTON, P.C.
                                          MICHAEL J. ASHER
15                                        1000 Maccabees Center
                                          25800 Northwestern Highway
16                                        Southfield, MI  48075-1000
                                          Telephone:  248/746-0700
17                                        248/746-2760 (fax)

18                                        Additional Counsel for Plaintiff
19

20

21

22

23

24

25

26

27

28

- 45 -

1266459_1

<u>CERTIFICATE OF SERVICE</u>

1

2       I hereby certify that on May 31, 2017, I authorized the electronic filing of the

3 foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses denoted on the attached Electronic

5 Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6 document or paper via the United States Postal Service to the non-CM/ECF

7 participants indicated on the attached Manual Notice List.

8       I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct.  Executed on May 31, 2017.

10                                s/ LAURIE L. LARGENT

11                                  LAURIE L. LARGENT

12                                ROBBINS GELLER RUDMAN
                                         &amp; DOWD LLP

13                                655 West Broadway, Suite 1900
                                San Diego, CA  92101-8498

14                                Telephone:  619/231-1058
                                619/231-7423 (fax)

15                                E-mail:  llargent@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 8:17-cv-00118-AG-DFM In re Banc of California Securities Litigation,

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joel M Athey**
  joel.athey@hklaw.com,julia.corbin-cooper@hklaw.com,bobb.mack@hklaw.com

- **Daniel L Germain**
  germain@lalawyer.com,attorneygermain@gmail.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Andrew Gray**
  andrew.gray@lw.com,andrew-gray-3541@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-
  2405@ecf.pacerpro.com,jordan.cook@lw.com,jana.roach@lw.com

- **Michele D Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-
  2405@ecf.pacerpro.com,jana.roach@lw.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Tricia L McCormick**
  tmccormick@rgrdlaw.com,hectorm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark R McDonald**
  mmcdonald@mofo.com,docket-la@mofo.com,mmendoza@mofo.com,melissa-mendoza-4207@ecf.pacerpro.com,mark-
  mcdonald-0458@ecf.pacerpro.com

- **Steven J Olson**
  solson@omm.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Robert M Swerdlow**
  rswerdlow@omm.com,dgade@omm.com,ckhademi@omm.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)