1  ROBBINS GELLER RUDMAN
&  DOWD LLP
2  LAURIE L. LARGENT (153493)
MATTHEW I. ALPERT (238024)
3  655 West Broadway, Suite 1900
San Diego, CA  92101
4  Telephone:  619/231-1058
619/231-7423 (fax)
5  llargent@rgrdlaw.com
malpert@rgrdlaw.com
6
Lead Counsel for Plaintiff
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  SOUTHERN DIVISION

11
   In re BANC OF CALIFORNIA         )  No. SACV 17-00118 AG (DFMx)
12  SECURITIES LITIGATION            )  consolidated with
                                    )  SACV 17-00138 AG (DFMx)
13  ─────────────────────────────── )
                                    )
14  This Document Relates To:        )  CLASS ACTION
                                    )
15      ALL ACTIONS.                 )  PLAINTIFF'S OMNIBUS
                                    )  OPPOSITION TO DEFENDANTS
16                                   )  BANC OF CALIFORNIA'S AND
                                    )  STEVEN A. SUGARMAN'S
17                                   )  MOTIONS TO DISMISS THE
                                    )  CONSOLIDATED AMENDED
18  ─────────────────────────────── )  COMPLAINT FOR VIOLATION OF
                                       THE FEDERAL SECURITIES LAWS
19
                                       DATE:     August 14, 2017
20                                      TIME:     10:00 a.m.
                                       CTRM:     Dept. 10D
21                                      JUDGE:    Hon. Andrew J. Guilford
22

23

24

25

26

27

28

1287318_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................. 1

II.    SUMMARY OF FACTS AND ALLEGATIONS ......................... 4

    A.     Defendants' Misstatements and Omissions: The Misleading Public Perception Portrayed by Defendants as to Banc's Top Leadership ........................................................................ 4

    B.     Defendants Concealed Their Ties to Galanis ...................... 4

    C.     Concealment of Brownstein's Impaired Director Independence ......... 5

    D.     The Truth Is Disclosed .................................................. 6

III.   ARGUMENT ...................................................................... 7

    A.     Legal Standard ........................................................... 7

    B.     That the Information Concealed by Defendants' Connections Was Revealed in the Article Does Not Undermine the Complaint's Allegations ................................................. 8

    C.     Defendants' Omissions Were Material ............................... 9

    D.     Defendants Had a Duty to Disclose ................................ 12

        1.     Banc's 2015 Proxy Biographies of Sugarman and Brownstein Were Materially Misleading ..................... 13

        2.     Defendants' Public Statements About Banc's "Quality People," "Top Talent," and "Strong and Independent Board" Were Materially Misleading ........................... 15

        3.     Defendants' Purported Risk Disclosure About Banc's Reputation Were Materially Misleading ..................... 16

        4.     Banc's SEC Filings Were Materially False and Misleading ........................................................ 17

    E.     Plaintiff's Allegations Raise a Strong Inference of Scienter ........... 18

        1.     Sugarman's Scienter .................................................. 19

        2.     Banc's Scienter ....................................................... 21

    F.     The Complaint Sufficiently Pleads Loss Causation .............. 22

    G.     Section 20(a) Control Person Liability Is Properly Pled ........ 25

IV.    CONCLUSION ................................................................. 25

1

2                                                                                              **Page**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1287318_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
  554 F.3d 342 (3d Cir. 2009) ............................................................... 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 7

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ....................................................... 12, 16

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ....................................................... 14

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
  2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ..................................... 23

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ............................................................. 12

*Brown v. China Integrated Energy, Inc.*,
  875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) ................................... 19

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................... 11

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................... 22

*ESG Capital Partners, LP v. Stratos*,
  828 F.3d 1023 (9th Cir. 2016) ............................................................. 8

*Feyko v. Yuhe Int'l, Inc.*,
  2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ......................................... 8

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ..................................... 17

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................... 20

1

2                                                                                    **Page**

3
*Hanon v. Dataproducts Corps.*,
   976 F.2d 497 (9th Cir. 1992) ................................................................. 15

*Henning v. Orient Paper Inc.*,
   2011 WL 2909322 (C.D. Cal. July 20, 2011) ................................. 8, 23

*Hsu v. Puma Biotechnology, Inc.*,
   213 F. Supp. 3d 1275 (C.D. Cal. 2016) .............................................. 7

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ............................ 11, 12

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................ 11, 12, 14

*In re Blue Earth, Inc. Sec. Class Action Litig.*,
   2015 WL 12001274 (C.D. Cal. Nov. 3, 2015) .................................. 23

*In re China Educ. Alliance, Inc. Sec. Litig.*,
   2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ..................................... 8

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ............................................................. 21

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) .............................................. 22

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................ 12

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..................................................... 22, 25

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ............................................................. 17

*In re Herbalife, Ltd. Sec. Litig.*,
   2015 WL 12732428 (C.D. Cal. Mar. 27, 2015) ................................ 23

**Page**

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........................................... 20

*In re LendingClub Sec. Litig.*,
   2017 WL 2289186 (N.D. Cal. May 25, 2017) .................................. 21

*In re Massey Energy Co. Sec. Litig.*,
   883 F. Supp. 2d 597 (S.D. W.Va. 2012) ......................................... 14

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ................................. 10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ........................................................... 8

*In re Volkswagen "Clean Diesel" Mktg.,*
*Sales Practices & Prods. Liab. Litig.*,
   2017 U.S. Dist. LEXIS 112977
   (N.D. Cal. July 19, 2017) ............................................................... 16

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007)............................................. 19

*Kelsey v. Allin*,
   2016 WL 825236 (N.D. Ill. Mar. 2, 2016) ......................... 13, 15, 19

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016)............................... 12, 22, 24, 25

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ......................................................... 22

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ......................................................... 22

*Luna v. Marvell Tech. Group*,
   2017 WL 2171273 (N.D. Cal. May 17, 2017) ........................... 11, 20

*Maiman v. Talbott*,
   2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ........................... 21, 25

1287318_1

**Page**

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................. 16, 22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................. 9

*Mauss v. NuVasive, Inc.*,
   2016 WL 3681831 (S.D. Cal. July 12, 2016) ................................................. 24

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................ 2

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ................................................................ 12

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................... 16

*Nguyen v. Radient Pharms. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ................................................. 14

*No. 84 Employer-Teamster Joint Council Pension
   Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ................................................................ 10

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ................................................................ 21

*Omnicare, Inc. v. Laborers Dist. Council
   Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) .................................................................. 13, 16

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................... 11

*Public Emples. Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................ 22

*Public Pension Fund Group v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ................................................................ 14

**Page**

*Redwen v. Sino Clean Energy,*
   2012 WL 1991762 (C.D. Cal. June 4, 2012)............................................... 9

*Reese v. Malone,*
   747 F.3d 557 (9th Cir. 2014) ................................................... 10, 18

*Richard v. Northwest Pipe Co.,*
   2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ............................................ 20

*Robb v. Fitbit Inc.,*
   216 F. Supp. 3d 1017 (N.D. Cal. 2016) ........................................... 25

*Schueneman v. Arena Pharms., Inc.,*
   840 F.3d 698 (9th Cir. 2016) ................................................. 12, 16, 25

