1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SPENCER A. BURKHOLZ (147029)
   LAURIE L. LARGENT (153493)
3  ROBERT R. HENSSLER, JR. (216165)
   MATTHEW I. ALPERT (238024)
4  ERIKA OLIVER (306614)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   spenceb@rgrdlaw.com
7  llargent@rgrdlaw.com
   bhenssler@rgrdlaw.com
8  malpert@rgrdlaw.com
   eoliver@rgrdlaw.com
9
   Lead Counsel for Plaintiff
10
                    UNITED STATES DISTRICT COURT
11
                  CENTRAL DISTRICT OF CALIFORNIA
12
                         SOUTHERN DIVISION
13
   In re BANC OF CALIFORNIA          )  No. SACV 17-00118 AG (DFMx)
14 SECURITIES LITIGATION             )  consolidated with
                                     )  SACV 17-00138 AG (DFMx)
15 _____   )
                                     )
16 This Document Relates To:         )  CLASS ACTION
                                     )
17    ALL ACTIONS.                   )  DECLARATION OF MATTHEW I.
                                     )  ALPERT IN SUPPORT OF LEAD
18 _____   )  PLAINTIFF'S MOTION FOR FINAL
                                        APPROVAL OF CLASS ACTION
19                                      SETTLEMENT AND PLAN OF
                                        ALLOCATION OF SETTLEMENT
20                                      PROCEEDS AND LEAD COUNSEL'S
                                        MOTION FOR AN AWARD OF
21                                      ATTORNEYS' FEES AND EXPENSES
                                        AND REIMBURSEMENT OF LEAD
22                                      PLAINTIFF'S TIME PURSUANT TO
                                        15 U.S.C. §78u-4(a)(4)
23
                                        DATE:      March 16, 2020
24                                      TIME:      10:00 a.m.
                                        CTRM:      10D
25                                      JUDGE:     Hon. Andrew J. Guilford
26
27
28

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   THE LITIGATION ................................................................................... 9

    A.    The Commencement of the Litigation .................................................. 9

    B.    Defendants' Motions to Dismiss ........................................................ 10

    C.    Defendants' §1292(b) Motion ............................................................ 11

    D.    Rule 26(f) Joint Case Management Report ......................................... 12

    E.    Confidentiality and Protective Order .................................................. 12

    F.    Plaintiff's Motion for Class Certification ........................................... 12

    G.    Defendants' Rule 23(f) Petition to the Ninth Circuit .......................... 15

    H.    Fact Discovery .................................................................................. 15

        1.    Plaintiff's Document Discovery Directed to Defendants ......... 15

            a.    Plaintiff's Document Discovery Directed to
                Defendant Banc ............................................................. 16

            b.    Plaintiff's Document Discovery Directed to
                Defendant Sugarman ..................................................... 16

        2.    Defendants' Document Discovery Directed to Iron
            Workers .......................................................................... 17

        3.    Plaintiff's Document Discovery Directed to Relevant
            Nonparties ...................................................................... 17

        4.    Plaintiff's Discovery Disputes with Defendants and
            Nonparties ...................................................................... 19

            a.    The "Deposition Disputes" Briefing .............................. 19

            b.    Plaintiff's Motion to Compel Against WilmerHale ....... 20

            c.    Plaintiff's Motion to Compel Documents from
                 Nonparty Carlos Salas ................................................... 21

            d.    The Production of Unredacted, Relevant KPMG
                 Workpapers and Materials .............................................. 21

        5.    Discovery Disputes Between Defendants and Between
            Sugarman and Certain Nonparties .................................. 22

        6.    Depositions .................................................................... 23

Cases\4831-8602-1295.v2-2/10/20

**Page**

I.   Jason Galanis........................................................................................26

J.   Plaintiff's Experts ...............................................................................27

    1.   Zachary R. Nye, Ph.D..............................................................27

    2.   Steven P. Feinstein, Ph.D., CFA. .............................................27

    3.   Harvey L. Pitt...........................................................................28

    4.   Craig Pirrong, Ph.D. .................................................................29

    5.   Bjorn Steinholt, CFA ................................................................29

K.   In-House Forensic Accounting Department ........................................30

L.   Settlement Negotiations and Terms .....................................................31

III.   NATURE AND ADEQUACY OF THE SETTLEMENT...........................32

A.   Strengths and Weaknesses of the Case ................................................33

    1.   Falsity and Materiality..............................................................33

    2.   Scienter .....................................................................................35

    3.   Loss Causation and Damages....................................................36

    4.   The Credibility of Jason Galanis ..............................................38

B.   The Settlement Is in the Best Interests of the Class and Warrants Approval.................................................................................39

C.   The Plan of Allocation .........................................................................39

D.   Reasonableness of Attorneys' Fees and Expenses ..............................41

I, MATTHEW I. ALPERT, declare and state as follows:

1.     I am an attorney duly licensed to practice before all of the courts of the State of California, and I am admitted to practice before this Court.  I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), counsel for Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff" or "Iron Workers"), and the Class.  I have been actively involved in the prosecution and resolution of this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active supervision and participation in all material aspects of the Litigation.

2.     I submit this Declaration in support of Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation of Settlement dated October 28, 2019 (the "Stipulation") (*see* ECF No. 592),[1] which provides for a cash settlement of $19,750,000 (the "Settlement Amount"); (b) the proposed Plan of Allocation; (c) Lead Counsel's application for an award of attorneys' fees and expenses; and (d) award to Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Class.

## I.     PRELIMINARY STATEMENT

3.     This case has been zealously litigated for over two years.  The basic terms of the Settlement were finalized in September 2019, after the parties exchanged expert reports and just before Defendants were scheduled to file their motions for summary judgment.[2]  Plaintiff aggressively litigated this case at every stage in the face of Defendants' vigorous opposition and denial of any liability.

4.     The Settlement was achieved only after Lead Counsel had a full appreciation of the strengths and weaknesses of its case.  Indeed, Lead Counsel

---

[1]   Capitalized terms not otherwise defined in this Declaration have the same meanings as set forth in the Stipulation.

[2]   Defendants are Banc of California, Inc. ("Banc" or the "Company") and Steven A. Sugarman ("Sugarman") (collectively, the "Defendants").

- 1 -

conducted an exhaustive factual investigation prior to the drafting of the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") (*see* ECF No. 41)[3] and successfully opposed Defendants' motions to dismiss. *See* ECF No. 68. Plaintiff and Lead Counsel successfully obtained class certification, wherein the Court certified a class of Banc investors who purchased stock between April 15, 2016 and January 20, 2017 ("Class Period"), and appointed Iron Workers to be Class Representative and Robbins Geller to serve as Class Counsel. ECF No. 236. Lead Counsel then successfully opposed Defendants' Rule 23(f) petition.[4]

5.      In addition, the factual record was fairly advanced as the parties engaged in significant discovery. Plaintiff propounded numerous discovery requests upon both Defendants and served (or attempted to serve) more than 60 nonparty document subpoenas. Plaintiff also responded to numerous discovery requests served by each Defendant. Lead Counsel traveled on multiple occasions to meet with Jason W. Galanis ("Galanis"), who is currently an inmate at FCI Terminal Island in San Pedro, California and whose alleged connections to Defendants formed the crux of the Complaint's allegations. Lead Counsel also deposed 17 fact witnesses including: (1) the federally incarcerated Galanis; (2) Sugarman; (3) former Banc executives and employees; (4) current and former members of Banc's Board of Directors; (5) Banc's former General Counsel; (6) multiple 30(b)(6) representatives for the Company; (7) two separate former outside counsels for Banc who represented the Company during the Class Period; and (8) a former partner from Banc's then-outside auditor KPMG LLP. Defendants meanwhile deposed Iron Workers' investment manager who purchased Banc common stock on its behalf during the Class Period. In total, Lead Counsel reviewed and analyzed more than 1.2 million pages of documents produced by both Defendants and relevant nonparties which were electronically stored on Lead

---

[3]   All "¶" and "¶¶" references are to the Complaint.

[4]   *See Garcia v. Banc of California, Inc.*, No. 18-80068, 2018 WL 4474393 (9th Cir. Sept. 19, 2018) ("*Banc Appeal*").

Counsel's in-house computer databases. This significant discovery is the result of numerous and extensive telephonic and written meet and confers with Defendants and relevant nonparties regarding the production of documents and scheduling of depositions and, where necessary, the filing of motions with the Court.

6. The Settlement is the result of extensive arm's-length negotiations between the parties, including two formal mediation sessions and subsequent vigorous discussions. The first all-day mediation between the parties was on August 10, 2018 and was conducted by Robert H. Fairbank, the principal of Fairbank ADR and a former civil litigator with over 40 years of experience. Despite follow-up discussions with Mr. Fairbank, the parties were unable to reach a resolution.

7. Subsequently, after fact discovery closed and pursuant to this Court's March 6, 2019 Order ("Moratorium Order") (*see* ECF No. 551) requiring the parties to renew settlement discussions, the parties engaged the Honorable Layn R. Phillips (Ret.) and Michelle Yoshida, both well-respected and highly experienced mediators. The all-day mediation with Judge Phillips and Ms. Yoshida took place on June 21, 2019. After nearly three months of extensive settlement negotiations following the June mediation session, the parties were ultimately able to reach a settlement.

8. The substantial discovery, motion practice, exchange of numerous detailed expert reports, and trial preparation outlined herein informed Plaintiff that, while its case had strengths, it also had weaknesses and risks, which had to be, and were, conscientiously evaluated in determining what course of action was in the best interests of the Class.

9. The gravamen of the Complaint's allegations is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), Defendants materially misled investors by omitting certain information from Sugarman's biography included within Banc's April 15, 2016 Annual Proxy Statement ("Proxy"). Specifically, Plaintiff alleged that the Proxy materially and misleadingly

- 3 -

omitted any discussion of the allegedly extensive connections between Galanis, a then-indicted securities fraudster, and Banc's Chairman and CEO via Sugarman's COR-related entities.[5]   Additionally, Plaintiff alleged that Defendants materially misled investors again in October 2016 when Banc issued an admittedly inaccurate press release in response to a *SeekingAlpha.com* blog (the "Blog") published on October 18, 2016.  The Blog discussed the author's belief (based on publicly sourced documents) that Galanis had wide-ranging ties to several executives and directors at Banc and there was therefore a risk that Galanis controlled Banc through his dealings with Sugarman and other officers and directors at the Company.

