# EXHIBIT B

*Rough Transcript Check Against Audio*

# Steven Sugarman Interview with Reuters

## *Muddy Water RICO Investigation*

### February 2022

(In Progress…)

**Steve Sugarman:** [00:00:00] You know. Can you show me that? Then there's a document somewhere on the public record. Probably because I spent a lot of time. I was released from the case by the plaintiffs with an apology, basically. And.

**Reuters Reporter:** [00:00:16] Mhmmm

**Steve Sugarman:** [00:00:17] As part of the release, I got De-protected, you know, 100 plus kinds of types of documents and stuff that are just now public. So, it's probably somewhere in there.

**Steve Sugarman:** [00:00:32] So so with that kind of how did I learn? Wow, probably in two stages. First, you know, by background, I was a hedge fund guy, so.

**Steve Sugarman:** [00:00:47] I traded stocks long and short and ran a hedge fund before running a bank and then also acquired a securities clearing firm in 2011 with my business where we had a stock loan desk, where what happens is if a securities clearing firm is the person who holds all the stocks, like the custodian for a lot of kind of broker dealers around the country, and when you hold a stock, when someone shorts a stock, they have to they're supposed to borrow the stock from someone who owns it. And we had the service that lent the stock to those people. So, I'm pretty familiar with shorting with stock loans, with the mechanism, you know, with all the trading stuff. And so when this happened, when I was running the bank, it was interesting because, you know, you recognize patterns and you see what's happening and you see what's going on.You just don't know who.

**Steve Sugarman:** [00:01:51] And so as we were running the Banc, I think that the scheme itself is pretty self-evident. Just pattern recognition of how stocks trade and how volumes move and, and different things. And but, but what became more and more

evident is that it wasn't a single player who you could go to and say, oh, the trading is happening under the same name as the person who's publishing the articles, and that person is then going out and it wasn't kind of one person acting under his own name because the first kind of things that happened were first him reaching out to his his connection at Bloomberg to try and kind of post a story that they ended up not running with, but then became the anonymous blog.

**Reuters Reporter:** [00:02:51] Right

**Steve Sugarman:** [00:02:51] Or they ran with in part, but not any of the salacious stuff. And so so when I was at the Banc, I think I had a pretty good idea of what was going on. But then when I got the subpoena power in the litigation, we were able to collect documents. And the way that we found out who is by looking at who traded in the stock, the days leading up to the blog and who traded the stock immediately after the blog. And what you find is that over 90% of all option trades on the short side.

**Steve Sugarman:** [00:03:29] So options that are betting the stock goes down 90% of those trades in the couple of weeks before the blogs posted were done by three people.

**Reuters Reporter:** [00:03:39] Yeah,

**Steve Sugarman:** [00:03:40] Right.

**Reuters Reporter:** [00:03:40] Yeah.

**Steve Sugarman:** [00:03:41] And so that's a pretty good start of who to look at. And then if you look at the equity and people who shorted the equity, about 90% of the equity shorts, I think it's 85% or so I could get you the exact number. I could tell you all the exact numbers on all this stuff. But in in the interest of speed, I'll give you estimates, but like 85% of all the short interest was basically 1 in 1 investor with 2 or 3 side..other accounts that did the exact same trades in smaller quantity.

**Steve Sugarman:** [00:04:17] And so that's a pretty good place to start. You know, one of the people that was also attacked by the same anonymous blogger was another bank out here in Southern California called Bank of the Internet. And it was attacked by the

2

same blog. And I know the some of the executives over there. And before I got subpoena power, I got a call from them and they said, you know, we got an anonymous tip that the Aurelius blogger, the anonymous blogger is a guy named James Gibson and that there's a document somewhere on the Internet where they didn't. Move the metadata. And if you look at the creator of the document, it says James Gibson, and it's from somewhere in Minnesota.

**Reuters Reporter:** [00:05:08] Oh?

**Steve Sugarman:** [00:05:09] So I got a tip. Now, they said, we can't prove it. And it's such a common name that we can't even Google and find the guy. And we don't know if it's a random tip and we don't know anything. But if you find something, let us know. So one of the first things we did when we got the trading data is I called the people reviewing it and I said, Can you look for the name James Gibson? And magically, he was the largest trader of short options in the three weeks leading up. And his firm, Castilian partners, you know, combined with him were the largest trader. I was like, Wow, that's a pretty remarkable coincidence.