*Scott v. ZST Digital Networks, Inc.,*
   2012 WL 12884888 (C.D. Cal. Apr. 23, 2012)................................................ 23

*Scott v. ZST Digital Networks, Inc.,*
   2012 WL 538279 (C.D. Cal. Feb. 4, 2012) ........................................ 23

*SEC v. Merchant Capital, LLC,*
   483 F.3d 747 (11th Cir. 2007) ....................................................... 14

*SEC v. Todd,*
   642 F.3d 1207 (9th Cir. 2011) ...................................................... 9

*SEC v. Wash. Inv. Network,*
   475 F.3d 392 (D.C. Cir. 2007) ......................................................... 11

*Siemers v. Wells Fargo & Co.,*
   2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) ................................................. 15

*Siracusano v. Matrixx Initiatives, Inc.,*
   585 F.3d 1167 (9th Cir. 2009), *aff'd,*
   563 U.S. 27 (2011) ................................................................ 17, 18

*Snellink v. Gulf Res., Inc.,*
   870 F. Supp. 2d 930 (C.D. Cal. 2012)............................................*passim*

1287318_1

**Page**

*South Ferry LP v. Killinger,*
542 F.3d 776 (9th Cir. 2008) .................................................................. 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ....................................................................... 7, 18

*TSC Indus. v. Northway,*
426 U.S. 438 (1976) ............................................................................. 9

*Union Asset Mgmt. Holding AG v. Sandisk LLC,*
2017 U.S. Dist. LEXIS 97294
(N.D. Cal. June 22, 2017) ................................................................... 19

*United States SEC v. Jensen,*
835 F.3d 1100 (9th Cir. 2016) ............................................................ 17

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.,*
28 F. Supp. 3d 93, 115 (D. Mass. 2014) ............................................. 20

*ZPR Inv. Mgmt. v. SEC,*
2017 WL 2821540 (11th Cir. June 30, 2017) ...................................... 14

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b) ............................................................................................ 9, 25
§78t(a) .................................................................................................. 25
§78u-4 ...................................................................................... 8, 18, 25
§78u-4(b)(1)(B)-(2)(A) ......................................................................... 8
§78u-4(b)(2)(A) ................................................................................... 18

Federal Rules of Civil Procedure
Rule 9(b) ............................................................................................ 8, 25
Rule 12(b)(6) .............................................................................. 7, 8, 25

17 C.F.R.
§240.10b-5 .......................................................................................... 25

1287318_1

1

2                                                                                      **Page**

3

**SECONDARY AUTHORITIES**

4

5

Brett S. Messing and Steven A. Sugarman, *The Forewarned Investor:*
     *Don't Get Fooled Again by Corporate Fraud* (2006)..................................... 1, 3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.      INTRODUCTION**

Be it ironic or prophetic, defendant Steven Sugarman, the former Chief Executive Officer and Chairman of the Board of Directors of Banc of California once wrote:

> Like a defendant in a lawsuit, companies try to overwhelm their investors with so much information that they cannot find the handful of signs that something is amiss.  ***How does one find the needle in the haystack?***

Brett S. Messing and Steven A. Sugarman, *The Forewarned Investor: Don't Get Fooled Again by Corporate Fraud* (2006) ("Messing & Sugarman") at 212.[1]

Well, after poring through hundreds of pages of court documents, SEC filings and third-party websites, that proverbial "needle in the haystack" was eventually uncovered by a short seller, who Sugarman himself concedes "often come up with valuable insights."  *Id.* at 141; ¶¶5-6, 30, 33-37, 44, 85.[2]  The October 18, 2016 *SeekingAlpha.com* article ("Article") unearthed evidence showing that companies controlled by Jason Galanis (who was indicted for, and later pled guilty to, securities fraud) had ties to entities Banc listed in its 2015 Proxy Statement ("Proxy") biographies of Sugarman and Banc's former lead independent director, Chad Brownstein.  The Article also uncovered financial connections between Sugarman and Brownstein through undisclosed business ventures, contradicting defendants' public assertions that Brownstein was an "independent" director and that Banc had a "strong

---

[1]    *See* Exhibit A to the Declaration of Matthew I. Alpert in Support of Plaintiff's Omnibus Opposition to Defendants Banc of California's and Steven A. Sugarman's Motions to Dismiss the Consolidated Amended Complaint for Violation of the Federal Securities Laws ("Alpert Decl.").  All citations are omitted and all emphasis is added unless otherwise noted.

[2]    All "¶" and "¶¶" refer to the Consolidated Amended Complaint for Violation of the Federal Securities Laws ("Complaint") (Dkt. No. 41), filed with this Court on May 31, 2017.  Additionally, all defined terms used here are the same as in the Complaint and have the same meaning here.

1287318_1

1   and independent Board."   ¶¶44-46, 63; *see also* Messing & Sugarman, *supra*, at 44

2   ("Without a strong board to veto dubious business practices, a corrupt CEO has free

3   rein to do what he pleases with corporate finances.").

4   Contrary to defendants' spin of the case, plaintiff is not claiming that

5   defendants had to disclose "every relationship that senior Banc executives have with

6   any person who could be the subject of any negative opinion, with or without merit,"

7   or "every actual or potential banking relationship that, with or without merit, could be

8   misused by an anonymous blogger to harm the Banc's reputation." Dkt. No. 42 at 6-

9   7. Instead, plaintiff alleges with sufficient particularity that when defendants took it

10  upon themselves to tout the business successes of Sugarman and Brownstein in Banc's

11  2015 Proxy, defendants had a duty to disclose that several of the entities listed in these

12  biographies were tied to securities fraudster Galanis. The Complaint also alleges that

13  when Sugarman publicly boasted about the "quality" and "talent" of Banc's

14  management and its "strong and independent Board," Sugarman, as CEO and

15  Chairman, had the duty to inform shareholders about how some of these talented,

16  quality people – namely Banc's top leadership – were connected to Galanis and that

17  the "independence" of their lead independent director, who approved the related-party

18  transactions that benefitted Sugarman, was nothing more than a charade. Because

19  defendants chose to conceal these material facts from their public statements, Banc

20  investors had no idea they were being misled.

21  Defendants' challenges to the Complaint on the grounds of loss causation and

22  materiality are equally without merit. Defendants do not dispute that on October 18,

23  2016, when the Article publicly revealed facts about Galanis's ties to Banc insiders

24  and the Board's lack of "independence," ***Banc's stock price plummeted 29%***. The

25  fact that the Article's author was not a "maven of Wall Street" wielding "great clout"

26  and whose reputation alone (according to one court[3]) could have investors "flee[ing]

27

28  [3]   *Meyer v. Greene*, 710 F.3d 1189, 1200 (11th Cir. 2013).

- 2 -

like rats from a sinking ship," only makes it more plausible that the massive plunge in Banc's stock price that followed the Article's publication was caused by the substantive, and previously undisclosed, facts partially revealed by the Article to investors.