10.     The Complaint also alleged that the truth about Galanis's purported ties to Defendants was first partially revealed by the October 18, 2016 Blog.  After its publication, Banc's stock price dropped nearly 30% from a close of $15.87 on October 17, 2016 to a close of $11.26 per share on October 18, 2016, on significant volume of 17.2 million shares.  Plaintiff further alleged that the final disclosure of Defendants' alleged fraud was revealed to the public on January 23, 2017 when Banc announced in a press release that its October 18, 2016 response to the Blog was inaccurate, that the SEC had initiated an investigation into the Company over its October 2016 press release and related statements, and that Sugarman had resigned as Chairman and CEO.  On this news, Banc shares fell $1.50 per share, or nearly 10%, to close on January 23, 2017 at $14.65 per share.

11.     In opting to settle the Litigation, Plaintiff and its counsel considered the significant risks associated with proving the claims alleged in the Complaint.  For instance, whether the statement in Banc's April 2016 Proxy about Sugarman's COR entities was either material or misleading and whether the Proxy should have disclosed alleged ties between Galanis and Sugarman (through his COR companies) was a vigorously contested issue between the parties.  Defendants strenuously

---

[5]   These include COR Securities Holdings, Inc. ("CORSHI"), COR Capital LLC, COR Advisors and COR Clearing LLC ("COR Clearing").

- 4 -

contended: (1) there were no ties between Galanis and Sugarman requiring disclosure in Banc's Proxy; (2) nothing about Sugarman's COR entities within his Proxy biography omitted material information that necessitated disclosure to investors; and (3) since the author of the October 2016 Blog purportedly uncovered links between Galanis-Sugarman based on publicly accessible information (some of which predated the Proxy), the investing public must have already known about these alleged ties and therefore could not have been materially misled by any non-disclosure by Defendants.

12.    As to whether there were any ties between Sugarman and Galanis that should have been publicly disclosed, Defendants pointed to the findings of two internal investigations (one in late 2015 and the other in late 2016 through early 2017) respectively led by the nationally recognized law firms Winston & Strawn LLP ("Winston Strawn") and Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale").  According to Defendants, both of these firms determined that there were no links between Galanis and any officers or directors at Banc that were either unlawful or required public disclosure.  Furthermore, WilmerHale concluded in January 2017 that it could find no evidence that Galanis controlled Banc (either directly or through any of its officers or directors) – something that the October 2016 Blog claimed made Banc an investment risk as a result of alleged connections between Galanis and high-ranking individuals at the Company.

13.    Issues related to loss causation and damages were also hotly contested throughout this case, from Defendants' motions to dismiss, to Defendants' motion for reconsideration and/or certification for interlocutory appeal, class certification (including Defendants' Rule 23(f) petition to the Ninth Circuit), and on through to substantive arguments raised in each side's expert reports.  Combined, Defendants submitted reports from five different experts focusing on the elements of loss causation and/or damages.  The issue of Plaintiff's burden to prove loss causation (and whether that burden was met) would have also been a cornerstone defense for Defendants at trial.  Defendants would have taken the position, supported by expert

- 5 -

testimony, that neither the October 2016 nor the January 2017 drops in Banc's stock price could be attributed to the revelation of the alleged fraud and, therefore, the Class suffered no legal damages. Defendants' primary loss causation argument would have centered around their "truth-on-the-market" contention that if the materials relied upon (and cited to) in the October 2016 Blog were publicly accessible, the stock price decline that followed its publication could not have been due to any purported revelatory disclosure of new information. Defendants raised this argument at class certification (*see* ECF No. 175), relying on the decision in *In re BofI Holding, Inc., Sec. Litig.*, 302 F. Supp. 3d 1128, 1140-1142 (S.D. Cal. 2018); a decision which is currently pending before the Ninth Circuit. *See HMEPS v. BofI Holding*, *Inc.*, No. 18-55415 (9th Cir.).[6]

14.  Defendants would have also most likely argued that the January 2017 stock price decline was unrelated to any alleged connections between Galanis and Sugarman, but was instead the result of Banc announcing, *inter alia*, that there was an SEC investigation into Banc's October 2016 response to the Blog and that Sugarman resigned his Chairman and CEO position at the Company. Additionally, as articulated in several of their experts' reports, Defendants would have contended at both summary judgment and trial that not only was the nearly 30% stock price decline following the Blog's publication in October 2016 not attributable to any revelation of the alleged fraud, but that it was in fact the result of various forms of market manipulation by a network of short sellers.

15.  While Plaintiff disputes these contentions and would have done so at both summary judgment and trial, there was a substantial risk of recovering limited or no damages if, ultimately, the Court or jury agreed with Defendants' loss causation/price

---

[6]  In *BofI*, the court directly disagreed with this Court's holding as to whether a short seller report relying on "publicly available" information can constitute a corrective disclosure for loss causation purposes. *See BofI*, 302 F. Supp. 3d at 1141.

1   impact arguments, or simply found that Plaintiff failed to carry its burden of proof at
2   trial.

3      16.   The parties would also no doubt disagree on the importance, meaning,
4   and admissibility of witness testimony and many of the trial exhibits produced in the
5   Litigation.  There was no way to predict which interpretations and inferences a jury
6   would accept.  One of the key issues, especially for Plaintiff, was the sworn deposition
7   testimony (and, if possible, the potential trial testimony) of Galanis – who is currently
8   incarcerated at FCI Terminal Island after pleading guilty for his role in two distinct
9   multi-million dollar securities frauds.[7]  Defendant Banc noticed Galanis's deposition
10  in this case and, in January 2019 (less than a month before the close of fact discovery),
11  Galanis voluntarily agreed to provide up to 14 hours of testimony to accommodate
12  questioning by counsel for each Defendant and Plaintiff.  And while Galanis took
13  responsibility for his role in the crimes that ultimately led to his incarceration, there
14  was a substantial risk that a jury would significantly discount the veracity of Galanis's
15  deposition and/or trial testimony because he is an admitted (and convicted) securities
16  fraudster.  Additionally, the fact that Galanis was in prison for committing two multi-
17  million dollar securities frauds would almost assuredly have been a major point of
18  focus by Defendants if this case proceeded to trial.

19     17.   In deciding to settle the Litigation, Plaintiff weighed the witness
20  testimony and documents it believed supported the allegations against the testimony
21  of other witnesses and documents that Defendants believed undercut those allegations.
22  All of these issues, and the risks attendant to them, were considered by Plaintiff and
23  its counsel in deciding to settle this Litigation on the agreed terms.

24

25  [7]  Galanis is currently being held at the Metropolitan Detention Center in Brooklyn,
    New York, awaiting resentencing on both of the securities frauds to which he pled
26  guilty.  As a result, had a trial in this Litigation started in February 2020 per the
    Court's Moratorium Order (*see* ECF No. 551 at 2), Galanis would be outside of the
27  Central District of California and therefore in all likelihood unavailable for Plaintiff to
28  call as a live trial witness in support of its case in chief.

- 7 -

18.     On balance, considering all the circumstances and risks faced at trial, Plaintiff believes the Settlement is in the best interests of the Class.

19.     Lead Counsel prosecuted the Litigation on a wholly contingent basis and advanced or incurred all litigation expenses.  By doing so, Lead Counsel shouldered the substantial risk of an unfavorable result.  Lead Counsel has not yet received any compensation for its effort.

20.     The fee application for 33% of the Settlement Amount is fair both to the Class and Lead Counsel, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits conferred on the Class.  The Settlement Amount accounts for approximately 25% of reasonably recoverable damages.  It also accounts for the risks undertaken by Lead Counsel, the quality of representation, the nature and extent of legal services performed, and the fact that the $19.75 million Settlement was not likely at the outset of the case.  Both the Settlement and the fee request have been independently approved by the Lead Plaintiff, Iron Workers.  This is the kind of result envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq*. (the "PSLRA") and is entitled to significant weight by the Court in awarding fees to counsel.

21.     Lead Counsel also seeks an award of $1,575,210.83 in expenses reasonably and necessarily committed to the prosecution of the Litigation over the last three years.   These expenses include: (i) the substantial fees and expenses of consultants and experts whose services Lead Counsel required for the successful prosecution and resolution of this case; (ii) the costs associated with conducting fact witness depositions, which included court reporter and videographer fees and travel expenses; (iii) photocopying, imaging, shipping, and managing an electronic database of more than 1.2 million pages of documents; and (iv) online factual and legal

1    research.   These expenses were reasonable and necessary to obtain the successful
2    result.

3           22.    Also, as permitted by the PSLRA, Lead Plaintiff Iron Workers seeks an
4    award of $1,444 pursuant to 15 U.S.C. §78u-4(a)(4) for its representation of the Class.
5    Its investment of time, effort, and expense greatly contributed to the successful result
6    of the Litigation.

7           23.    The following is a summary of the principal events which occurred
8    during the course of the Litigation and the legal services provided by Lead Counsel.

9    **II.    THE LITIGATION**

10          **A.    The Commencement of the Litigation**

11          24.    On January 26, 2017, the initial class action complaint was filed in front
12   of the Honorable Judge Cormac J. Carney against Banc, Sugarman, and Banc's former
13   CFO, James J. McKinney ("McKinney"), alleging violations of the federal securities
14   laws on behalf of purchasers of Banc common stock during the period October 29,
15   2015 through January 20, 2017, inclusive.  *See Malak v. Banc of California, Inc.*, No.
16   8:17-cv-00138-AG-DFM, ECF No. 1 (C.D. Cal.) ("*Malak*").

17          25.    On March 24, 2017, Iron Workers moved to be appointed lead plaintiff
18   and for approval of its selection of Robbins Geller as lead counsel.  *See Garcia v.*
19   *Banc of California, Inc.*, No. 8:17-cv-00118-CJC-DFM, (C.D. Cal.) ECF Nos. 15-19
20   ("*Garcia*").

21          26.    On April 20, 2017, this case was transferred from Judge Carney to this
22   Court.  *See Malak*, ECF No. 17.

23          27.    On May 1, 2017, the Court appointed Iron Workers as lead plaintiff
24   pursuant to §21D(a)(3)(B) of the Exchange Act as amended by the PSLRA, approved
25   its selection of Robbins Geller as lead counsel and consolidated the *Malak* and *Garcia*
26   actions, captioning the case as *In re Banc of California Securities Litigation.  See* ECF
27   No. 39.