**Steve Sugarman:** [00:06:01] I then a couple of weeks later or a couple months later had a drink with the reporter who covered this for the LA Times. And who absolutely killed me. Like, just killed me. But in retrospect, he kind of, you know, we became friendly. And I told him that, you know, we think someone named James Gibson was a was the guy. And he had written an article where he talked to Aurelius and there was like an article about it. And he said, you know, I just you know, I don't know about all the names stuff, but it's funny. Did I ever tell you that the first time I called him when he was anonymous to try and get a hold of him after DMing him, he accidentally picked up the phone and said, "Hi, Steve Sugarman", and used his real name.

**Steve Sugarman:** [00:06:59] And I said, "No, you never told me that." He said, "Yeah, I can't piece together or tell you kind of his real name. But it was a really hard one to Google. And I think I started with James or something."

**Reuters Reporter:** [00:07:11] Yeah.

*Rough Transcript Check Against Audio*

**Steve Sugarman:** [00:07:11] And it was interesting because the guy, the reporter was James Rufus Koren. So like they shared a first name and everything and I was like, Shit, you know, we have Bank of the Internet getting the tip. We have the trading records that he's trading in. My stock is the biggest trader, and the LA Times guy pretty much confirms that it's the guy you talked to. So we felt pretty good about that. And so we started looking at the trading and we subpoenaed Castilian. We subpoenaed Muddy Waters because it turned out that there was an account that did all the equity short selling before the first blog. It was account 817 on the FINRa oats data.

**Reuters Reporter:** [00:07:59] Mhmm

**Steve Sugarman:** [00:08:00] And we went to the broker dealer in charge of that account, which was Alfred Albert Freed, that got acquired by TD Ameritrade and TD Ameritrade said in lieu of a subpoena, we'll just tell you who the account is. It's Muddy Waters.

**Reuters Reporter:** [00:08:17] Oh, wow. Okay.

**Steve Sugarman:** [00:08:18] So so we got that verified by the broker. And it's interesting because he was trading through some broker dealer. No one's ever heard of Alfred Freed or Freed Freed and Company. And that's not that's not Merrill Lynch.

**Reuters Reporter:** [00:08:34] No.

**Steve Sugarman:** [00:08:34] And it's also really interesting because it was surprised us because we didn't think it was you know, we hadn't heard Muddy Waters name before. And if you go through every tweet, research report, interview, article, CNBC performance, Muddy Waters has never mentioned Banc of California as a trading position of theirs. Before we you know, before two years later, when we started subpoenaing them and telling people what they did.

**Reuters Reporter:** [00:09:06] Hmmm. Hmmm.

**Steve Sugarman:** [00:09:07] So Muddy Waters is in the business of talking about their shorts. They're very well known. They brag about all their shorts. But it seems that they

have a side business where when they actually don't believe in the short and they know that they're doing deceptive stuff, they just don't mention it and that gooses their profits.

**Reuters Reporter:** [00:09:28] Hmmm.

**Steve Sugarman:** [00:09:29] So we subpoenaed Muddy Waters and asked for every investment committee memo and analysis they've ever done on Banc of California. And they've confirmed to the court that they don't have any.

**Reuters Reporter:** [00:09:42] Oh?

**Steve Sugarman:** [00:09:42] But what they had, which is in some of the public records, but they're still keeping under a protective order. So it's probably the one thing I can't, you know, that's under a protective order that they labeled attorney's eyes only is. Correspondence where they've red lined the blog that happens before the blog is issued. And on a draft of the blog, which is not the final draft.

**Reuters Reporter:** [00:10:12] What? Oh, my goodness. Okay. Okay.

**Steve Sugarman:** [00:10:17] So. So they were in possession of and red lining and this is in public stuff, the blog. But they don't have any investment committee memos or any reason why or any analysis of the blog thing, which I would say from my past, is someone who's not doing a fundamental analysis. It's someone who's manipulating a stock or, you know, they care more about how they can impact that. They believe they can get the stock to go down based on an article, but they don't have to do any analysis on the stock.

**Reuters Reporter:** [00:10:51] Hmmmm.

**Steve Sugarman:** [00:10:52] So Muddy Waters and Castilian had not traded Banc of California stock once in the two years prior to this blog, except for in the two weeks prior.

**Reuters Reporter:** [00:11:05] Okay,

**Steve Sugarman:** [00:11:06] So that's the first time they ever took a position. They never spoke about it. They never called up. They never had a meeting with management or IRR. They never did anything. So the totally secret people who then publish a blog under a fake name. Right.