Defendants' materiality argument likewise fails.  While defendants portray this case as one merely based on the immaterial opinions of a blogger motivated to bring down the price of Banc's stock, they ignore that ***after*** the Article was published in October 2016, Sugarman and Brownstein were forced to resign from the Company, the SEC began its investigation into the Banc's ties with Galanis, the Company conducted an independent investigation into the Galanis ties, and Banc announced a myriad of remedial and corporate governance changes.  In the words of Steven Sugarman, "the fact that a company executive is complaining about the [short sellers] is generally a sign that he or she is trying to distract attention away from the company itself."  Messing & Sugarman, *supra*, at 160; *see also id.* at 142 ("***Government regulators pick their targets carefully; they have neither the money nor the time to chase down every idle rumor***.  While one is always innocent until proven guilty, investors should be a cynical bunch, and remember that ***where there's smoke, there's usually fire***.").

Last, defendants' challenge to scienter is also meritless.  Sugarman, who is alleged to have the connections to Galanis and Brownstein, cannot credibly argue he was unaware of those ties.  Moreover, that the Company essentially terminated both Sugarman and Brownstein immediately following Banc's second internal investigation, and that after the truth was disclosed Banc implemented remedial measures to correct the issues that are at the heart of this case (*i.e.*, failure to disclose material information), further support scienter.

Accordingly, defendants' motions should be denied.

- 3 -

1287318_1

## II.     SUMMARY OF FACTS AND ALLEGATIONS

### A.     Defendants' Misstatements and Omissions: The Misleading Public Perception Portrayed by Defendants as to Banc's Top Leadership

Throughout Class Period earnings conference calls, press releases, and SEC filings, Sugarman and Banc repeatedly stressed to investors that the key to Banc's continued financial growth and success was talented personnel and management and proudly emphasized that "[t]he quality of our value proposition and our success is founded in the quality of our people." *See, e.g.*, ¶¶28, 52, 54, 60, 73-74.  Banc also touted the impressive credentials of its top leaders, Sugarman and Brownstein, in published biographies and praised its "strong and independent Board" for its "strategic oversight." ¶¶63, 67-69.  The Complaint alleges, however, that the public perception portrayed by defendants' statements as to its top leadership was, in truth, anything but quality or independent. ¶¶59, 72.  Misleading investors, defendants failed to disclose the multiple and troubling business connections Sugarman, Brownstein, and another top Banc executive had to Galanis, and that because of his own financial relationship with Sugarman, Brownstein's director independence was impaired when he approved related-party transactions that financially benefitted Sugarman and his family members. *Id.*

### B.     Defendants Concealed Their Ties to Galanis

In September 2015, before the start of the Class Period, Galanis was civilly and criminally charged with securities fraud in connection with a publicly traded company called Gerova Financial Group, Ltd.  ("Gerova") and in 2016, during the Class Period, pled guilty to the charges.  ¶31.  Galanis was also under federal investigation and, in January 2017, pled guilty to another securities fraud that began in 2014 involving a scheme to defraud a Native American tribal entity of millions of dollars ("Tribal Bond Scheme").  ¶32.  During this same time period, Sugarman, through COR Capital LLC ("COR") and its related entities, was involved in several businesses with Galanis that

1    were used to perpetuate the Tribal Bond Scheme.   ¶¶33-35.   For example, Valor

2    Group Ltd. ("Valor"), controlled by COR and Galanis, and Valor's subsidiary Wealth

3    Assurance (an entity owned by COR), were used by Galanis in the Tribal Bond Fund

4    Scheme to finance payments to investment managers, who in turn purchased the tribal

5    bonds.   *Id.*   Sugarman's brother, who was also a Banc consultant and was Valor's

6    chairman and CEO during the Tribal Bond Scheme, and a former COR director served

7    as President of Valor while still at COR.   ¶33.   Burnham Securities acted as the

8    placement agent in the Tribal Bond Scheme (also part of COR) and, according to

9    documents obtained by the SEC, operated out of the same building as Banc's

10   corporate headquarters during the fraud.   ¶34.

11       In addition to Sugarman's ties to Galanis through COR, Sugarman and Banc's

12   EVP Jeffery Seabold ("Seabold") controlled an entity (Camden), which was used to

13   finance Galanis amidst the Tribal Bond Scheme and was utilized for transactions with

14   Galanis during the Gerova securities fraud.   ¶36.   Brownstein also had undisclosed ties

15   to Sugarman that defendants did not reveal to investors during the Class Period.   ¶37.

16   Indeed, defendants' repeated statements highlighting the quality and talent of the

17   people behind Banc's success, including the impressive résumés of Sugarman and

18   Brownstein, sharply contrast with the truth that three of Banc's top leaders had

19   connections to the indicted (and later convicted) Galanis.

20       **C.    Concealment of Brownstein's Impaired Director**
21       **Independence**

22       As Banc's lead independent director and Chairman of the Board's

23   Compensation, Nominating and Corporate Governance Committee ("CNCG"),

24   Brownstein was responsible for reviewing and approving Banc's related-party

25   transactions, many of which benefitted Sugarman and his family members by millions

26   of dollars.   ¶40.   For instance, in 2013 Brownstein, as an ostensibly independent

27   director, approved Banc's acquisition of CS Financial, which was owned in part by

28   Sugarman's brother, sister-in-law, and father.   ¶42; *see also* ¶41.   Banc acquired CS

Financial for $10 million.  ¶42.  Over half the proceeds from the sale (in the form of Banc stock) went to Sugarman's family, and a portion of the proceeds were used to repay a debt owed by CS Financial to Sugarman's sister-in-law.  *Id.*

At the time he approved this transaction, however, Brownstein's independence as a director was impaired because of his material financial ties with Sugarman, which violated the NYSE director independence standards.  ¶43.  Not only did Brownstein receive loans from Camden, an entity owned and controlled by Sugarman and Seabold, but he also had undisclosed financial ties to Sugarman through Prospect Global.  ¶¶44-45.

### D.   The Truth Is Disclosed

On October 18, 2016, the truth about Banc insiders' connections to Galanis, as well as Brownstein's lack of independence, began to be revealed when a *SeekingAlpha.com* contributor published the Article, concluding that: (1) Galanis had indisputable ties to Sugarman, COR, Brownstein, and Seabold; (2) Camden, controlled by Sugarman and Seabold, was used to finance Galanis amidst his criminal securities fraud violations; and (3) Brownstein had material financial ties to Sugarman and COR, raising concerns about Brownstein's independence as a Banc director when he approved related-party transactions financially benefitting Sugarman and his family.  ¶¶5, 84.  In response to the Article, Banc's stock price plummeted 29%, from a close of $15.87 on October 17, 2016 to a close of $11.26 per share on October 18, 2016, on a volume of 17.2 million shares.  ¶7.

On the same day after market close, Banc responded to the Article, admitting that for the last year disinterested members of its Board had been conducting an "independent" investigation into similar claims of ties to Galanis.  ¶¶8, 85-86.  Banc told investors that the "independent" investigation failed to uncover any ties between Galanis and Sugarman but failed to disclose that the investigation was being directed by management (who had a stake in the investigation's outcome) and Sugarman's and

- 6 -

Banc's personal counsel.  ¶86.