28          28.    On May 31, 2017, Plaintiff filed the Complaint.  *See* ECF No. 41.

- 9 -

**B.     Defendants' Motions to Dismiss**

29.     On June 30, 2017, Defendants Banc, Sugarman, and McKinney each filed their own motion to dismiss the Complaint. *See* ECF Nos. 42-53. Their detailed and complex motions raised numerous legal issues and challenges to the sufficiency of the Complaint's allegations.    In sum, they argued that Plaintiff: (1) failed to adequately allege any misleading statements or omissions; (2) failed to adequately allege materiality; (3) failed to adequately allege scienter, including any allegations of motive or opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness; (4) failed to adequately allege loss causation; and (5) failed to meet the pleading requirements required for a §20(a) control person claim. *See* ECF Nos. 42-44.

30.     On July 21, 2017, Plaintiff filed its omnibus opposition to the motions to dismiss filed by defendants Banc and Sugarman.[8] Specifically, Plaintiff argued that the Court should deny both motions because, *inter alia*, the Complaint sufficiently alleged that: (1) Defendants' statements and omissions in Banc's Proxy with respect to the biographies of Sugarman and former Banc director Chad T. Brownstein ("Brownstein") were materially false and/or misleading; (2) Defendants' public statements about Banc's "quality people," "top talent," and "strong independent board" were materially misleading; (3) Defendants' purported risk disclosures about Banc's reputation were materially misleading; (4) Banc's Class Period filings referring to Brownstein as an "independent" director were materially misleading; (5) Defendants made these public material misrepresentations with the requisite fraudulent state of mind (*i.e.*, scienter); (6) both the October 18, 2016

---

[8]     On July 24, 2017, the parties stipulated, and the Court agreed, that Plaintiff would have until July 28, 2017 to respond to McKinney's motion to dismiss because Plaintiff was trying to have all parties agree to McKinney's dismissal.  ECF Nos. 57-58. However, because Plaintiff could not obtain approval from all the parties to dismiss McKinney with prejudice, Plaintiff filed its notice of dismissal with respect to the former Banc CFO on July 26, 2017.  ECF No. 59.

- 10 -

*SeekingAlpha.com* Blog and Banc's January 23, 2017 press release were actionable corrective disclosures for purposes of pleading the element of loss causation; and (7) Defendants were "control persons" who violated §20(a) of the Exchange Act. *See* ECF No. 55. In opposing Defendants' motions to dismiss, Lead Counsel spent significant time and resources performing the legal research necessary to demonstrate that the Complaint satisfied the pleading requirements imposed by the PSLRA.

31.    On August 4, 2017, Defendants filed replies in support of their respective motions to dismiss. *See* ECF Nos. 60-61.

32.    On September 6, 2017, the Court issued an order ("MTD Order") that partially denied Defendants' motion to dismiss and holding that Plaintiff sufficiently alleged: (1) that Sugarman's biography within Banc's April 2016 Proxy contained an actionable material misrepresentation; (2) the material misrepresentation in Banc's Proxy was made by Defendants with scienter; and (3) that the October 2016 Blog and Banc's January 2017 press release were actionable corrective disclosures for the purposes of establishing loss causation at the pleading stage. *See* ECF No. 68 at 10-17.[9]

## C.    Defendants' §1292(b) Motion

33.    On October 5, 2017, pursuant to 28 U.S.C. §1292(b), Defendants moved the Court to amend its MTD Order and then certify it for immediate appeal on the issues of whether: (1) the Blog, which relied on publicly accessible information, can constitute a corrective disclosure for loss causation purposes; and (2) Sugarman's biography in Banc's Proxy misleadingly omitted any material information about alleged ties between the former Banc CEO and Galanis. *See* ECF No. 74.

34.    On October 9, 2017, Plaintiff filed its opposition to Defendants' §1292(b) motion. *See* ECF No. 75. Plaintiff argued that Defendants were simply rehashing arguments raised at the motion to dismiss stage, arguments this Court rejected when it upheld the Complaint's allegations about Sugarman's Proxy biography. Plaintiff

---

[9]    Unless otherwise noted, the page number references are to the blue ECF numbers at the top of each page.

further argued that Defendants failed to demonstrate any of the §1292(b) factors had been met and, as a result, the Court should deny their request which is reserved only for "exceptional" cases.

35.     On November 3, 2017, Defendants filed a reply brief in support of their §1292(b) motion.  *See* ECF No. 81.

36.     On November 20, 2017, the Court denied Defendants' §1292(b) motion. *See* ECF No. 86.

### D.     Rule 26(f) Joint Case Management Report

37.     On October 2, 2017, after extensive telephonic and written communications, the parties jointly submitted their Case Management Report, pursuant to Fed. R. Civ. P. 26(f).  *See* ECF No. 73.

38.     On October 16, 2017, the Court entered its Scheduling Order and adopted the dates and deadlines attached in an exhibit to the parties' Case Management Report. *See* ECF No. 79.

### E.     Confidentiality and Protective Order

39.     On November 6, 2017, the parties jointly submitted a proposed Confidentiality and Protective Order ("Confidentiality Order") to the Court.  *See* ECF No. 82.

40.     On November 13, 2017, the Court signed and entered the Confidentiality Order.  *See* ECF No. 83.

### F.     Plaintiff's Motion for Class Certification

41.     On December 21, 2017, Lead Plaintiff moved for class certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), and to appoint Iron Workers as Class Representative and Robbins Geller as Class Counsel. *See* ECF Nos. 91-94.  Because the Court dismissed the Complaint's allegations predating Banc's publication of its Proxy in 2016,[10] Plaintiff moved to certify a class of Banc investors who purchased

---

[10]   *See* ECF No. 68 at 10.

their shares between April 15, 2016 and January 20, 2017, inclusive.  Attached to Plaintiff's class certification briefing was the expert report of  Zachary Nye, Ph.D. *See* ECF. No. 93-3.  Dr. Nye's report focused on the issue of market efficiency, wherein he opined that based on his research and analysis, Banc's stock traded in an efficient market during the Class Period.

42.    On February 8, 2018, Defendants deposed Iron Workers' investment manager who transacted in Banc stock on its behalf during the Class Period.  The deposition took place in Chicago, Illinois.

43.    On February 12, 2018, Defendants filed their opposition to Plaintiff's motion for class certification.  *See* ECF Nos. 141-142.  Defendants' opposition brief attached an expert report from Alexander Aganin, Ph.D.  *See* ECF No. 141-2.  Relying in part on Dr. Aganin's report, Defendants made a two-pronged attack as to why individual issues of reliance predominated over common ones compelling the Court to deny class certification under Rule 23(b)(3).  Defendants claimed that because the Blog cited to and relied upon information that had been publicly accessible since before its October 18, 2016 publication, the subsequent 30% stock price decline could not have been caused by the purported revelation of alleged ties between Galanis and Banc's then-CEO, Sugarman.  Alternatively, Defendants argued that if indeed Banc's steep stock price decline on October 18, 2016 was the result of information allegedly "revealed" by the Blog, then the market for Banc's stock could not have been efficient because the publicly accessible information allegedly disclosed by the Blog would have already been incorporated into Banc's stock price long before it was published on October 18th.  Defendants also argued that Plaintiff did not sufficiently demonstrate that common issues regarding the element of damages predominated over individual ones.  Specifically, Defendants claimed that Dr. Nye did not explain how the event study he utilized for market efficiency purposes could exclude confounding information surrounding both alleged corrective disclosures pleaded in the Complaint,

*i.e.* October 18, 2016 and January 23, 2017, when calculating damages caused by Defendants' allegedly fraudulent conduct.

44.    On March 22, 2018, Plaintiff filed its reply brief in support of class certification.  *See* ECF Nos. 163-164.  Along with its reply brief, Plaintiff filed a rebuttal expert report by Dr. Nye addressing the issues raised by Defendants (and their expert) as to both market efficiency and damages. *See* ECF No. 164-1.  In response to Defendants' opposition, Plaintiff countered that Defendants failed to rebut the fraud-on-the-market presumption of reliance enunciated by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).  Furthermore, Plaintiff argued that the issues raised by Defendants as to whether the public was actually aware of the alleged ties between Galanis and Sugarman and also whether Banc's stock price declines on October 18, 2016 and January 23, 2017 were proximately caused by public revelations of Defendants' alleged fraudulent conduct or "confounding information," were nothing more than arguments about materiality and loss causation – two elements of a §10(b) action that are inappropriate to decide at class certification.

45.    On April 3, 2018, Defendant Banc filed a Notice of Supplemental Authority in Support of Opposition to Class Certification ("NSA"), citing to the motion to dismiss decision in *BofI*, 302 F. Supp. 3d 1128.  *See* ECF No. 175.  Banc argued that based on the decision and reasoning by the court in *BofI* on the issue of loss causation, this Court should deny class certification under Rule 23(b)(3) because a stock price decline cannot be attributed to the release of information that was already technically publicly available or accessible.

46.    On April 4, 2018, Plaintiff filed its response to Banc's NSA, highlighting to the Court why the *BofI* decision was completely inapt to the issues being litigated in this case at the class certification stage and that the decision there relied on arguments and case law this Court had already rejected when it denied Defendants' motions to dismiss and their §1292(b) motion.  *See* ECF No. 176.

- 14 -

47.     On April 4, 2018, Defendant Banc filed a Request for Leave to File Rebuttal Expert Report ("RFL"), attaching another report by Dr. Aganin.  *See* ECF No. 177.

48.     On April 5, 2018, Plaintiff filed its opposition to Banc's RFL.  *See* ECF No. 178.

49.     On May 31, 2018, the Court granted Plaintiff's motion for class certification under Rule 23(a) and 23(b)(3), appointed both Iron Workers as Class Representative and Robbins Geller as Class Counsel.  *See In re Banc of California Sec. Litig.*, 326 F.R.D. 640 (C.D. Cal. 2018).

**G.     Defendants' Rule 23(f) Petition to the Ninth Circuit**

50.     On June 14, 2018, Defendants filed their Rule 23(f) petition with the Ninth Circuit, seeking permission to appeal this Court's grant of class certification. *See Banc Appeal*, ECF No. 1.  In their petition, Defendants resurrected the identical arguments they made in their opposition to class certification.