**Reuters Reporter:** [00:11:24] Hmmm.

**Steve Sugarman:** [00:11:24] And Muddy Waters has admitted because he got in trouble in the past in litigation, that he publishes stuff under fake names. And he's also admitted that he does what he calls balance sheeting people, which is you take someone who doesn't have a lot of capital to invest and you give them the capital and they get to keep 10% or 20% of the profits. But if they have an idea, you're basically working conjunction where it's your capital and their and their hard work. And.

**Reuters Reporter:** [00:12:00] Okay

**Steve Sugarman:** [00:12:01] So he has a history that he's admitted to publicly saying he balance sheets people and he publishes things under anonymous names. And so that's kind of the premise of when you say it's complex with the people, like deliberately so, because it allows him to do what he did just last week when one of your or your some article came out about this where Muddy Waters tweeted that only 21% of Joshua Mitt's candidates.

**Reuters Reporter:** [00:12:35] Yes

**Steve Sugarman:** [00:12:36] For short sales actually traded in the stock.

**Steve Sugarman:** [00:12:39] Well of course, because he balance sheets third party people to hold the stock and he and he publishes anonymously through other third party people. So it's a web where if someone just goes to the person who published it, they're not big enough for it to be a manipulative scheme because they don't have enough money under management. And you've got to like understand that it's, it's it's an enterprise working in conjunction with each other. So he's deliberately not using the same balance sheet. His balance sheet Castilians Aurelius account, Quentin Matthews Rota Fortuna account and now he's got these two little guys who don't control any

6

money are off the radar. Reuters would never even think of them because they're they control $50 million bucks. Who cares? But they have a balance sheet the size of Muddy Waters balance sheet because he'll give them whatever money they need. And they have a megaphone that he amplifies with his tweets and that they each amplify each other almost like a Potemkin village approach. Right. And.

**Reuters Reporter:** [00:13:49] Hmmmm

**Steve Sugarman:** [00:13:50] And so, you know, when we looked. Muddy Waters shorted the stock. Quinton Matthews and Castilian shorted the options.

**Reuters Reporter:** [00:14:01] Mhmmm

**Steve Sugarman:** [00:14:03] And plain as day. And and because our stock isn't that liquid and doesn't have a lot of options volume one that allows it to be manipulated easier but to it means that they start representing 90% of the volume or on.

**Reuters Reporter:** [00:14:21] Yeah

**Steve Sugarman:** [00:14:21] On the day when they covered they represented almost 15 to 20% of all volume in the stock, which is huge.

**Reuters Reporter:** [00:14:30] Yeah. Wow.

**Steve Sugarman:** [00:14:32] So so you can see who the people are who have financial interest.

**Reuters Reporter:** [00:14:36] Yeah. No. Understood. And may I ask, so just going back to the redlining document and that back and forth, so they were aware of the blog post and this is the first blog post, right? And I'm just finding on is it. 2016 or.

**Adam Levine:** [00:14:56] October.

**Reuters Reporter:** [00:14:56] Of 2016?

7

**Adam Levine:** [00:14:57] Yeah.

**Reuters Reporter:** [00:15:00] So they were aware of it in advance of the publication.

**Steve Sugarman:** [00:15:03] Yes.

**Reuters Reporter:** [00:15:03] Did they have, did they I'm curious if you can share anything about what they said. Was there much of a back and forth? Like was it easy to see that beyond just receiving it? They were I don't know, were they giving feedback or do you remember some of the context of that communication.

**Steve Sugarman:** [00:15:24] Because of how they sealed it? It's very hard to get into the specific details other than they were redlining and proposing. It was almost like an editor process where they were proposing how it could be written more effectively.

**Reuters Reporter:** [00:15:46] Mhmmm. Interesting, okay.

**Steve Sugarman:** [00:15:46] Right. It's.

**Reuters Reporter:** [00:15:46] Okay

**Steve Sugarman:** [00:15:46] I've alleged that Aurelius is like a collaboration. It's an enterprise where what they publish under that is kind of like a cooperative amongst them.

**Reuters Reporter:** [00:15:56] Mhmmm

**Steve Sugarman:** [00:15:56] And it looked like if you had a Google Docs and different people made different edits to the same document,

**Reuters Reporter:** [00:16:03] Right?

**Steve Sugarman:** [00:16:04] And it was before the first blog post. And there's some reason to believe that it could have also been the document that they were sharing with Bloomberg to try and make it into kind of just a hit piece.