On January 23, 2017, Banc finally admitted that the aforementioned investigation into the ties with Galanis was not, in fact, independent and that investors had been misled.  ¶88.  Banc announced it hired WilmerHale to replace Sugarman's and Banc's personal counsel due to conflicts of interest.  ¶89.  The investigation also resulted in the forced resignations of Sugarman and Brownstein. *Id.*  Additionally, Banc announced an SEC investigation into the matter.  ¶88.  As a result of the news on January 23, 2017, Banc shares fell nearly 10%.  ¶90.

Banc has now publicly admitted that due to an inadequate "tone at the top" during the Class Period, it had a material weakness in its internal controls over its public disclosures.  ¶¶92-93.  The Company announced an extensive remediation plan, including approval of a new policy to tighten controls on the outside business activities of Banc's executives and board members, such as those engaged in by Sugarman, and a new policy to "add rigor" to the review of related-party transactions. ¶106.  Banc also disclosed that the CEO and Chairman positions previously held by Sugarman were being separated, and that the position as lead independent director (formerly held by Brownstein) was eliminated. *Id.*

## III.   ARGUMENT

### A.   Legal Standard

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1279 (C.D. Cal. 2016).  A complaint "does not need detailed factual allegations," but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  As the Ninth Circuit recently held, a plaintiff "need not prove its case at the outset.  Rather, it has to provide a narrative of fraud – facts which, if true,

- 7 -

1    substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG*
2    *Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

3    Along with Rule 12(b)(6)'s requirements, a complaint alleging securities fraud
4    must satisfy the requirements of Rule 9(b) and the Private Securities Litigation
5    Reform Act ("PSLRA"). *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,
6    701 (9th Cir. 2012); *see also ESG*, 828 F.3d at 1035 ("while federal securities fraud
7    claims require more particularized pleadings, the standard is not insurmountable").
8    Rule 9(b) requires a plaintiff to state with particularity the circumstances constituting
9    fraud, including identifying the statements at issue and setting forth what is false or
10   misleading about the statements and why the statements were misleading when made.
11   Fed. R. Civ. P. 9(b).  Likewise, the PSLRA requires a plaintiff to specify the alleged
12   false statements or omissions, identify the reasons why they are misleading, and state
13   with particularity facts giving rise to a strong inference that the defendant acted with
14   scienter.  15 U.S.C. §78u-4(b)(1)(B)-(2)(A).

15       **B.    That the Information Concealed by Defendants'
             Connections Was Revealed in the Article Does Not
16           Undermine the Complaint's Allegations**

17       Courts in this district have repeatedly upheld allegations based on reports from
18   anonymous short-sellers, appropriately categorizing defendants' attacks on the
19   credibility or motive of the author as "'factual dispute[s] not appropriate for resolution
20   at this stage.'" *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *11 (C.D. Cal. Mar. 5,
21   2013).[4]  There is nothing in the alleged facts or defendants' arguments here that
22   should lead this Court to reach a different conclusion.  *See Snellink v. Gulf Res., Inc.*,
23   870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a
24   short seller report . . . to allege falsity at the pleading stage.").

25

26   [4]    *See also In re China Educ. Alliance, Inc. Sec. Litig.*, 2011 WL 4978483, at *4
27   (C.D. Cal. Oct. 11, 2011) (that a short-seller is allegedly "self-interested" is not
     grounds for dismissal); *Henning v. Orient Paper Inc.*, 2011 WL 2909322, at *4 (C.D.
28   Cal. July 20, 2011) (same).

- 8 -

1    Defendants' arguments ignore that the Article specifically identifies the

2 multiple sources it relies on and that the Article's website provides links to several

3 hundred pages of documents that support its conclusions.  ¶¶6 n.1, 34-36; *see Redwen*

4 *v. Sino Clean Energy*, 2012 WL 1991762, at *6 (C.D. Cal. June 4, 2012) (refusing to

5 strike allegations based on short-seller report where author "shared documentation to

6 support its conclusions").  Thus, contrary to defendants' assertions, the Complaint

7 sufficiently details the basis for the short seller's information.  ¶¶6 n.1, 34-36.

8    **C.    Defendants' Omissions Were Material**

9    The fact-intensive question of materiality in the context of a §10(b) action

10 comes down to "whether a ***reasonable*** investor would have viewed the nondisclosed

11 information "'as having significantly altered the 'total mix' of information made

12 available.""" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (emphasis

13 in original).  There is no "bright-line rule" as to whether omitted information is

14 material (*id*. at 30), and only if "'reasonable minds cannot differ on the question of

15 materiality'" should a court find that, as a matter of law, a misstatement or omission is

16 immaterial.  *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976).  Similarly, the

17 decision as to "'whether adverse facts were adequately disclosed is a mixed question

18 to be decided by the trier of fact.'"  *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

19    Here, one could hardly dispute that information revealing ties between a

20 publicly traded company's CEO/Chairman, its lead independent director, and an

21 indicted securities fraudster (who later pled guilty) was important to the reasonable

22 investor.  Even defendant Sugarman agrees.  *See* Messing & Sugarman, *supra*, at 118-

23 119 ("***Any CEO with a questionable past should raise immediate alarm bells among***

24 ***investors***, who should demand increased safeguards for any future activities if they are

25 to stay with the company."); *id*. at 189 ("A board of directors is supposed to serve as a

26 check and balance to the management team, not as a set of 'yes-men.'  ***A board***

27 ***stacked with cronies lacks the independence necessary to keep an out-of-control***

28 ***CEO in check***.").  In fact, even before news broke of either Sugarman's and

- 9 -

1287318_1

1   Brownstein's ties to Galanis, or Brownstein's lack of independence, a major investor
2   of Banc's wrote to the Company expressing concerns about similar issues which the
3   Banc failed to address.  ¶¶100-101; *see Reese v. Malone*, 747 F.3d 557, 570 (9th Cir.
4   2014) ("Facts demonstrating public interest in the withheld information support its
5   materiality.").

6          Banc's stock price's reaction following release of the Article also demonstrates
7   the materiality of defendants' omissions.  *See No. 84 Employer-Teamster Joint
8   Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir.
9   2003) ("the fact that a firm's stock price does significantly change is strong evidence
10  of materiality").  When the Article was published, and the connections between
11  Galanis and Sugarman and Brownstein were exposed to the investing public at large,
12  Banc's stock price plunged 29% on heavy trading volume.  ¶¶7, 108; *see In re
13  Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *7 (N.D. Cal. Apr. 21,
14  2016) ("Because the corrective disclosure that highlighted the omission is alleged to
15  have caused a 25.9% stock decline in Montage stock price, the omission is material, as
16  reasonable investors would have considered the omission important in determining
17  whether to purchase shares of Montage stock."); *Alaska Elec. Pension Fund v.
18  Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("And, of course, the materiality
19  of the alleged misrepresentations is self-evident when we look at the market's
20  negative reaction – to the tune of a nine-percent drop in stock price in three
21  days . . . .").