51.     On June 25, 2018, Plaintiff filed its opposition to Defendants' Rule 23(f) petition.  *See id*., ECF No. 3.

52.     On July 3, 2018, Defendants moved for leave to file a reply in support of their Rule 23(f) petition.  *See id.*, ECF No. 4.

53.     On September 19, 2018, the Ninth Circuit denied Defendants' Rule 23(f) petition.  *See id.*, ECF No. 5; *see also Banc Appeal*, 2018 WL 4474393, at *1.

**H.     Fact Discovery**

    **1.     Plaintiff's Document Discovery Directed to Defendants**

54.     Upon expiration of the PSLRA-mandated discovery stay, Plaintiff served document requests ("RFPs") and its first set of interrogatories ("Rogs") on Defendants on October 13, 2017.

- 15 -

### a. Plaintiff's Document Discovery Directed to Defendant Banc

55. In addition to the October 13, 2017 RFPs served on both Defendants, Plaintiff served additional RFPs on Banc on November 13, 2017, December 15, 2017, March 16, 2018, July 2, 2018, July 10, 2018, October 12, 2018, October 29, 2018, November 6, 2018, November 12, 2018 and December 4, 2018. Plaintiff and Defendant Banc conducted several meet and confers and negotiations as to the appropriate scope of Banc's search for and production of relevant documents and communications, including electronically-stored information ("ESI"). Ultimately, Plaintiff and Banc agreed on a set of search terms that the latter would run with respect to ESI on its servers. After subsequent meet and confers concerning Plaintiff's later-served RFPs, the two parties agreed on the production by Banc of various hard copy documents as well. In response to Plaintiff's document requests, Banc produced approximately 456,000 pages of documents.

56. Plaintiff also served its second and third sets of Rogs on Banc on January 12, 2018 and August 17, 2018, respectively. Finally, Plaintiff served its first and second sets of requests for admission ("RFAs") on Banc on July 17, 2018 and August 17, 2018, respectively.

### b. Plaintiff's Document Discovery Directed to Defendant Sugarman

57. With respect to Sugarman, Plaintiff served its additional document requests on March 16, 2018, June 1, 2018, and November 12, 2018. Plaintiff and Defendant Sugarman separately conducted numerous meet and confers and negotiations as to an appropriate set of search terms Sugarman would run in connection with his non-Banc email addresses. In total, Sugarman produced nearly 1,900 pages of documents in response to Plaintiff's document requests.

58. In addition, Plaintiff served RFAs on Sugarman on January 31, 2018, February 12, 2018, February 13, 2018, and July 12, 2018.

- 16 -

### 2.    Defendants' Document Discovery Directed to Iron Workers

59.    On December 15, 2017, Banc served its first set of RFPs and Rogs on Iron Workers.  Banc later served an additional set of RFPs, its second set of Rogs, and its first set of RFAs on Iron Workers on November 12, 2018.  Subsequent to Banc serving its second set of Rogs and first set of RFAs, Plaintiff and Banc had multiple meet and confers to discuss the sufficiency of Plaintiff's responses to these two sets of discovery requests.  As a result of these discussions, Plaintiff agreed to amend and supplement its responses to these discovery requests served by Banc.

60.    In response to Banc's RFPs, Iron Workers produced more than 3,300 pages of documents.

61.    Sugarman served Iron Workers with RFPs on April 9, 2018 and December 14, 2018.  Additionally, Sugarman served its first set of Rogs and RFAs on Iron Workers on December 14, 2018.

### 3.    Plaintiff's Document Discovery Directed to Relevant Nonparties

62.    Because of the nature of the underlying factual allegations in this case, obtaining documents from relevant nonparties was crucial to Lead Counsel's prosecution of this Litigation.  For example, the central allegation in this case was that Sugarman, through his COR entities, had material and undisclosed connections to both Galanis and entities that Galanis influenced and/or controlled ("Galanis Entities") that were directly involved in a multi-million dollar criminal securities fraud known as the Tribal Bonds Scheme.  *See* ¶¶32-36, 38, 59(a), 72(a), 84.  Therefore, Sugarman's alleged non-Banc connections to non-Banc people and entities were particularly important.

63.    As a result, Plaintiff subpoenaed a multitude of nonparties with potentially relevant information, including: (1) Sugarman's COR entities; (2) certain individuals who worked directly for or with Sugarman's COR entities; (3) persons who were ultimately prosecuted by the United States Department of Justice for their

- 17 -

involvement with Galanis in the Tribal Bonds Scheme; (4) certain companies, law firms, and individuals allegedly tied to the Tribal Bonds Scheme through Galanis, Galanis Entities and/or Jason Sugarman (Steven Sugarman's older brother, a former member of Banc's advisory board and also a former paid consultant to a Banc subsidiary);[11] (5) Jason Sugarman; and (6) a company Jason Sugarman co-founded and ran, and whose email address domain the SEC contended he used to communicate with Galanis and others involved in the Tribal Bonds Scheme.[12]

64. This case also involved two separate internal Banc investigations led by Winston Strawn (in late 2015) and WilmerHale (in late 2016 and early 2017) into alleged ties between Galanis and Banc officers and directors, including Steven Sugarman. Thus, Plaintiff subpoenaed both of these law firms for materials they produced or shared (*e.g.*, via a presentation) with the SEC as part of the latter's investigation into Banc stemming from the Company's admittedly inaccurate October 18, 2016 press release responding to the allegations laid out in the Blog. And because Banc's auditor, KPMG, was also involved in the WilmerHale-led investigation and also sent a letter to Banc's chairman of the Company's Joint Audit Committee on October 27, 2016, "raising concerns about allegations of 'inappropriate relationships with nonparties' and 'potential undisclosed related party relationships,'"[13] Plaintiff subpoenaed KPMG for documents as well.

65. In total, Plaintiff successfully served 54 nonparty subpoenas, resulting in the production of more than 92,000 pages of documents. Most of these documents were produced only after numerous meet and confers between Lead Counsel and the

---

[11] *See* ¶¶33, 56. The SEC recently charged Jason Sugarman as a co-conspirator of Galanis's in the Tribal Bonds Scheme. *See Securities and Exchange Commission v. Jason Sugarman*, No. 1:19-cv-05998-WHP (S.D.N.Y.), ECF No. 6, ¶¶1-3.

[12] *See Sec. and Exchange Comm'n v. Archer*, No. 16cv3505, 2018 WL 3424449, at *1 (S.D.N.Y. July 2, 2018).

[13] *See* ECF No. 102 at 4:22-25.

counsel for each respective nonparty.  This required extensive coordinated efforts and expenditures of time and resources by Lead Counsel.

### 4. Plaintiff's Discovery Disputes with Defendants and Nonparties

66.     Plaintiff negotiated and, in some instances, briefed several complex discovery disputes involving Defendants and relevant nonparties.

### a. The "Deposition Disputes" Briefing

67.     In September 2018, after numerous rounds of meet and confers, the parties briefed for the Court several deposition-related disputes.  *See* ECF Nos. 356-359, 370-372.  Specifically, with respect to Sugarman's deposition, Plaintiff and Banc each sought up to seven hours (*i.e.*, up to 14 hours combined), and Sugarman refused to be deposed for more than seven hours total.  Similarly, with respect to the deposition of Banc's former General Counsel (who was also designated by Banc as a 30(b)(6) representative), Plaintiff and Sugarman each sought up to seven hours, and Banc refused to allow him to sit for more than seven hours combined as both an individual and corporate designee.

68.     As to the depositions of the Company's current and/or former directors, Banc argued that Plaintiff and Sugarman together could only depose certain current and/or former Company directors for up to two hours each and also that the areas of inquiry be limited to certain topics.  Finally, Plaintiff requested that the Court order Banc to designate a corporate representative on certain topics, one of which was Sugarman's resignation in January 2017.

69.     In October 2018, the Court ruled that it would not deviate from the presumptive limits under the Federal Rules of Civil Procedure and allowed Plaintiff to depose Sugarman for up to seven hours, and if Banc wanted to depose Sugarman for any more time, then they could seek leave of Court if that situation arose.  *See generally* ECF No. 374.  The Court also ruled that Plaintiff and Sugarman could depose the former and/or current Banc directors for up to seven hours each – with

- 19 -

Plaintiff and Sugarman dividing up the seven hours – and that Banc's former General Counsel could be deposed for up to fourteen hours total as both an individual and in his capacity as a 30(b)(6) representative for Banc. *Id.*

70.     Not surprisingly, this deposition briefing, along with the seemingly endless meet and confers that preceded it, delayed Plaintiff's ability to depose both named Defendants, Banc's former General Counsel, and certain current and/or Former Banc Directors.

### b.     Plaintiff's Motion to Compel Against WilmerHale

71.     In January and February 2018, Plaintiff, Defendants, and certain nonparties participated in *omnibus* discovery briefing to address overarching discovery disputes. *See* ECF Nos. 102-105, 111-133, 137-139. One dispute related to disagreements Sugarman had with his co-Defendant Banc as well as certain nonparties over the appropriate scope and sequencing of discovery. In addition, Plaintiff had a dispute over whether Banc could invoke (or, in the alternative, had waived) the attorney-client privilege and work product protections relating to internal investigations conducted on Banc's behalf by the law firms Winston Strawn and WilmerHale. Banc and WilmerHale zealously argued that neither waived the privilege or work product protections. Plaintiff argued that any applicable privilege was waived as to findings made by either Winston Strawn or WilmerHale ultimately disclosed to the SEC, including the factual information underlying those conclusions. While the Court ruled on the scope of the discovery issues, it determined that ruling on the privilege issue was premature at that juncture. *See* ECF No. 146.

72.     Two weeks after the Court's order on February 14, 2018, Plaintiff participated in an in-person meet and confer with both Defendants and WilmerHale in Los Angeles. At that conference, Plaintiff and WilmerHale were able to largely agree on a narrowed scope of production. However, WilmerHale steadfastly asserted that attorney work product protection applied to the law firm's notes and memoranda of

interviews that it conducted of Banc officers, directors, and employees (including Steven Sugarman). In May 2018, Plaintiff moved to compel the production of these materials, which the Court granted. *See* ECF Nos. 194-195, 223.