*Rough Transcript Check Against Audio*

**Reuters Reporter:** [00:16:18] Mhm. Okay. That's very helpful.

**Steve Sugarman:** [00:16:21] Which, which came about a month before the blog post.

**Adam Levine:** [00:16:24] So just curious Steve, on the protection. So,

**Steve Sugarman:** [00:16:28] So, Muddy Waters after fighting for like a year that he shouldn't have to give anything. The judge ruled that he had to give some stuff so he, he gave us that and he labeled it under the protective order attorney's eyes only.

**Reuters Reporter:** [00:16:52] Mhmmm.

**Steve Sugarman:** [00:16:53] So the attorneys have been able to characterize things from it in public filings. And in public filings, you can see that it exists and you can see broad characterizations of it and that there's editing and that they had it before the blog came out. But you can't quote from it because it's attorney's eyes only. So unless someone went to the judge and asked to be able to see it, like you can't quote from it right now. And when we filed the lawsuit, the first amended complaint, we basically.

**Speaker3:** [00:17:24] When you say you can't quote from it, you guys can't your lawyers couldn't quote from it.

**Steve Sugarman:** [00:17:27] Yeah, nobody... Only Muddy Waters can quote from it.

**Adam Levine:** [00:17:30] Okay.

**Steve Sugarman:** [00:17:31] And.

**Reuters Reporter:** [00:17:31] yeah

**Steve Sugarman:** [00:17:32] And then we went and we also fought with Castilian for production. And they admitted to a judge in Minnesota that they had voluminous documents, including communications with market participants, regulators and others relating to this.

9

**Adam Levine:** [00:17:51] Mm hmm.

**Steve Sugarman:** [00:17:51] So, like.

**Reuters Reporter:** [00:17:52] Regulators? Okay.

**Steve Sugarman:** [00:17:54] Yeah, well, regulators for sure, because what they do is once they publish it, anonymous only they submit it to the SEC on the whistleblower hotline. And then if you try and subpoena it, they say that they have whistleblower protection.

**Reuters Reporter:** [00:18:09] Mm hmm. Okay.

**Steve Sugarman:** [00:18:10] And so we had to actually go through a subpoena process that. "No, just by the nature of submitting it on that hotline for the SEC, for Dodd Frank, whistleblower doesn't mean it's subpoena proof." And then they said they're actually journalists and it's a First Amendment thing and they shouldn't have to produce any of it. And we said, "No, we can show that they traded in the stuff against what they're saying. And it's a commercial speech thing, not a not a journalist speech thing."

**Reuters Reporter:** [00:18:44] Mmmm.

**Steve Sugarman:** [00:18:45] And we won on that, but on the anonymity because they were a third party. We did not win on getting rid of their anonymity because they were not a party in the action.

**Reuters Reporter:** [00:19:00] Ah. I see. Okay.

**Steve Sugarman:** [00:19:02] So it was a real it took a year of probably 20 different court hearings and stuff to dig through the layers of of obstacles they put in the way of people discovering who they are, these people who just want to tell the truth and do the right thing, theoretically, you know. But we even had a letter come in from a law firm that said that they were representing the anonymous blogger "Aurelius" although it's impossible to verify that's true, saying that they objected to us subpoenaing materials

*Rough Transcript Check Against Audio*

from Matthews, Castilian, and Muddy Waters, because all those materials would risk the anonymity of Aurelius, which basically.

**Reuters Reporter:** [00:19:53] Yeah.

**Steve Sugarman:** [00:19:53] Says that all of them have materials from Aurelius. Right. This was an unsolicited.

**Reuters Reporter:** [00:20:00] Interesting

**Steve Sugarman:** [00:20:00] They kind of inter-pleaded in the case and said, we've been watching the case anonymously. If you allow us to get discovery from Matthews, our First Amendment rights are at issue and we want a hearing on that. So we know that all of them have been working with Aurelius and they've admitted it. And what's interesting about that, that law firm that did that anonymous request to inter-plead themselves in this is that when I then sued all of them, that law firm is the law firm that now represents James Gibson and Castilian.

**Reuters Reporter:** [00:20:46] Yes, I saw that in the complaint it's a....

**Steve Sugarman:** [00:20:48] So on the on the one case, they said they're representing Aurelius and it's Anonymous. And there's a different law firm representing Castilian who had already lost. They almost just wanted a second bite at the apple. And then the next lawsuit, it's that law firm that represents these guys.

**Reuters Reporter:** [00:21:04] Yeah...yeah

**Steve Sugarman:** [00:21:04] So so like it's all this stuff. So we know that the three of them have communications with each other. We know that they have prior versions of the blog that do not match the final version. So they were earlier versions that were redlined. And we know that their trading is done in unison. And so that was kind of the first thing. But the second thing is I was able to get trading records that go through kind of 2017 and there wasn't just a blog October 18th, but there was a follow up blog like the next week, like October 25th. And.