22         The events that unfolded after the publication of the Article also evidence
23  materiality.  For example: (1) less than a month after this news broke, Banc publicly
24  announced that it was delaying the filing of its 3Q16 10-Q in order to finish its own
25  probe "into certain purported improper relationships and related party transactions and
26  related matters"; (2) about two months later in January 2017, the Company announced
27  the resignation of Sugarman and that the SEC was formally investigating Banc's
28  public response to the Article; (3) two weeks after that, Banc's former lead

- 10 -

1  independent director Brownstein, also implicated in the Article, resigned; and (4) in

2  the wake of these resignations, the Company announced a slew of remedial measures,

3  including separating the CEO and Chairman positions and eliminating the role of a

4  lead independent director.  ¶¶10, 12, 48, 87-89, 93, 103, 106; *see Luna v. Marvell*

5  *Tech. Group*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) ("'house-cleaning

6  and reforms' like terminating certain employees, restructuring, and instituting training

7  programs 'do not follow innocent mistakes.  Rather, they customarily, even if not

8  invariably, follow systemic and fraudulent abuse of internal financial controls'").

9         Defendants incorrectly contend that the information unearthed by the Article's

10  author, who reviewed hundreds of pages of federal criminal and civil court filings

11  involving Galanis, Banc, Sugarman, Brownstein, and related business entities and

12  transactions, cannot be material because it was already public.  Dkt. No. 43 at 9, 12-

13  13; Dkt. No. 42 at 8.  However, simply because information "may have been publicly

14  discoverable," does not mean that it was "so manifestly well-known that it was, as a

15  matter of law, already part of the total mix of information available to investors." *City*

16  *of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415

17  (S.D.N.Y. 2011); *see also SEC v. Wash. Inv. Network*, 475 F.3d 392, 405 (D.C. Cir.

18  2007) ("The existence of the bar order may have been public information, but it was

19  not information that was so widely disseminated that an average small investor could

20  be expected to be aware of it.").

21         Indeed, to succeed with their "truth-on-the-market defense," defendants "'must

22  prove that the information that was withheld or misrepresented was transmitted to the

23  public with a degree of intensity and credibility sufficient to effectively

24  counterbalance any misleading impression created by [the] insider's one-sided

25  representations.'" *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *15 (C.D. Cal.

26  Aug. 4, 2014) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996)); *In*

27  *re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008) ("As a general

28  rule, the truth-on-the-market defense is intensely specific, so courts rarely dismiss a

- 11 -

1   complaint on this basis."). Defendants overlook that the research conducted by the

2   Article's author, and the conclusions based on that research, involved multiple sources

3   and hundreds of pages of documents pieced together by the author over a period of

4   months. Thus, defendants cannot meet the "heavy burden" in successfully asserting

5   this defense. *Amgen*, 2014 WL 12585809, at *15; *Amgen*, 544 F. Supp. 2d at 1025,

6   1030-31; *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437-38

7   (S.D.N.Y. 2009) ("'[t]here are serious limitations on a corporation's ability to charge

8   its stockholders with knowledge of information omitted from a document such as a

9   proxy statement or prospectus on the basis that the information is public knowledge

10  and otherwise available to them'"). Therefore, the omitted information alleged in the

11  Complaint is material.

12          **D.     Defendants Had a Duty to Disclose**

13          Under the federal securities laws, defendants can be held liable for a material

14  omission if they have a duty to disclose that information, or make a public statement

15  that "'affirmatively create[s] an impression of a state of affairs that differs in a

16  material way from the one that actually exists.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d

17  1200, 1209 (9th Cir. 2016) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d

18  997, 1006 (9th Cir. 2002)). Moreover, once defendants choose to tout "positive

19  information to the market," they are "'bound to do so in a manner that wouldn't

20  mislead investors,' including disclosing adverse information that cuts against the

21  positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th

22  Cir. 2016) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir.

23  2008)). Even literally accurate statements "'can become, through their context and

24  manner of presentation, devices which mislead investors. For that reason, the

25  disclosure required by the securities laws is measured not by literal truth, but by the

26  ability of the material to accurately inform rather than mislead prospective buyers.'"

27  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

28          Here, the Complaint details how defendants publicly touted the impressive

- 12 -

résumés of Banc's CEO, Sugarman, and supposedly independent director Brownstein, and boasted about Banc's "top talent" on conference calls with analysts and investors, all the while concealing the fact that both its CEO and lead independent director had multiple business connections with the then-indicted (and later convicted) securities fraudster Jason Galanis.  The Complaint also pleads with particularity as to why this information that defendants hoped investors would never unearth made their public statements materially misleading.  ¶¶29-46, 59, 72; *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015) (a defendant must "desist from misleading investors by saying one thing and holding back another").

### 1. Banc's 2015 Proxy Biographies of Sugarman and Brownstein Were Materially Misleading

Quoting defendant Sugarman, "[t]he question of who's in charge is [also] an important one to ask when considering an investment, because many investors will be surprised to find that not all CEOs are exactly who they say they are."  ¶28.  By omitting information about their ties to Galanis, the publicly filed biographies of both Sugarman and Brownstein gave Banc investors a misleading impression of two of the most important leaders of the Company.  ¶¶68-69, 72; *see Kelsey v. Allin*, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016) ("Having touted [the CEO's] prior experience, defendants had a duty to disclose all of the experience, including any negative experience.").

Courts in and outside of this Circuit have upheld allegations regarding material omissions about a company's top executive's personal and business-related experiences and history.  For example, in *Kelsey*, the court upheld allegations that the publicly filed biography of the CEO of the defendant corporation misleadingly omitted that he previously led a company that "was involved with 'notorious convicted stock fraudsters.'"  2016 WL 825236, at *3-*5; *see also Snellink*, 870 F. Supp. 2d at 940 ("The falsity pleaded in Plaintiffs' AC concerns the concealment of

1   Liu's employment history.  Plaintiffs contend that the concealed information is
2   material because China Finance is a suspect company with a record of dealings with
3   fraudulent Chinese companies.  Taking these allegations as true, the Court finds that
4   Plaintiffs have adequately pleaded falsity."); *SEC v. Merchant Capital, LLC*, 483 F.3d
5   747, 770-771 (11th Cir. 2007) ("We conclude that . . . a reasonable investor ***would***
6   have been interested in Wyer's previous personal bankruptcy, and that it was thus
7   materially misleading to omit the information.") (emphasis in original).

8       Contrary to defendants' assertion, their duty to disclose was not negated by the
9   fact the Article gathered and synthesized scattered information that was publicly
10  available.  *See Amgen*, 544 F. Supp. 2d at 1025; *see also ZPR Inv. Mgmt. v. SEC*, 2017
11  WL 2821540, at *7 (11th Cir. June 30, 2017) ("'the mere availability of accurate
12  information' does not 'negate[] an inaccurate statement'") (alterations in original);
13  *Public Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972, 983 n.8 (8th Cir. 2012)
14  (rejecting contention that statements about material compliance with FDA regulations
15  were not false or misleading "because the Form 483s were publicly available through
16  a [FOIA] request").  As courts have held time and again, a defendant's materially
17  misleading statements and omissions are not rendered innocuous just because the
18  withheld information was "already in the public sphere."  *Nguyen v. Radient Pharms.*
19  *Corp.*, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011); *see also Billhofer v.*
20  *Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("The results . . . were not
21  'publicly available' simply because they were posted in an obscure location on the
22  internet."); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618-19 (S.D.
23  W.Va. 2012) (rejecting defendants' argument that investors were aware of alleged
24  materially omitted information because it could be accessed on a federal government
25  website).