### c. Plaintiff's Motion to Compel Documents from Nonparty Carlos Salas

73. In October 2017, Plaintiff served a subpoena on nonparty Carlos Salas, requesting the production of several categories of documents (which included any transcripts of testimony given by Salas to the SEC). Salas served as a chief executive at two of Sugarman's COR entities – specifically COR Clearing LLC and CORSHI – and for part of the Class Period, was Sugarman's Chief of Staff at Banc. In October 2017, Plaintiff also served CORSHI with a subpoena to produce documents. In February and April 2018, respectively, both CORSHI and Salas produced documents in response to Plaintiff's subpoenas.

74. However, Plaintiff and Salas disagreed about whether Salas had ever given testimony to the SEC related to topics relevant to this Litigation and, if he did, whether he would produce any transcript of his testimony. Initially, Salas neither confirmed nor denied that any hearing with the SEC took place. Eventually, after multiple meet and confers, Salas informed Plaintiff that because he did not physically possess his SEC hearing transcript, he could not produce it, nor would he order it from the SEC and subsequently produce it to Plaintiff. Ultimately, Plaintiff had no choice but to move to compel. *See* ECF Nos. 153-155. Salas filed an opposition (*see* ECF No. 162), but before Plaintiff's reply brief was due, the parties had several discussions and eventually agreed that Plaintiff would withdraw its motion if Salas agreed to produce a redacted copy of his SEC transcript, blocking out portions irrelevant to this litigation. *See* ECF No. 165.

### d. The Production of Unredacted, Relevant KPMG Workpapers and Materials

75. In October 2017, Plaintiff served a subpoena on nonparty KPMG, Banc's former outside auditor. KPMG ultimately produced over 2,400 pages of documents;

- 21 -

however, at Banc's direction, KPMG redacted information relating to WilmerHale's investigation, despite producing the same documents to the SEC with no redactions. In August and September 2018, Plaintiff participated in extensive meet and confers with both KPMG and Banc.  Banc and its now-former auditor ultimately agreed to allow Plaintiff to electronically review unredacted versions of certain KPMG workpapers and, in November 2018, produced those requested documents.

76.    Because Plaintiff needed these documents to effectively depose KPMG's former audit partner Christopher Brown ("Brown"), the individual who led the Banc engagement and was involved in WilmerHale's investigation on behalf of the Company's Special Committee, his deposition was delayed for several months.

### 5.    Discovery Disputes Between Defendants and Between Sugarman and Certain Nonparties

77.    This Litigation also had a multitude of disputes arising out of document and deposition-related discovery that Sugarman sought from Banc, WilmerHale, certain current and former members of Banc's Board of Directors and a former employer of one of Banc's former directors.[14]  When these discovery clashes eventually reached the level of briefing, Plaintiff reviewed those Court filings and also prepared for and attended hearings (either telephonically or in person) in case this Court had any questions for Plaintiff as to its stance on the various disagreements involving Sugarman and the nonparties.  Plaintiff also reviewed the briefing, hearing transcripts, and subsequent orders issued by Magistrate Judge Douglas F. McCormick

---

[14]    *See, e.g.*, ECF Nos. 144-145, 156-157, 161, 169-174, 190-192, 198-202, 205-206, 208-209, 211, 213, 215-218, 221-222, 229-230, 232, 242, 244-245, 250-254, 256-257, 259-268, 270-281, 283-285, 288, 290-292, 297, 300-303, 306-307, 309-310, 314, 323, 325, 328, 341, 345, 348-349, 358-362, 364-367, 371-373, 375-377, 379-390, 396-398, 405-418, 421, 426-427, 431-434, 436-464, 468-469, 473-486, 493, 499, 503-504, 508, 512, 515, 518-519, 521, 526, 530-535, 537-544, 547-548, 552, 560-563, 565-569, 575-580, 582-584.

regarding motions to compel Sugarman filed against several alleged short-sellers of Banc stock during the Class Period.[15]

78.    Plaintiff also carefully monitored the discovery disputes regarding Banc's noticed depositions of: (1) Sugarman; (2) 30(b)(6) representatives for two of Sugarman's COR-related entities; (3) Carlos Salas, a former executive at both CORSHI and COR Clearing; and (4) Cynthia Abercrombie, a former director of a wholly owned subsidiary of Banc.  *See* ECF Nos. 487-488, 491, 494, 500-502, 528-529, 536, 553, 556.

### 6.    Depositions

79.    In preparation for trial, Plaintiff took or participated in 17 fact depositions that included Sugarman, the federally incarcerated Galanis, two 30(b)(6) representatives for Banc, Banc's former General Counsel, current and former members of Banc's Board, Banc's former Chief Accounting Officer, former outside counsel for Banc and a former KPMG audit partner who worked on the Banc engagement and was involved in the WilmerHale-led investigation on behalf of Banc's Special Committee (a subsection of Banc's Board) in late 2016 and early 2017.

80.    Additionally, as a result of the contentiousness of this Litigation, two depositions needed to be continued at the Federal Courthouse in Santa Ana in front of Magistrate Judge McCormick.  *See* ECF Nos. 446-455, 461-464, 468-469 (briefing between the Defendants regarding deposition of then-current Banc director Halle Benett); ECF Nos. 431-434, 436-437, 456-457, 473-479 (briefing between the Defendants regarding deposition of Banc's former outside counsel, Sanford Michelman).  Another example of just how combative this Litigation would become, after Plaintiff deposed Sugarman for seven hours over a span of two days in

---

[15]    *See In re Subpoenas to Produce Documents Information, or Objects to Muddy Waters Capital LLC, MLAF LP, and SS&C Technologies, Inc.*, No. 2:18-MC-00147 (C.D. Cal.); *In re Banc of California Sec. Litig.*, Nos. 8:19-MC-00004 & 8:19-MC-00005 (C.D. Cal.).

January 2019, Banc successfully moved to compel its co-defendant Sugarman to sit for an additional seven hours – which he did in March and April 2019. *See* ECF Nos. 500-502, 514.

81.     Lead Counsel noticed or participated in the depositions of the following witnesses:

| DEPONENT | DATE(S) | LOCATION | POSITION DURING CLASS PERIOD |
|---|---|---|---|
| Leo Harman | 02/08/18 | Chicago, Illinois | Plaintiff's Outside Investment Manager |
| Tina Van der Zee | 05/30/18 | Los Angeles, California | Banc Senior Vice President/Account Relationship Manager |
| Carlos Velasquez | 06/21/18 | Los Angeles, California | Employee at both Banc & Sugarman's COR Entities |
| Richard Smith | 06/28/18 | Los Angeles, California | Banc Managing Director of Private Banking |
| David Aronoff | 08/09/18 | Chicago, Illinois | Outside Counsel for Banc (Winston Strawn) |
| Sanford Michelman | 11/28/18; 2/28/19 | Los Angeles, California; Santa Ana, California (federal court house) | Outside Counsel for Banc (Michelman & Robinson LLP) |
| Eric Holoman | 11/30/18 | Los Angeles, California | Banc Board & Special Committee Member |
| Halle Benett | 12/06/18; 1/16/19 | New York, New York; Santa Ana, California (federal court house) | Banc Board & Special Committee Member |
| Jonah Schnel | 12/17/18 | Los Angeles, California | Banc Board & Special Committee Member |
| John Grosvenor | 12/19/18 | Los Angeles, California | Banc General Counsel |
| Albert Wang | 01/04/19 | New York, New York | Banc Chief Accounting Officer |
| Jeffrey Karish | 01/15/19 | Los Angeles, California | Banc Board & Special Committee Member |

- 24 -

| DEPONENT | DATE(S) | LOCATION | POSITION DURING CLASS PERIOD |
|---|---|---|---|
| Jason Galanis | 01/17/19-01/18/19 | San Pedro, California (FCI Terminal Island) | Federally Convicted Securities Fraudster With Alleged Material Ties to Sugarman and His COR Entities |
| Robert Sznewajs[16] | 01/23/19 | Los Angeles, California | Banc Board & Special Committee Member |
| Steven Sugarman | 01/24/19, 1/29/19, 03/05/19 & 04/18/19 | Los Angeles, California | Banc CEO and Chairman |
| Christopher Brown | 01/25/19 | Irvine, California | KPMG Audit Partner |
| John Grosvenor[17] | 01/28/19 | Los Angeles, California | Banc General Counsel |

82.    Several of these depositions were critically important in Lead Counsel's attempt to develop evidence necessary to establish that Defendants violated federal securities laws by allegedly failing to disclose in Banc's Proxy the purported material connections between the then-indicted Galanis and Sugarman's COR entities.  Some of these depositions were also vital in exploring other areas related to Plaintiff's allegations, such as: (1) the late 2015 and early 2016 Winston Strawn-led internal investigation into alleged ties between Galanis and Banc's officers and directors (including Sugarman); (2) Banc's October 18, 2016 press release responding to the Blog which allegedly revealed those connections in a *SeekingAlpha.com* post that same day; (3) the late 2016 and early 2017 WilmerHale investigation (assisted by KPMG) on behalf of Banc's Special Committee into the veracity of certain assertions made by Banc in its October 2016 press release; (4) the circumstances surrounding and reasons behind Sugarman's resignation in January 2017; and (5) findings made by KPMG as a result of the WilmerHale investigation on topics that include the adequacy of Banc's internal controls and "tone at the top" issues.

---

[16]    Testifying as both a fact witness and a Banc 30(b)(6) representative.

[17]    Testifying as a Banc 30(b)(6) representative.

- 25 -

### I.    Jason Galanis

83.    One of the unique features of this Litigation is that the key allegations revolved around whether a CEO of a publicly-traded company had material ties to a then-indicted, and now federally incarcerated, securities fraudster.  Thus, the two main individuals that possessed information directly related to Plaintiff's allegations were Sugarman (a named defendant), and Galanis, an inmate at FCI Terminal Island in San Pedro, California.[18]  Plaintiff reached out to Galanis in January 2018 to gauge whether he would be willing to discuss the Complaint's allegations and his alleged ties to Banc, Sugarman, and Sugarman's COR entities.  Galanis agreed, and subsequently began communicating with Lead Counsel via email.  After months of emailing back and forth, Lead Counsel visited Galanis at FCI Terminal Island in the fall of 2018.  During their nearly all-day meeting, Lead Counsel and Galanis discussed the underlying allegations in the Litigation and also reviewed various documents produced in discovery that were either emails Galanis sent and/or received, or documents he had signed.