11

*Rough Transcript Check Against Audio*

**Reuters Reporter:** [00:21:44] Mmmm.

**Steve Sugarman:** [00:21:44] There's another blog at the end of January that's actually really interesting. It was a week after I left the bank and before every blog, all three of these parties and their associates. Shorted in unison and covered with the blog. So it wasn't a one time event. It was 3 to 4 times independently.

**Reuters Reporter:** [00:22:12] Yeah. Okay.

**Steve Sugarman:** [00:22:14] And and what's really interesting about that is the one in January, their kind of blog allegation was something they didn't realize. They did a blog allegation that our loans were fraudulently marked, that it was we were lying about the value of our loans. But what was interesting is in December, the loans that they were complaining about that are what's called marked anyhow... the loans they were complaining about I had sold and we had sold them and gotten cash in our bank account for $17 Million more than the the value they were listed at. And so we didn't announce that publicly because it wasn't material. It was it would come out at earnings time, which is the end of January. So two days before earnings, they posted a new blog saying our loans are fraudulently marked and they're worth like 20% of what we say, almost like what they did to Farmland. But that one was very easy for the company to dispel because all they had to say was, Well, we don't own those loans anymore. And we got more than the amount that they were marked at. Like very easy. So on that one, there was so much interest in the company at that time that our liquidity profile had gone up and it was so easy to dispel that the stock actually didn't trade down. It actually traded up.

**Reuters Reporter:** [00:23:40] Mhmmm...okay

**Steve Sugarman:** [00:23:41] And all three of these guys got stuck in their short position because in a "short and distort" you have to force the price down and create liquidity so you can get out. So they got stuck in it and they weren't able to cover their position that same day. And that's when a week later, for the first time ever, "Rota Fortuna" wrote his first article ever on Seeking Alpha, and it was about Banc of California alleging new things -- that was in February.

**Reuters Reporter:** [00:24:14] Mmmmm.

**Steve Sugarman:** [00:24:15] And it was really just that they got stuck in their position. And so they needed to take a second swipe at the apple. But the.

**Reuters Reporter:** [00:24:23] Ah..

**Steve Sugarman:** [00:24:23] But the first article that Quentin Matthews did on Seeking Alpha ever was a Banc Of Cal article in February of 2017 when they were stuck in a position.

**Reuters Reporter:** [00:24:37] Mmmmm.

**Steve Sugarman:** [00:24:37] Which kind of shows that they're just trying to manipulate the market to get out of their position.

**Reuters Reporter:** [00:24:43] That that I mean, that all makes sense, right? The timing of why they would need something else to kind of push, you know, push prices down and and like a catalyst, I think is how they sometimes call it. Right. Do you have any. Did anything turn up in discovery that linked where they were discussing that in some way? Or is that you're putting that together based on the timeline?

**Steve Sugarman:** [00:25:13] It's more trading....it's more action. You know, Muddy Waters,

**Reuters Reporter:** [00:25:18] Okay

**Steve Sugarman:** [00:25:18] Muddy Waters covered his entire short position in the 45 minutes after the posting of the blog. So.

**Reuters Reporter:** [00:25:25] Oh? Okay.

**Steve Sugarman:** [00:25:26] I don't know if you've tried to read the blog, but it takes about more than 45 minutes.

13

**Reuters Reporter:** [00:25:31] Yeah. Yeah.

**Steve Sugarman:** [00:25:32] And at the same time, after he covered his whole position, if you read in the first amended complaint, we did links to like tweets.

**Reuters Reporter:** [00:25:42] Mmmm...Yeah.

**Steve Sugarman:** [00:25:42] And unfortunately the lawyers kind of cut back the actual quotes, but I think they're hyperlinked for ease. But if you go and.

**Reuters Reporter:** [00:25:50] They are. Yeah, you can still see them.

**Steve Sugarman:** [00:25:52] So like what you're going to see is that a Aurelius publishes this article, someone then takes the...and he posted on Twitter, someone then takes the link to that and forwards it to Muddy Waters and says, "Have you seen this?" And Muddy Waters is like, "Yeah, it's great work." Or Muddy Waters forwards it to someone and says, "Have you..?" you know, and they're pretending to be independent people who are just seeing it right now and they're like amplifying each other like an echo chamber. But Muddy Waters actually does his tweet about, "Wow, what great work" or "I'm just seeing this" or and forwards it along after he's already covered his whole position.