26      Therefore, the biographies of Sugarman and Brownstein in Banc's 2015 Proxy
27  were materially misleading.

28

### 2. Defendants' Public Statements About Banc's "Quality People," "Top Talent," and "Strong and Independent Board" Were Materially Misleading

If there was one consistent theme that the young CEO of "California's Bank," whose face graced billboards throughout Southern California, made sure to hammer home to investors and analysts, it was that Banc was "relentlessly pursuing ***top talent*** to oversee our business at every level" (¶54) and was "***winning top talent***."  ¶78.[5] Defendant Sugarman also publicly heaped praise on Banc's "strong and independent Board" for its "strategic oversight."  ¶63; *but see* Messing & Sugarman, *supra*, at 118-119 ("At a minimum, investors should insist on] full and complete transparency and a strong independent management team or board of directors.").

Yet nowhere in these public statements extolling the quality and talent of the people behind Banc's purported success did defendants ever disclose that the Company's CEO/Chairman and its Lead Independent Director had business ties with an indicted – and later during the Class Period, convicted – securities fraudster or that Brownstein was not independent as defendants publicly represented.  *See Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, at *8 (N.D. Cal. Apr. 17, 2007) ("The integrity of management is always of importance to investors."); *see also Snellink*, 870 F. Supp. 2d at 940; *Kelsey*, 2016 WL 825236, at *3-*5.  Scrutinized in context, these statements on conference calls with investors and analysts were far from innocuous puffery because Sugarman's references to the quality and talent of Banc naturally included himself and other members of the Company's leadership as support for why Banc was a great investment.  *See Hanon v. Dataproducts Corps.*, 976 F.2d 497, 503 (9th Cir. 1992) ("The investing public justifiably places heavy reliance on the

---

[5]  *See also* ¶28 ("[t]he quality of our value proposition and our success is founded in the ***quality of our people***"); ¶62 ("[o]ur strong results are a testament to the hard work and dedication of our ***talented employees***"); ¶73 ("we are winning market share and ***top talent***"); ¶74 ("The addition of ***talented individuals and teams*** such as these further validates that our value proposition is taking hold and driving increasing market share gains.").

statements and opinions of corporate insiders."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 112977, at *687 (N.D. Cal. July 19, 2017) ("The statements that Volkswagen's 'top priority' and 'focal point' for R&D was to develop engines that reduced emissions could have led a reasonable investor to conclude that Volkswagen was committed to emissions-reducing technology. . . . Together, the inference that arises from these statements is that Volkswagen was a good investment *because* of its commitment to emissions-reducing technology.") (emphasis in original).

Furthermore, while nothing required defendants to repeatedly praise the "quality" and "talent" of its people – which certainly includes its top executives and board members – to the public once defendants chose to speak publicly about this topic "they were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information within their possession]." *Schueneman*, 840 F.3d at 707 (quoting *Berson*, 527 F.3d at 987) (alteration in original); *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) ("the Court may not assess the statements listed in the FAC in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable").

When they concealed the ties connecting Galanis, Sugarman, and Brownstein, defendants misled investors "by saying one thing and holding back another." *Omnicare*, 135 S. Ct. at 1331; *cf. Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused [the company's] stock price to plummet, as it did when the truth came out a couple of months later.").

### 3. Defendants' Purported Risk Disclosure About Banc's Reputation Were Materially Misleading

Defendants cannot shield themselves from liability by speaking about risks to

Banc's reputation "with no indication that the risk 'may already have come to fruition.'"  *Siracusano v. Matrixx Initiatives, Inc*., 585 F.3d 1167, 1181 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).  At the time defendants' statements regarding "[m]anaging reputational risk" were made in Banc's Class Period SEC filings (*see* ¶¶58, 64), this "risk" had already materialized in the form of business connections between Galanis and both the Company's CEO/Chairman and its lead independent director.  *See In re Harman Int'l Indus., Inc. Sec. Litig*., 791 F.3d 90, 103 (D.C. Cir. 2015) ("There is an important difference between warning that something 'might' occur and that something 'actually had' occurred.").  And the fact that Banc's formerly pristine reputation remained relatively untarnished until the publication of the Article disclosing the ties connecting Galanis and Sugarman and Brownstein "does not make the statements any less misleading."  *Flynn v. Sientra, Inc*., 2016 WL 3360676, at \*12 (C.D. Cal. June 9, 2016).  It is also noteworthy that this "reputational" risk disclosure first appeared in the FY12 10-K Banc filed approximately six months *after* Sugarman became its CEO in September 2012.

Thus, the Court should reject defendants' attempt to escape liability for this actionable and materially misleading statement.  *See United States SEC v. Jensen*, 835 F.3d 1100, 1112 (9th Cir. 2016) ("'[S]igners of documents should be held responsible for the statements in the document.'").

### 4.    Banc's SEC Filings Were Materially False and Misleading

As alleged in the Complaint, Banc's SEC filings during the Class Period were false and misleading because defendants failed to disclose that Brownstein's independence was impaired due to his material financial relationship with Sugarman, which violated the NYSE listing standards for director independence. ¶¶39-46, 55-57, 59(b).  Defendants incorrectly argue that these statements are not actionable because Brownstein is not mentioned by name as approving the related-party transactions. Dkt. No. 43 at 12.  To the contrary, Banc's SEC filings make clear that the

1  transactions were ratified and approved by its Board's "disinterested directors," which

2  included Brownstein as lead independent director, and by the CNCG, which

3  Brownstein chaired.  *See* Dkt. No. 51, Ex. 8 at 65; 39-43.  Thus, while defendants

4  publicly claimed that purportedly "disinterested directors" approved the related-party

5  transactions that Sugarman and his family handsomely profited from, this was untrue.

6  **E.   Plaintiff's Allegations Raise a Strong Inference of Scienter**

7         The PSLRA requires that a complaint must "'state with particularity facts

8  giving rise to *a strong inference* that the defendant'" made the "'false or misleading

9  statements either *intentionally* or with *deliberate recklessness*.'"  *Reese*, 747 F.3d at

10 568-69 (emphasis in original); 15 U.S.C. §78u-4(b)(2)(A).  Deliberate recklessness is

11 defined as "'a highly unreasonable omission, involving . . . an extreme departure from

12 the standards of ordinary care, and which presents a danger of misleading buyers or

13 sellers that is either known to the defendant or is so obvious that the actor must have

14 been aware of it.'"  *Siracusano*, 585 F.3d at 1180.

15        In determining the sufficiency of scienter allegations, a court must: (1) accept

16 all factual allegations in the complaint as true; (2) consider all of the allegations

17 collectively; and (3) entertain only those plausible opposing inferences that can be

18 "rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.  "The inference

19 that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-

20 gun' genre, or even the 'most plausible of competing inferences.'"  *Id*. at 324.  A court

21 must conclude that a strong inference of scienter has been pled "if a reasonable person

22 would deem the inference of scienter cogent and *at least as compelling* as any

23 opposing inference one could draw from the facts alleged."  *Id.*; *see also South Ferry

24 LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("In assessing the allegations

25 holistically as required by *Tellabs*, the federal courts certainly need not close their

26 eyes to circumstances that are probative of scienter viewed with a practical and

27 common-sense perspective.").