84.    In December 2018, Banc noticed Galanis's deposition to take place in January 2019 at FCI Terminal Island.  Galanis agreed to be deposed under oath for up to 14 hours.  The parties agreed to split the deposition time amongst themselves with Banc and Plaintiff sharing seven hours, and Sugarman having up to seven hours to question Galanis.  *See* ECF Nos. 430, 435.  Prior to his deposition, Lead Counsel met with Galanis two more times, wherein they reviewed the Complaint's allegations and discussed certain relevant materials produced in discovery that were documents or communications Galanis had either previously sent, received, and/or signed.  On January 17 and 18, 2019, the parties deposed Galanis at FCI Terminal Island.

---

[18]   Plaintiff served document and deposition subpoenas on Hugh Dunkerley, a former director of Sugarman's CORSHI entity and an admitted co-conspirator of Galanis's in the Tribal Bonds Scheme, but Dunkerley refused to produce any documents or appear for a deposition, invoking his right against self-incrimination pursuant to the Fifth Amendment.

### J.    Plaintiff's Experts

85.    To assist Lead Counsel in investigating and proving Plaintiff's claims and navigating the complex issues involved in this matter, the services of certain experts and in-house forensic accounting professionals were required.

#### 1.    Zachary R. Nye, Ph.D.

86.    Dr. Zachary Nye is a financial economist and Vice President at Stanford Consulting Group, Inc.  He holds an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine.  His research areas include the market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation, and corporate finance.  Dr. Nye has offered expert opinions and/or been deposed in numerous securities fraud related actions.  As this Court noted in its class certification opinion, Dr. Nye's "resume and experience sufficiently establish his qualification as an expert witness, which Defendants don't dispute."  *Banc*, 326 F.R.D. at 648.

87.    In connection with the motion for class certification, Plaintiff utilized the services of Dr. Nye to examine and opine that Banc's stock traded in an efficient market during the Class Period.  In certifying the Class, the Court found that Plaintiff, *via* Dr. Nye's report, sufficiently demonstrated that "many signs of an 'efficient market'" were present and, as a result, common issues of reliance predominate over individual ones.  *Id.*; *see also id.* at 650 ("The Court finds Nye's event study sufficient to show a causal relationship 'between unexpected corporate events or financial releases and the price reaction of Banc of California stock,' which therefore also favors a finding of market efficiency.").

#### 2.    Steven P. Feinstein, Ph.D., CFA.

88.    Dr. Feinstein is currently an Associate Professor of Finance at Babson College, and the founder and president of Crowninshield Financial Research, Inc., a financial economics consulting firm.  He holds a Ph.D. in Economics from Yale

University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College.  Dr. Feinstein also possesses the Chartered Financial Analyst designation, granted by the CFA Institute.  Dr. Feinstein has extensive experience in the financial industry, having been selected to review papers for finance journals and having conducted analyses and presented opinions related to markets, valuation, and damages in over 70 cases.  *See generally Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx), 2018 WL 4956520, at *4-*5 (C.D. Cal. October 5, 2018) (denying defendants' motion to exclude Dr. Feinstein).

89.    Dr. Feinstein was retained by Plaintiff to provide an expert report on the issue of loss causation and damages.  Plaintiff submitted Dr. Feinstein's report (along with attached exhibits and underlying documents) to Defendants when the parties exchanged expert reports in February 2019 and rebuttal reports in May 2019. Dr. Feinstein also submitted a supplemental rebuttal report in July 2019 in response to a June 2019 rebuttal expert report submitted by Sugarman concerning loss causation and damages.

### 3.    Harvey L. Pitt

90.    Mr. Pitt has a long and distinguished career, which first began at the SEC and continued for over a decade, where he served as the SEC General Counsel for three years before leaving and then returning to serve as the 26th Chairman of the SEC from 2001-2003.  Mr. Pitt was also a senior partner and Co-Chairman of Fried Frank LLP for almost 25 years, and has also served as a fiduciary director to numerous public and non-public companies, for-profit and nonprofit organizations, and private sector and governmental advisory boards. Mr. Pitt also has extensive teaching experience at a number of law schools.

91.    Plaintiff retained Mr. Pitt to provide an expert report on issues pertaining to the common practices and understandings surrounding full and fair public

disclosure by companies in the United States.  Plaintiff submitted Mr. Pitt's report (along with attached exhibits and underlying documents) to Defendants when the parties exchanged expert reports in February 2019 and rebuttal reports in May 2019.

### 4.    Craig Pirrong, Ph.D.

92.    Dr. Pirrong is currently a Professor of Finance at the University of Houston's Bauer College of Business.  He holds both an undergraduate and Ph.D. degree from the University of Chicago.  Dr. Pirrong's research focuses on the economics of commodity markets, the relation between market fundamentals and commodity price dynamics, and the implications of this relation for the pricing of commodity derivatives.  Dr. Pirrong has also published extensively on the economics of financial exchanges.  He published 30 articles in professional publications and is the author of three books.  He has also served on the Commodity Futures Trading Commission ("CFTC") Energy and Environment Markets Advisory Committee, and has testified as an expert (for both plaintiffs and defendants) on a variety of manipulation cases.

93.    Banc and Sugarman each retained their own experts on loss causation who opined that the fluctuation of Banc's stock price leading up to and following the publication of the October 2016 Blog was caused by alleged market manipulation – referred to as "spoofing" and "layering" – by a group of purported short sellers. Plaintiff retained Dr. Pirrong to provide a rebuttal expert report to both of those experts.    Plaintiff exchanged Dr. Pirrong's expert report with Defendants in May 2019.

### 5.    Bjorn Steinholt, CFA

94.    Mr. Steinholt is the managing director of Caliber Advisors, Inc., a full-service financial valuation and economic consulting firm with offices in San Diego, California and Chicago, Illinois.  Mr. Steinholt has approximately 30 years of experience providing capital markets consulting, including analyzing and valuing investments and has provided expert reports and testified on issues such as market

- 29 -

1  efficiency, loss causation, and/or damages in numerous federal securities fraud cases
2  across the country.

3      95.    Plaintiff retained Mr. Steinholt to consult in connection with both the
4  August 2018 and June 2019 mediations.  Mr. Steinholt prepared event studies that
5  analyzed the movements in the price of Banc stock in comparison to the broader stock
6  market and prepared damages analyses for Lead Counsel.  Mr. Steinholt and his team
7  spent time studying the record and public information regarding Banc, including
8  analyst reports and Banc's SEC filings, in order to be able to analyze the market in
9  which the Company's stock traded, disclosures related to Banc's finances and
10  operations, and the movements of Banc's stock in response to the disclosures and
11  events identified in the Complaint.  Based on this work, Mr. Steinholt provided
12  Plaintiff with detailed information and analyses that were utilized in analyzing
13  damages, and provided support for Plaintiff's arguments at the August 2018 mediation
14  and the negotiations in connection with the June 2019 mediation session that
15  ultimately led to the Settlement.

16      **K.**    **In-House Forensic Accounting Department**

17      96.    Bradley Sader is a senior level Robbins Geller in-house forensic
18  accountant who worked on this Litigation.  He is a Certified Public Accountant,
19  Certified Fraud Examiner, and has been designated by the AICPA as Certified in
20  Financial Forensics.  Mr. Sader has over 16 years of professional experience, including
21  extensive experience in forensic accounting consulting in numerous complex litigation
22  matters as well as auditing at a national CPA firm.  He is an active member of the
23  AICPA, the CalCPA, and the Association of Certified Fraud Examiners.

24      97.    Mr. Sader provided analysis and input throughout the course of the
25  Litigation.  For example, during the drafting of the Complaint, Mr. Sader researched
26  the public filings, discussed relevant facts and analysis with the attorneys, and
27  provided input during the Complaint drafting process.  Then, in discovery, Mr. Sader
28  provided input on requesting documents from KPMG, and he closely reviewed the

- 30 -

KPMG workpapers as well as relevant Banc documents produced in the Litigation. In addition, Mr. Sader helped the attorneys with their preparation for the deposition of former KPMG audit partner Christopher Brown and attended the deposition with Lead Counsel. Also, Mr. Sader participated in the preparation for the deposition of Albert Wang, including selection of potential deposition exhibits and drafting of potential questions to consider for the Wang deposition. Also, Mr. Sader participated in the identification and selection of an expert witness in the Corporate Governance area, which resulted in the hiring of expert witness, Harvey Pitt. Along with the attorneys, Mr. Sader worked with Mr. Pitt in helping him understand the case. Mr. Sader reviewed drafts of Mr. Pitt's expert reports and also reviewed final reports from certain expert witnesses hired by defense counsel and provided feedback to the attorneys concerning these expert reports.

### L.    Settlement Negotiations and Terms

98.    The parties began settlement discussions in the fall of 2018. Initially, the parties retained Mr. Fairbank of Fairbank ADR, a former civil litigator with over 40 years of experience. The parties attended an all-day mediation session with Mr. Fairbank in August 2018 in Los Angeles. During that session, the parties gave detailed and thoughtful presentations on the perceived strengths and weaknesses of their respective cases. Although the mediation was confidential, it is fair to say that all parties understood that the issues of falsity, materiality, scienter, and especially loss causation and damages would all be hotly contested issues throughout the Litigation. The parties were unable to reach a settlement at the conclusion of the mediation with Mr. Fairbank; nor were they able to agree on settlement terms through their respective follow-up discussions with Mr. Fairbank through the end of 2018 and beginning of 2019.

99.    After the close of fact discovery and pursuant to this Court's March 6, 2019 Moratorium Order instructing the parties to renew settlement discussions, the parties engaged Judge Phillips and Ms. Yoshida, both well-respected and highly

experienced mediators, and participated in an all-day mediation with them on June 21, 2019 in New York City.

100.   After nearly three months of extensive settlement negotiations following the June mediation session, Judge Phillips made a proposal to the parties *via* email on September 14, 2019 for an amount he believed should resolve the case.  In the time specified by Judge Phillips, the parties accepted the mediator's proposal to settle the Litigation for $19,750,000.

101.   After reaching an agreement-in-principle, the parties worked diligently to prepare preliminary approval papers and negotiate complex Stipulations with Banc and Sugarman, respectively.   The parties then advised the Court of the tentative settlement on September 18, 2019 (*see* ECF Nos. 585, 587) and, on October 30, 2019, Plaintiff filed the preliminary approval papers.  *See* ECF Nos. 589-592.

102.   On December 4, 2019, the Court issued an order preliminarily approving the Settlement and the form and manner of notice to the Class.  *See* ECF No. 595.