**Reuters Reporter:** [00:26:35] Mhmmmm.

**Steve Sugarman:** [00:26:37] So their pret...if you look at their tweets you will see very clearly that they're pretending not to know each other and they're pretending they didn't know that this blog was coming. And they're just reading it now.

**Steve Sugarman:** [00:26:54] It's very deceptive and what it is is it's saying "Hey this Aurelius, this guy has credibility with well known guys like Muddy Waters." Without saying that Muddy Waters actually wrote this thing. He's self-validating his own research. And same with James...same with Rota Fortuna. "Hey, you guys are doing great. You're unbelievable research. Thanks for sharing it with me." But like, he wrote it and he's already traded on it and he's sought the position. And what's interesting is and this came out in discovery and we could show you how this happened, but when we

subpoenaed Castilian, we had a meet and confer about our theory and why he was relevant. And he was first represented by some local counsel. And one of the things is the disclosure on the article says that he's short, but he might cover at some point.

**Reuters Reporter:** [00:27:55] Mhmmm.

**Steve Sugarman:** [00:27:55] But we thought that was a little bit deceptive because he actually covered within the first hour and he intended to cover and right. But after.

**Reuters Reporter:** [00:28:04] Right.

**Steve Sugarman:** [00:28:05] But after we subpoenaed them, they put a...they updated their disclosure on their article, on their website and made people made it kind of you had to accept their disclosure before going on and they used the Muddy Waters identical disclosure, which says not only are we short, but our partners, our investors, our affiliates might trade and we might even trade long and go and.

**Reuters Reporter:** [00:28:33] Mhmmm

**Steve Sugarman:** [00:28:33] ...go bullish. And so was a whole new disclosure that got put on this article two years after the article was posted. And and.

**Reuters Reporter:** [00:28:42] (laughter)

**Steve Sugarman:** [00:28:43] And the biggest part of the new disclosure was it talked about their investors and partners also being short and also trading in it. And that's kind of what the whole balance sheet relationship is like.

**Reuters Reporter:** [00:28:55] Yeah...

**Steve Sugarman:** [00:28:55] They didn't disclose they might have a balance sheet relationship from investors like Muddy Waters. And if someone looked at them, they're like, they got like $50 million bucks under management, who cares? But if people knew that they had $1 billion fund behind them that was trading opposite what's being published and helping write the article. Like that's that's interesting.

15

**Reuters Reporter:** [00:29:21] yeah

**Steve Sugarman:** [00:29:21] So...

**Reuters Reporter:** [00:29:22] Yeah,

**Steve Sugarman:** [00:29:22] So that's so that's kind of how I, how we started to pull the string, you know, when I was at the Banc after they published the articles, there were research firms that started calling all of our LinkedIn contacts and trying to do like "push polling" and drum up people who would be a whistleblower or say negative things.

**Steve Sugarman:** [00:29:43] And so we got a lot of feedback on that. And so when you look at some of the articles that are out there from Bloomberg, they talk about a lot of research firms that're involved. We had at least two of those firms and maybe three that were involved. We had people, those research firms send people to follow people around and to go through trash cans of.

**Reuters Reporter:** [00:30:06] Mhmmm.

**Steve Sugarman:** [00:30:07] Employees and people like us and follow kids around with the idea that if they could dislocate if they could get someone to quit the company, that kind of is a new catalyst event. So they tend to focus on the CEO, the chief risk officer and the chief financial officer, all people that if they left, create a new catalyst. So.

**Reuters Reporter:** [00:30:28] Sure

**Steve Sugarman:** [00:30:29] Like, you know, we had people getting their kids followed to school by these research firms,

**Reuters Reporter:** [00:30:36] Mhmmm

**Steve Sugarman:** [00:30:36] You know, all sorts of stuff. But but the biggest thing is the trading, I think. And then and then knowing that they have all this correspondence that

goes back and that predates it. And it's not just whispers. And so it's a coordinated thing. And.

**Reuters Reporter:** [00:30:56] Yeah

**Steve Sugarman:** [00:30:56] And then when you look at kind of some of these other guys who get attacked, you know, you know, there's similar trading liquidity, similar market cap. So, you know, it's hard to manipulate Apple stock and Google. They're too big. And if you do like penny stocks, my personal view and this isn't like, you know, I can't give you documents on it, but they get manipulated….

**[Mr. Sugarman motioned to Mr. Levine to end recording]**