28        As demonstrated below, the Complaint sufficiently pleads scienter.

- 18 -

### 1.    Sugarman's Scienter

Assuming the Complaint's factual allegations to be true: (1) Galanis, the indicted (and later convicted) securities fraudster, had material ties to defendant Sugarman that were not publicly disclosed in Banc's Class Period SEC filings, press releases, or in public statements to investors and analysts; and (2) Sugarman's concealed connections to the supposed lead "independent" director Brownstein materially undermined Banc's claim in its SEC filings that the latter was truly "independent."   Given these allegations, it is hardly plausible that Sugarman was unaware of his own connections to Galanis, or that defendants' failure to disclose this information in the Proxy's biographies, SEC financials, or in public statements Sugarman made as Banc's CEO/Chairman touting the "quality" and "talent" of the people at the Company and the "strong and independent" Board was simply an oversight.  *See Kelsey*, 2016 WL 825236, at *5 (as to whether a CEO knew or should have known about the misleading nature of his own published biography, "the answer is obviously yes"); *cf. Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) ("[i]t is natural to conclude that an executive is aware of the business dealings of his own son, particularly when those dealings were with the executive's own company").  Instead, it is more plausible that this information "was likely omitted because its inclusion would have sullied [Banc's] reputation – thus, the purpose in omitting the connection is manifest." *Snellink*, 870 F. Supp. 2d at 941 ("it would be absurd to suggest that [the Chairman] did not know about the operations of his various companies"); *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 2017 U.S. Dist. LEXIS 97294, at *7 (N.D. Cal. June 22, 2017) ("If the defendants were aware of the undisclosed information, the most logical explanation for their failure to disclose it . . . was that they intended to conceal it.").  Additionally, that Sugarman signed these publicly filed SEC filings that misleadingly omitted information about his own connections to Galanis and Brownstein is evidence of his scienter.  *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1013 (N.D. Cal. 2007) ("[P]reparing and

- 19 -

1   signing false or misleading proxy statements show evidence of scienter.").

2       Scienter is also supported by the fact that the Company's internal investigation

3   into Galanis's ties to the Banc was initially directed by management who had a stake

4   in the investigation's outcome (or reported to those who did, *i.e.*, CEO/Chairman

5   Sugarman) – instead of an independent entity – along with personal counsel for both

6   Sugarman and Banc (and whose head litigation partner is featured as a client on

7   Banc's website), as it implies that they had something to hide.[6]   And because

8   defendants initially lied to investors about the nature of this investigation, this too

9   further supports scienter.  ¶¶8, 10, 49, 86, 99, 103; *see In re LDK Solar Sec. Litig.,*

10   584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) ("[O]fficers and directors are not

11   exonerated when their own audit committee finds nothing wrong in the company's

12   accounting practices.  To rule otherwise would create a huge fox-guards-the-chicken-

13   house loophole in our private securities law enforcement."); *Freudenberg v. E*Trade*

14   *Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("corporate wrongdoers rarely

15   admit that they committed fraud").

16       Sugarman's resignation on the same day the Company announced an SEC

17   investigation into Banc's response to the Article, followed by Banc's announcement

18   of remedial and corporate governance changes, further bolsters a cogent and

19   compelling inference of scienter.  ¶48; *see Luna*, 2017 WL 2171273, at *5 (finding

20   "'house-cleaning and reforms'" support inference of scienter); *Richard v. Northwest*

21   *Pipe Co*., 2011 WL 3813073, at *5 (W.D. Wash. Aug. 26, 2011) ("[CEO's] departure

22   was suspicious because the company had previously touted him as essential.");

23   *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc*., 28 F. Supp. 3d 93, 115 (D. Mass.

24   2014) ("[G]overnment investigation[s] can be seen as one more piece of the puzzle, a

25   series of circumstances that add up to a strong inference of scienter.").  And, when

26

27   [6]   *See* https://www.bancofcal.com/about-us/who-we-serve/david-aronoff/2788

28   (accessed July 21, 2017).

considered within the context of the entirety of the Complaint's allegations, the Company's public admission as to a lack of internal controls and "inadequate tone at the top" further supports a finding of scienter. *See In re LendingClub Sec. Litig.*, 2017 WL 2289186, at *6 (N.D. Cal. May 25, 2017) ("Specifically, LendingClub identified the 'tone at the top,' compliance with ethics policies, disclosure of related-party transactions, and adherence to investors' specifications for loans as some of its internal control problems. Corrupt practices from the get-go remain corrupt regardless of scale thereafter.").

Finally, Sugarman's scienter is not undermined or negated because of a lack of Class Period stock sales. *See* Dkt. No. 42 at 9. As this Court has held, "a plaintiff need not allege stock sales to establish a strong inference of scienter." *Maiman v. Talbott*, 2010 WL 11421950, at *6 (C.D. Cal. Aug. 9, 2010).

### 2.      Banc's Scienter

"[A] corporation 'can only act through its employees and agents' and can likewise only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). And because Banc's former CEO/Chairman and lead "independent" director were all acting within the scope of their apparent authority on behalf of the Company when they signed the materially misleading SEC financials or misleadingly omitted information from public statements in Banc press releases or on calls with investors and financial analysts, "imputation is proper." *Id*. at 473; *see also Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers, who – unlike the public relations or personnel departments – are necessarily aware of the requirements of SEC regulations and state law and of the danger of misleading buyers and sellers."). Additionally, the fact that Brownstein is not a named defendant is not dispositive of whether his scienter – *i.e.*, his knowledge of his own connections to Galanis and Sugarman that were concealed from investors and gave a misleading impression of his independence as a director – can be imputed to defendant Banc. *Cf*

- 21 -

*Makor*, 513 F.3d at 710 ("[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."). Thus, the Complaint sufficiently pleads defendant Banc's scienter.

### F.   The Complaint Sufficiently Pleads Loss Causation

Determining loss causation "is a 'context-dependent' inquiry, as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd*, 811 F.3d at 1210. At the pleading stage, "the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). Additionally, the revelation of the truth behind defendants' fraud does not need to "mirror" earlier misrepresentations, and nothing in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), "prevent[s] a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such truth by persons other than the defendants." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 264 (5th Cir. 2009). Loss causation can also be pled based on post-class period disclosures. *See Snellink*, 870 F. Supp. 2d at 942; *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006).