103.   The Stipulation resolves the claims of the Class against all Defendants and settles this Litigation for $19,750,000 in cash, subject to the Court's approval.

104.   The Settlement is the result of vigorous arm's-length negotiations.  In Lead Counsel's judgment, the compromise embodied in the Stipulation represents a successful resolution of a very complex class action.

## III.   NATURE AND ADEQUACY OF THE SETTLEMENT

105.   The Settlement was the product of vigorous, arm's-length negotiations between the parties and, Lead Counsel believes, reflects the strengths and weaknesses of the case.  A settlement on the terms proposed would not have been achieved absent the extensive efforts described above to plead and obtain the evidence necessary to prove Plaintiff's claims of securities fraud.  Nor would settlement have been achieved without the substantial participation and assistance of strong mediators with extensive experience in negotiating the resolution of complex actions of this type.

106.    We believe that our reputation as attorneys who will zealously prosecute a meritorious case through the trial and appellate levels, as well as our aggressive litigation of this case, put us in a strong position in settlement negotiations with Banc's insurance carriers.

107.    Set forth below is an assessment of the strengths and weaknesses of the case and the risks to recovery at trial, and a description of the significant terms of the Settlement.

**A.    Strengths and Weaknesses of the Case**

108.    Although Plaintiff believes that its case is meritorious and that the Class would ultimately prevail in establishing both liability and damages, it also understands that a number of factors made the outcome of the trial uncertain.  For instance, while Plaintiff firmly believes that the documentary and testimonial evidence it intended to offer at summary judgment and trial fully supports its claims, there is no way of predicting which interpretations, inferences, or testimony the Court or jury would accept.  Further, Defendants have adamantly denied any culpability throughout the Litigation and were prepared to mount aggressive defenses that could potentially bar a Class recovery.  If the Court at summary judgment (or a jury at trial) sided with Defendants on even one of their defenses, the Class would recover nothing.  Defendants were prepared to aggressively challenge each and every element of Plaintiff's case alleging violations of the federal securities laws.

**1.    Falsity and Materiality**

109.    The Complaint alleges that Defendants failed to disclose in Banc's Proxy, specifically the section containing Sugarman's biography, that Sugarman's COR entities had material connections to Galanis and entities controlled by Galanis that were also involved in the Tribal Bonds Scheme.  *See Banc*, 326 F.R.D. at 644.  The Complaint further alleges that when the alleged ties between Sugarman and Galanis were purportedly revealed by the October 18, 2016 *SeekingAlpha.com* Blog, Banc's stock price plummeted nearly 30%.  *Id*.  Additionally, the Complaint alleges that

- 33 -

Banc's stock dropped another 9% on January 23, 2017, when Banc publicly announced that the SEC was investigating the Company regarding its press release response to the Blog in addition to Sugarman's resignation as Banc's CEO and Chairman. *Id.*

110.  As Defendants made abundantly clear, especially during the discovery process, it was their position that nothing about Sugarman's Proxy biography was materially misleading.  Defendants argued that there was nothing to disclose about Galanis anywhere in the Proxy, and the fact that Sugarman's biography listed various COR entities of his did not create a duty to disclose anything about Galanis. Defendants further contended that Sugarman did not have any material connections to Galanis at all, and to the extent that the two individuals may have known each other and had friends or business associates in common, does not mean that Banc's Proxy needed to disclose such immaterial information. *Cf. Sugarman et al. v. Muddy Waters Capital LLC et al.*, No. 3:19-cv-04248-MMC (N.D. Cal.) ("*Sugarman v. Muddy Waters*"), ECF No. 1, ¶44 ("In the conduct of his legitimate business affairs, Mr. Sugarman was introduced to Galanis and had interactions with him prior to 2015. However, at no time was Galanis ever an owner, officer, control person or employee of any of Mr. Sugarman's businesses.").

111.  Defendants would have also assuredly emphasized that neither Winston Strawn nor WilmerHale found that Sugarman had any connections to Galanis that required public disclosure. *See* ECF No. 131 at 5:18-20 ("Banc was aware of [Sugarman's] historical interactions with Galanis, and two investigations determined none of those 'ties' were material or otherwise needed to be disclosed.").  Another argument Defendants made in their motion to dismiss and class certification briefing, as well as in their post-fact discovery cut off expert reports, was a "truth on the market" defense.  Defendants argued that if the author of the Blog relied on publicly available information (some of it dated prior to the April 2016 Proxy) to allegedly link Galanis and Sugarman in its October 18, 2016 *SeekingAlpha.com* publication, then the

- 34 -

market must have already been aware of any purported connections between the two men, and therefore such information would have been immaterial by the time Proxy and the Blog were published.

112.   In an attempt to undercut Plaintiff's allegations as to both falsity and materiality, Defendants would have probably sought to present evidence at trial of the fact that, as Banc reported in a SEC Form 8-K filed on December 23, 2019, the SEC staff informed Banc that "they have concluded the investigation as to the Company, and they do not intend to recommend an enforcement action against the Company to the Commission."  Similarly, according to Sugarman, the SEC apparently informed him "that there is no on-going investigation related to [him] and it does not intend to pursue any claims against [Sugarman] for any actions related to Banc of California." *Sugarman v. Muddy Waters*, ECF No. 85, ¶2.  This too would be evidence that, at the very least, Sugarman would seek to use at trial in order to convince a jury that the lack of an SEC enforcement action – especially after it began an investigation into Banc more than three years ago – significantly undermines the strength of Plaintiff's case against him as well.

113.   If the Court at summary judgment or a jury at the conclusion of a trial found Defendants' arguments compelling, Plaintiff would have been hard-pressed to prevail at trial.

## 2.   Scienter

114.   In addition to the very real risks Plaintiff faced establishing falsity, Defendants were also prepared to mount a strong defense asserting that Plaintiff could not establish that Defendants made any false or misleading statements with the requisite intent.  At minimum, Plaintiff was required to establish that Defendants were reckless in issuing the material misstatements and/or omissions in Banc's Proxy.  Sugarman was prepared to argue that because he had no material connections to Galanis, he could not have any scienter with respect to the allegedly misleading Banc Proxy.  Additionally, Sugarman argued that by the time Banc filed the Proxy in

- 35 -

April 2016, the Company and their attorneys had "received full disclosure from Mr. Sugarman" and "were well aware of the purported Galanis ties," and that "Banc's counsels decided the purported ties did not need to be disclosed in the 2016 [P]roxy or otherwise." ECF No. 131 at 7:3-6. Both Banc and Sugarman also argued that documentary evidence and deposition testimony demonstrates that the latter's resignation in January 2017 was unrelated to the Proxy and its alleged failure to disclose links between the former Banc CEO and Galanis. *See id.* at 5:15-18 ("Banc and Mr. Sugarman . . . both agree Mr. Sugarman lacked scienter because . . . his separation had nothing to do with the 2016 proxy statement, which was accurate in all material respects.").

115. As a result, Plaintiff faced the very real risk that the Court or the jury could have accepted Defendants' arguments that it had failed to establish the element of scienter.

### 3.    Loss Causation and Damages

116. Even if Plaintiff succeeded in proving liability, a major risk going forward related to Plaintiff's ability to prove loss causation and damages. To establish these elements, Plaintiff would have to prove that the revelation of the alleged fraud proximately caused the declines in Banc's stock price during the Class Period and that those fraud-related causes could be parsed out from any potential non-fraud related news or publicly released information. Plaintiff believed that it would bring forth sufficient evidence to support both the finding of loss causation and damages at summary judgment and trial.

117. However, Defendants – as they did on multiple occasions in connection with the motions to dismiss, their §1292(b) motion and their opposition to class certification (including their 23(f) petition to the Ninth Circuit) – would argue (with the help of three reputable experts) that Plaintiff cannot demonstrate that Banc stock price declines during the Class Period were due (even in part) to the revelation of the alleged fraud.

118.   As demonstrated by their previous briefs and post-fact discovery expert reports, Defendants' attacks on Plaintiff's theory of loss causation and damages at summary judgment and trial would take multiple forms.  The first is a corollary to the "truth on the market" defense regarding materiality.  Defendants argued that the decline in Banc's stock price following the publication of the Blog on October 18, 2016 must have been related to something else because the author of the Blog admittedly relied on publicly available information.   Therefore, according to Defendants, anything purportedly "disclosed" by the Blog was not new, and could not have proximately caused the nearly 30% stock price drop.

119.   Defendants' second argument would be based on documentary evidence and their expert analysis that leading up to and following the publication of the October 18, 2016 Blog, short sellers were manipulating the price of Banc's stock through various unlawful tactics referred to as "spoofing" or "layering."  *See Sec. and Exchange Comm'n v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) ("The SEC has consistently found layering and spoofing activity to violate §10(b) and Rule 10b-5.").  Such trade practices are defined to be consisting of "bidding or offering with the intent to cancel the bid or offer before execution." *United States v. Coscia*, 866 F.3d 782, 786-87 (7th Cir. 2017).   Defendants' assertions that a group of short sellers manipulated the price of Banc's stock and did so, at least in part, through publishing the Blog, if supported with sufficient evidence, could convince the Court to grant summary judgment in favor of Defendants or influence a jury to find that Plaintiff has insufficiently proven loss causation and damages.

120.   A third argument Defendants would have certainly made as to loss causation and damages would have revolved around Banc's January 23, 2017 press release announcing the SEC's investigation into the Company's October 2018 public response to the Blog as well as Sugarman's resignation as Chairman and CEO. As to this partial corrective disclosure alleged by Plaintiff, Defendants would have argued that neither the announcement of the SEC investigation nor of Sugarman's resignation

- 37 -

1    was related to the Complaint's allegations that Galanis had material, undisclosed ties
2    to the former Banc CEO and his COR entities.

3        121.    Because the determination of loss causation and damages is a
4    complicated process requiring expert testimony, compounding the above factors was a
5    risk that the Court would grant, in whole or in part, Defendants' motion(s) to exclude
6    the opinion and testimony of Plaintiff's loss causation and damages expert (or
7    Dr. Pirrong, Plaintiff's rebuttal expert on the issues of market manipulation) at trial.
8    Even if Plaintiff's experts survived Defendants' *Daubert* motion, however, the loss
9    causation and damage assessments of the parties' experts at trial could vary
10    substantially, reducing this crucial element to a "battle of experts."