The disclosure of information that may have technically been in the public sphere but was not something that the ordinary reasonable investor would have necessarily noticed or appreciated can support loss causation allegations. *See, e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) ("It is not unreasonable that physicians – the targets of the off-label marketing – would respond to the Warning Letter while the public failed to appreciate its significance."); *see also Public Emples. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) ("At the pleading stage, this Court does not find the WSJ Article should be justifiably pushed aside simply because the data it was based upon may have been technically available to the public, given that the raw data itself had little to no probative value in

- 22 -

its native state.").  For example, in *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279 (C.D. Cal. Feb. 4, 2012), the court upheld plaintiffs' loss causation allegations stemming from the publication of a short seller report on *SeekingAlpha* despite defendants' argument that the alleged fraud was revealed on that very same website by another short seller six months prior to that.  *Id.* at *11; *see also Scott v. ZST Digital Networks, Inc.*, 2012 WL 12884888, at *3 (C.D. Cal. Apr. 23, 2012) (denying motion for interlocutory appeal on loss causation grounds).

Here, the information revealed in the 28-page Article about defendants' undisclosed connections to Galanis were pieced together based on the author's review and analysis of hundreds of pages of documents that included voluminous federal criminal and civil court (and SEC) filings involving Galanis and his intricate web of fraudulent investment entities and schemes.  ¶¶6 n.1, 30-38; *see Snellink*, 870 F. Supp. 2d at 942 ("***A short seller  report may be used to establish loss causation****. . . .  [T]he Court finds that the Glaucus report publicly revealed Gulf's alleged fraud and as a result, Gulf's *stock price immediately fell over thirty percent after the revelation*.") (citing *Henning*, 2011 WL 2909322, at *8).[7]  When the Article was published, Banc's stock price nosedived 29% on October 18, 2016 on a heavy volume of trading.

What did happen in the wake of the Article is that less than a month later, on

---

[7]    As for the cases decided by Judge Dale Fischer that defendants cite in support of their claims that loss causation has not been adequately pled, those decisions are distinguishable.  For example, *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428 (C.D. Cal. Mar. 27, 2015), involved a short-seller's questions on a company conference call and plaintiffs alleged that the questions themselves were corrective disclosures.  *Id.* at *5.  In *In re Blue Earth, Inc. Sec. Class Action Litig.*, 2015 WL 12001274 (C.D. Cal. Nov. 3, 2015), the author of the short-seller report there admitted the information it found "'takes 1 minute with Google' to locate," only five pages of the 58-page report was related to the allegedly misrepresented information and the court found that plaintiffs had failed to demonstrate that it was not the "massive amount of negative information . . . unrelated to the alleged misrepresentations" that plausibly caused the stock price declines.  *Id.* at *2-*3; *see also Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *7 (N.D. Cal. Sept. 2, 2016) ("Just as in *Blue Earth*, plaintiffs have failed to demonstrate that the Pump Stopper Report's comments on CBMG's stock promotion practices revealed any new information or were a substantial cause of the stock's decline.").

November 16, 2016, the Company announced that it would delay filing its 3Q16 10-Q in order to allow Banc's Special Committee time to finish its investigation "into certain purported improper relationships and related party transactions and related matters." ¶87. On January 23, 2017, Banc came out publicly with more news related to facts revealed in the Article, namely the resignation of its CEO/Chairman Sugarman, that the SEC had launched a formal investigation into Banc, and that it hired a new law firm to investigate ties between Galanis and Banc insiders. ¶¶88-90. Banc's stock dropped another 9% on this news. ¶90.

Defendants claim that the Complaint's loss causation allegations are inadequate because there is no connection between the publication of the facts revealed in the Article and (1) the Company's announcements three months later about Sugarman's resignation; and (2) both the SEC and internal investigations into Galanis's ties to former Banc insiders like Sugarman and Brownstein. Defendants are mistaken, for the factual scenario in this case is strikingly similar to that supporting liability in *Lloyd*. There, the Ninth Circuit found that the announcement of a government subpoena, followed by a 20% stock price decline, was sufficient to allege loss causation because about a month later, when the Company disclosed that it was charging off millions in loans to its largest borrower, "the market reacted hardly at all . . . confirming that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous . . . statements." *Lloyd*, 811 F.3d at 1210.

Here, Banc's stock price dropped 29% on the partial revelation that defendants intentionally and fraudulently concealed from investors the ties connecting Galanis, Sugarman, and Brownstein, and then fell another 9% three months later on the news that defendant Sugarman resigned, the SEC was investigating Banc's ties to Galanis, and the Company hired a new law firm to conduct an independent probe (as opposed to the previous one led by Banc's and Sugarman's personal counsel) of its connections with Galanis. *See id*. at 1210-11; *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) ("While the facts of this case are not identical to *Lloyd*, the

- 24 -

1287318_1

logic behind *Lloyd* is perfectly applicable here. . . . [T]he announcement of [the defendant CEO's] resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to the investigation.").  This is sufficient to plead loss causation.  *See Gilead*, 536 F.3d at 1057 ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.  This is not 'a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation."); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").

### G. Section 20(a) Control Person Liability Is Properly Pled

Because plaintiff sufficiently alleges a primary violation of §10(b) and Rule 10b-5, the Complaint properly pleads control person liability under §20(a) as well. *See Maiman*, 2010 WL 11421950, at *8.

## IV. CONCLUSION

For the reasons set forth above, plaintiff satisfies all applicable pleading standards and defendants' motions to dismiss should be denied in their entirety.  *See Schueneman*, 840 F.3d at 710 ("Rule 9(b) and the PSLRA create a significant barrier for private securities plaintiffs. ***But it is not an impossible barrier; nor was it meant to be***.").

DATED:  July 21, 2017                     Respectfully submitted,

                                          ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                          LAURIE L. LARGENT
                                          MATTHEW I. ALPERT


                                                s/ MATTHEW I. ALPERT
                                          ───────────────────────────
                                               MATTHEW I. ALPERT

1287318_1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

- 26 -

1287318_1

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 21, 2017.

s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  malpert@rgrdlaw.com

- 27 -

1287318_1

## Mailing Information for a Case 8:17-cv-00118-AG-DFM In re Banc of California Securities Litigation,

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joel M Athey**
  joel.athey@hklaw.com,julia.corbin-cooper@hklaw.com,bobb.mack@hklaw.com

- **Matthew James Cave**
  mcave@mofo.com,melissa-mendoza-4207@ecf.pacerpro.com,matthew-cave-0289@ecf.pacerpro.com

- **Daniel L Germain**
  germain@lalawyer.com,attorneygermain@gmail.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Andrew Gray**
  andrew.gray@lw.com,andrew-gray-3541@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jordan.cook@lw.com,jana.roach@lw.com

- **Robert B Hubbell**
  rhubbell@mofo.com,docket-la@mofo.com,dawn-millner-4650@ecf.pacerpro.com,robert-hubbell-7718@ecf.pacerpro.com,dmillner@mofo.com

- **Michele D Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jana.roach@lw.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com

- **Tricia L McCormick**
  tmccormick@rgrdlaw.com,hectorm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark R McDonald**
  mmcdonald@mofo.com,docket-la@mofo.com,mmendoza@mofo.com,melissa-mendoza-4207@ecf.pacerpro.com,mark-mcdonald-0458@ecf.pacerpro.com

- **Steven J Olson**
  solson@omm.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Joseph Roth Rosner**
  jrosner@mofo.com

- **Robert M Swerdlow**
  rswerdlow@omm.com,diden@omm.com,dgade@omm.com,ckhademi@omm.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)