11        122.    In short, the parties disagreed on the merits of this case, including
12    whether or not damages were suffered and recoverable.  Defendants deny that they are
13    liable in any respect or that Plaintiff or the Class suffered any injury.  Accordingly,
14    recovery of any amount at trial was far from certain.  One cannot predict which
15    expert's testimony or methodology a jury would find reliable.  If the jury agreed with
16    Defendants and rejected Plaintiff's expert's calculations to apportion October 2016
17    and/or January 2017 stock price declines, Plaintiff would have had its damages
18    significantly reduced or its claims fail as a matter of law.

19        **4.    The Credibility of Jason Galanis**

20        123.    Had this case proceeded to summary judgment and trial, the testimony of
21    the currently incarcerated Jason Galanis would have been a primary piece of evidence
22    upon which Plaintiff would have relied.  While Plaintiff believes Galanis gave
23    truthful, sworn testimony during his more than seven hour deposition, there is no
24    question that relying on the testimony of someone who has pled guilty to two
25    multi-million dollar securities frauds is fraught with risks.  Defendants would certainly
26    attempt to impeach the credibility of Galanis's deposition (or live) testimony at trial
27    based primarily on the fact that he is in prison after pleading guilty to federal
28    securities fraud.  In fact, Sugarman's federal lawsuit in *Sugarman v. Muddy Waters*,

- 38 -

where Galanis is a named defendant, demonstrates that it would have been a forgone conclusion that Galanis's credibility and incarcerated status would take center stage at trial. And, assuming Defendants did attack the veracity of Galanis's testimony based on his admitted criminal history, there would be a very real risk that the jury would give little or no weight to his testimony. As a result, if the jury found that Galanis was not a credible witness, it could concurrently find that Plaintiff's remaining evidence is insufficient to prove that Defendants committed securities fraud against Banc investors.

### B. The Settlement Is in the Best Interests of the Class and Warrants Approval

124. Lead Plaintiff believes that it would have prevailed on the merits at trial. Defendants were just as adamant that Plaintiff would fail. There was a very real risk that Plaintiff would not have convinced a jury that Defendants acted with scienter or that the alleged misrepresentations and omissions were materially false or misleading when made. And there was a substantial risk that even assuming Plaintiff could prove liability, the jury could be convinced by Defendants' experts that most of the stock price declines were related to market or industry factors and not fraud – thereby significantly reducing damages, or eliminating them altogether.

125. Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based on all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the Settlement is fair, reasonable and adequate, and in the best interests of the Class.

### C. The Plan of Allocation

126. The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim and Release form. The Plan of Allocation ("Plan") provides that a Class Member will be eligible to participate in the distribution

- 39 -

of the Net Settlement Fund only if the Class Member has a market loss on all of his, her, or its transactions in Banc common stock during the Class Period.

127.    Based on counsel's and their consultant's analysis, the Plan incorporates an estimate of the amount of fraud-related inflation in Banc's common stock at various times during the Class Period.

128.    The amount of inflation in Banc stock after each of these events was determined based on an event analysis examining the movement of Banc's stock price compared to the overall market and an industry peer group following the event. Events that were alleged to have misled investors, such as the April 15, 2016 Proxy and Banc's October 18, 2016 admittedly inaccurate press release responding to the Blog, increased or maintained the amount of inflation.   On the other hand, the October 18, 2016 Blog and January 23, 2017 announcement of the SEC investigation and Sugarman's resignation, which were alleged to have disclosed the underlying falsity and/or misleading nature of the fraud, decreased the amount of inflation.

129.    The Plan apportions recognized losses to Class Members who retained their Banc shares at the end of January 23, 2017, based on the amount of inflation on the date they purchased their shares, *i.e.*, the amount they overpaid for their shares, limited by the statutory 90-day bounceback rule.  Shares sold prior to the October 18, 2016 partial disclosure of the alleged truth suffered no recognized losses, and are therefore not eligible to receive a recovery.  Recovery for all Class Members is limited to their actual out-of-pocket losses.

130.    Based on Lead Counsel's experience in this and other securities actions, and their understanding of the factual circumstances giving rise to this Litigation and the risks at trial, including the risks to both liability and damages, Lead Counsel believes that the Plan provides a fair, reasonable, and adequate method of apportioning the Net Settlement Fund among Authorized Claimants.

### D.    Reasonableness of Attorneys' Fees and Expenses

131.    The successful prosecution of this Litigation required Lead Counsel and their para-professionals to perform 11,049 hours of work valued at $7,561,131.30 and incur $1,575,210.83 in expenses, as detailed in the accompanying Declaration of Laurie L. Largent Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Attorneys' Fees and Expenses ("RGRD Decl."). *See* RGRD Decl., ¶¶4-5.

132.    Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and has requested a fee in the amount of 33% of the Settlement Amount. In light of the difficult nature and extent of the Litigation, the diligent prosecution of the Litigation, the complexity of the factual and legal issues presented, the risk of non-payment undertaken by Lead Counsel, and the other factors described above and in the accompanying motion for an award of attorneys' fees, Lead Plaintiff Iron Workers and Lead Counsel believe that the requested fee of 33% of the Settlement Amount is fair and reasonable. Moreover, it represents a significant ***negative*** multiple of counsel's lodestar.

133.    A 33% fee award is justified by the specific facts and circumstances in this case and the substantial risks that Plaintiff had to overcome at the pleadings, class certification, discovery, and appeal phases of the Litigation, and to prepare to overcome at summary judgment and trial, as set forth herein. The $19.75 million cash settlement was achieved as a result of extensive and creative prosecutorial efforts, contentious and complicated motions, over a year of hard-fought discovery, analysis of voluminous evidence, and ultimately the initial stages for trial preparation, as detailed herein. Importantly, the fee request has been approved by Lead Plaintiff.

134.    This Litigation was prosecuted by Lead Counsel on an "at-risk" contingent-fee basis. Lead Counsel fully assumed the risk of an unsuccessful result. It has received no compensation for its services during the course of this Litigation and has incurred significant expenses in litigating for the benefit of the Class.

Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

135.   This Litigation could not have been successfully prosecuted without the substantial participation and assistance of the Lead Plaintiff Iron Workers, which expended time monitoring the Litigation, consulting with Lead Counsel regarding case developments and prospects for settlement, and participating in discovery to demonstrate the typicality of its claims, the adequacy of its representation, and the suitability of this case for litigation on a class-wide basis.  The time spent by Lead Plaintiff in doing so, as reflected in the accompanying declaration of Iron Workers submitted contemporaneously herewith, was reasonable and necessary to the prosecution of this case.  As such, Iron Workers' request for $1,444 pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Class is reasonable and should be granted.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of February, 2020, at San Diego, California.

                                 _____
                                     s/ Matthew I. Alpert
                                  MATTHEW I. ALPERT

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 10, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  malpert@rgrdlaw.com

# Mailing Information for a Case 8:17-cv-00118-AG-DFM In re Banc of California Securities Litigation,

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Manuel A Abascal**
  manny.abascal@lw.com,manuel-abascal-7112@ecf.pacerpro.com

- **Zainab Anna Ali**
  zali@mofo.com

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Joel M Athey**
  joel.athey@dlapiper.com,joel-athey-7389@ecf.pacerpro.com

- **Margaret Nicole Buckles**
  mbuckles@mofo.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jordan Davisson Cook**
  jordan.cook@lw.com,#ocecf@lw.com,jordan-cook-5273@ecf.pacerpro.com

- **Roman E Darmer , II**
  rdarmer@jonesday.com,lmatson@jonesday.com,jthakur@jonesday.com,ECFIrvineNotifications@jonesday.com,epete@jonesday.com

- **Joseph De Leon**
  joseph.deleon@lw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com

- **Brian T Glennon**
  brian.glennon@lw.com,shirin.behrooz@lw.com,brian-glennon-0505@ecf.pacerpro.com

- **Andrew R Gray**
  andrew.gray@lw.com,andrew-gray-3541@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jordan.cook@lw.com,CLAUDIA.BARBERENA@lw.com,jana.roach@lw.com

- **Robert Russell Henssler , Jr**
  bhenssler@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William C Herbert**
  wherbert@mofo.com

- **Robert B Hubbell**
  rhubbell@mofo.com,docket-la@mofo.com,dawn-millner-4650@ecf.pacerpro.com,robert-hubbell-7718@ecf.pacerpro.com,dmillner@mofo.com

- **Michele D Johnson**
  michele.johnson@lw.com,michele-johnson-7426@ecf.pacerpro.com,#ocecf@lw.com,khadijah-fields-2405@ecf.pacerpro.com,jana.roach@lw.com

- **Laurie L Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Mark R McDonald**
  mmcdonald@mofo.com,docket-la@mofo.com,mmendoza@mofo.com,melissa-mendoza-4207@ecf.pacerpro.com,mark-mcdonald-0458@ecf.pacerpro.com

- **Erika Limpin Oliver**
  eoliver@rgrdlaw.com,crosini@rgrdlaw.com,kmccormack@rgrdlaw.com,CRosini@rgrdlaw.com

- **Steven J Olson**
  solson@omm.com,steven-j-olson-2026@ecf.pacerpro.com

- **Lesley F Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,clinehan@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com,charles-linehan-8383@ecf.pacerpro.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Nicholas Gray Purcell**
  nick.purcell@wilmerhale.com

- **Joseph Roth Rosner**
  jrosner@mofo.com

- **Carlos Salas**
  ecoff@ecofflaw.com

- **Nathan Matthew Saper**
  nathan.saper@lw.com

- **Robert Moss Tiefenbrun**
  rtiefenbrun@jonesday.com,lmatson@jonesday.com,ecfirvinenotifications@jonesday.com,ynomiyama@jonesday.com

- **Kristen Meredith Tuey**
  kristen.tuey@lw.com,kristen-tuey-6684@ecf.pacerpro.com

- **Ryan Arber Walsh**
  ryan.walsh@lw.com,ryan--walsh-0031@ecf.pacerpro.com,#ocecf@lw.com

- **Whitney Bruder Weber**
  whitney.weber@lw.com,whitney-weber-2642@ecf.pacerpro.com,#sflitigationservices@lw.com

- **Meryl L Young**
  myoung@gibsondunn.com,pmclean@gibsondunn.com

- **Mazamir Yousefi**
  mazamir.yousefi@lw.com,mazamir-yousefi-1016@ecf.pacerpro.com,#ocecf@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)