MONA Z. HANNA, ESQ. (SBN 131439)
  *mhanna@mrllp.com*
SAMANTHA A. DRYSDALE, ESQ. (SBN 307233)
  *sdrysdale@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:   (714) 557-7990
Facsimile:   (714) 557-7991

MARC R. JACOBS, ESQ. (SBN 185924)
  *mjacobs@mrllp.com*
JESSE J. CONTRERAS, ESQ. (SBN 190538)
  *jcontreras@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90024
Tel: (310) 299-5500
Fax: (310) 299-5600

Attorneys for
STEVEN A. SUGARMAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BANC OF CALIFORNIA SECURITIES LITIGATION,<br><br>This Document Relates To:<br><br>ALL ACTIONS. | Case No.: 8:17-cv-00118-DMG (DFMx)<br><br>CLASS ACTION<br><br>**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**<br><br>Date:      December 15, 2023<br>Time:      9:30 A.M.<br>Judge:    Hon. Dolly M. Gee<br>Crtrm:    8C |

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ............................................................................................ 1

II. PROCEDURAL AND FACTUAL BACKGROUND ................................... 4

    A. The Lee Report and Protective Order ................................................ 4

    B. Levine Receives the Lee Report as Background Information in Connection with a Request for Comment by a Reporter ...................................... 6

    C. Levine's Relationship with Sugarman Turns Hostile, Resulting in a Workplace Violence Restraining Order and Litigation ........................ 7

    D. Levine Continues His Harassing and Threatening Behavior Towards Sugarman ........................................................................................... 8

    E. Four Days After the WVRO Is Issued, Levine Provides Block with The Lee Report and Fabricates the Existence of a Smear Campaign ......... 10

    F. Muddy Waters Refuses to Utilize the Protective Order's Procedures for Unauthorized Disclosures .............................................................. 12

III. LEGAL ARGUMENT ............................................................................... 13

    A. Muddy Waters Has Not Shown Clear and Convincing Evidence of Contempt ...................................................................................... 13

        1. There Is No Clear and Convincing Evidence That Sugarman Violated the Protective Order ....................................................... 14

        2. Sugarman Substantially Complied with the Protective Order and Any Technical Violation Was Based on A Good Faith and Reasonable Interpretation ............................................................ 17

    B. Neither Compensatory nor Coercive Sanctions Are Appropriate ................. 18

    C. Sanctions Under Rule 37 Should Be Denied .................................... 19

    D. The Court Should Not Permit Discovery .......................................... 20

IV. CONCLUSION ........................................................................................ 21

DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adam Levine v. The Change Company CDFI, LLC*,
  Orange County Case No. 30-2023-01331710-CU-WT-CJC ...................................... 9

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locs. 21 & 4*,
  721 F.3d 1122, 1130 (9th Cir. 2013) ........................................................................... 20

*California Dep't of Soc. Servs. V. Leavitt*,
  523 F.3d 1025, 103 (9th Cir. 2008) ............................................................................. 20

*Fed. Trade Comm'n v. Mytel Int'l, Inc.*,
  2015 WL 13935988, at *4 (C.D. Cal. July 8, 2015) ................................................... 20

*FTC v. Kuykendall*
  371 F.3d 745, 752 (10th Cir. 2004) ............................................................................. 20

*Fuentes v. Maxim Healthcare Servs., Inc.*,
  2019 WL 1751822, at *3 (C.D. Cal. Feb. 8, 2019) ..................................................... 19

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376, 1380 (9th Cir. 1986) ........................................................................... 18

*Hook v. Arizona Dept't of Corrections*,
  107 F.3d 1397 (9th Cir. 1997) ..................................................................................... 14

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693, 695 (9th Cir. 1993) ................................................................... 13, 17, 19

*In re Subpoenas to Produce Documents, Information, or*
  *Objects to Muddy Waters Capital LLC, et al.*,
  Case No. 3:18-mc-80175 (N.D. Cal. October 17, 2018) ............................................. 4

*Littlejohn v. Bic Corp.*,
  851 F.2d 673, 680 (3d Cir. 1988) ................................................................................ 16

National Polymer Products v. Borg–Warner Corp.,
  641 F.2d 418, 421 (6th Cir.1981) ................................................................................ 16

*O'M & Assocs., LLC v. Ozanne*,
  2011 WL 2160938, at *4 (S.D. Cal. June 1, 2011 ...................................................... 13

*Phillips v. Goodyear Tire & Rubber Co.*,
  2008 WL 755913, at *4 (S.D. Cal. Mar. 18, 2008) .................................................... 14

*Shell Offshore Inc. v. Greenpeace, Inc.*,
  815 F.3d 623, 629 (9th Cir. 2016) ........................................................ 3, 18

*Shuffler v. Heritage Bank*,
  720 F.2d 1141, 1146-47 (9th Cir. 1983) ................................................ 18

*Sugarman et al. v. Muddy Waters Capital LLC et al.*,
  Case No. 19-cv-04248-MMC, (N.D. Cal. July 24, 2019) ...................... 6

*Sugarman et al. v. Muddy Waters Capital, LLC et. Al*,
  Court File No. 27-CV-21-11850
  (Fourth Judicial Dist., Hennepin Cty., Minn. 2021)............................. 6

*The Change Company CDFI LLC v. Adam Levine*,
  L.A. County Case No. 23SMCV0487 ...................................................... 9

*The Change Company CDFI LLC v. Adam Levine*,
  Los Angeles County Case No. 23STRO01946 ......................................... 9

*The Change Company CDFI, LLC v. Yeti Global Strategies, LLC*,
  Westchester County Index No. 69744/2023 ............................................. 9

*TriPharma, LLC v. First Fruits Bus. Ministry*,
  2013 WL 12131288, at *1 (C.D. Cal. Jan. 4, 2013)............................... 18

*Vans, Inc. v. Walmart, Inc.*,
  2022 WL 17371058, at *2 (C.D. Cal. Oct. 24, 2022) ........................... 19

Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,
  689 F.2d 885, 891 (9th Cir.1982) ........................................................ 17

**Statutes**

Fed. R. Civ. P. 37(b)(2)(A)(vii) .................................................................. 19

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S
MOTION FOR SANCTIONS AND CONTEMPT ORDER**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Nonparty Muddy Waters Capital LLC's ("Muddy Waters") Motion for Sanctions and Contempt Order is premised on the unfounded claims of Adam Levine ("Levine"), a consultant to Defendant Steven Sugarman's attorneys and a disgruntled former employee of The Change Company CDFI, LLC ("TCC") who reported to Defendant Steven Sugarman ("Sugarman"). Levine was terminated after his behavior grew erratic and hostile culminating in the Los Angeles Superior Court granting a Workplace Violence Restraining Order ("WVRO") to protect TCC employees, including specifically Sugarman, against Levine. Since the granting of the WVRO, Levine has continued his harassing tactics in violation of the WVRO by threatening TCC employees with jail time, threatening to destroy TCC unless paid, and making inflammatory statements regarding Sugarman.[1] Based on Levine's unreliable declaration, Muddy Waters claims that Sugarman and his attorneys Latham and Watkins LLP ("Latham") disseminated Attorneys' Eyes Only ("AEO") materials in violation of the Protective Order. These claims are fabricated and unsubstantiated, as Sugarman has never seen or received any AEO materials produced or designated by Muddy Waters and does not know what documents or information Muddy Waters produced.

Muddy Waters does not and cannot identify a single AEO document that was given to or disseminated by Sugarman. The document at issue is an expert report issued by Professor Charles Lee (who was retained by *Sugarman*) that was marked "CONFIDENTIAL" by Latham. Sugarman had no reason to know or suspect that the report contained any information obtained exclusively from Muddy Waters's AEO production. Indeed, Muddy Waters's documents were only sought because, based on data obtained from other sources, Sugarman believed Muddy Waters had traded in Banc of California stock in

---

[1] In August of 2023, Levine was arrested across the street from TCC's offices and had to post a $100,000 bond to secure his release pending further proceedings. Sugarman Decl., ¶ 30; Hanna Decl. ¶ 8, Ex. 8 at ¶ 11.

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

coordination with others and had advance knowledge of a blog at the center of the underlying case. Sugarman had received substantial information about Muddy Waters and its trading and interactions relating to Banc of California from numerous sources (none of them subject to the Protective Order), prior to ever subpoenaing Muddy Waters' documents. Further, Muddy Waters, through its collaborators, partners, and representatives, has spoken publicly (including in court) about its trading in Banc of California stock, and shared substantial information that corroborated information Sugarman had obtained from other sources.

Professor Lee was retained by Latham and ultimately reached the same conclusion as Sugarman. Lee's conclusion was also consistent with the publicly filed expert declaration of Torben Voetmann submitted in support of Sugarman's Opposition to Muddy Waters's Motion to Quash. Sugarman, having never seen Muddy Waters's production, had no reason assume Lee's conclusions in his report were based on any of Muddy Waters's AEO documents, since Lee's report was consistent with Voetmann's declaration, which was filed before Muddy Waters ever produced documents.

Further, the only disclosure of the report made by Sugarman was to Levine, which did not violate the Protective Order. In Section IV of the Protective Order, the parties agreed that nothing in the order would be "interpreted to prohibit or prevent the producing party from using or discussing its own" confidential or AEO "material in any way it sees fit or to so use or discuss that material for any reason." Dkt. No. 83, 4:10-15. Based on Latham's designation and the fact that Professor Lee was *his* expert, Sugarman understood the Lee Report to be his confidential document that, under Section IV of the Protective Order, could be disclosed by Sugarman for any reason. Based on that understanding, Sugarman disclosed the report to Levine, a public affairs consultant working with Sugarman's attorneys in connection with the ongoing litigation against Muddy Waters. Levine said that he wanted to understand the litigation to respond to a reporter that was attempting to contact Sugarman about what she said Muddy Waters told her about its trading in Banc of California stock.

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

There is no evidence — let alone the requisite clear and convincing evidence required for contempt — that Sugarman directed Levine to disclose any of Muddy Waters's AEO production. Muddy Waters's evidence consists of an unreliable declaration from Levine and an email showing that Levine (not Sugarman) sent the expert report to one reporter who ultimately did not cite or reference the report in his story. Muddy Waters also relies on a transcript produced by Levine of an alleged interview Sugarman gave to an unnamed reporter. The transcript was filed publicly and, in doing so, Muddy Waters conceded there is no protected material and waived any argument that the document is subject to the Protective Order.

Even assuming there was a technical violation of the protective order by Latham, Muddy Waters still fails to meet the remaining elements of civil contempt. Muddy Waters cannot establish that Sugarman did not substantially comply with the Protective Order or act based on a good faith and reasonable interpretation, given that Latham did not mark any portion of the report with an AEO designation. Sugarman reasonably understood Professor Lee's report to be *his* Confidential document because Professor Lee was retained by *his* attorneys to serve as *his* expert. In compliance with the Protective Order, Sugarman destroyed all materials he received from a designating party. Sugarman was unaware there were references to AEO material in Professor's Lee report until this motion arose. Upon learning of Muddy Waters's claim, Sugarman offered to utilize the Protective Order's procedures for alleged unauthorized disclosures. Muddy Waters refused the offer, instead choosing to bring this matter to Court and rely upon information stolen from Sugarman — including attorney client communications.

Finally, imposing sanctions will not further either of the "two separate and independent purposes" of the court's civil contempt powers, coercing a defendant into compliance and compensating the aggrieved party for actual losses caused by the violation. *Shell Offshore Inc. v. Greenpeace, Inc*., 815 F.3d 623, 629 (9th Cir. 2016). First, imposing coercive sanctions is unnecessary as Sugarman has offered to utilize the applicable

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

provisions of the Protective Order, even though this matter is over 5 years old. Second, the only actual loss identified is the attorneys' fees incurred in bringing this motion. Sugarman did not cause Muddy Waters to expend those fees — Muddy Waters did by filing a frivolous and unnecessary motion.

Muddy Waters's motion for contempt is little more than an attempt to capitalize on an aggrieved employee's ongoing campaign of harassment and extortion against Sugarman. The Court should reject these efforts.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Lee Report and Protective Order

This class action arose from allegations of securities fraud after the Banc of California ("Banc") stocks fell by 29% in connection with the publication of a blog on the website *SeekingAlpha.com* by an anonymous author claiming the Banc had ties to a known fraudster (the "Blog"). Dkt. 41. Sugarman, the Banc's Chief Executive Officer at the relevant time period, also was named as an individual defendant. Dkt. 1. "After serving subpoenas on the Financial Industry Regulatory Authority ("FINRA") Sugarman discovered that there was a significant build-up in short sales and put options in Banc stock in the days preceding the Blog" and, as a result, concluded that "several market participants, including Muddy Waters, were aware of the Blog before it was published." Dkt. 623-3 at 1-2. Evidence that the market knew about the contents of the Blog before it was published was relevant to Sugarman's materiality, reliance, and loss causation arguments. *In re Subpoenas to Produce Documents, Information, or Objects to Muddy Waters Capital LLC, et al.*, Case No. 3:18-mc-80175 (N.D. Cal. October 17, 2018) (hereinafter "*Muddy Waters* Dkt"), Dkt. No. 7 at 15:21-16:16.

Sugarman thereafter served a subpoena on Muddy Waters and Muddy Waters moved to quash claiming that the subpoena sought "irrelevant, overbroad, and confidential information." *Id*. at 2. Muddy Waters acknowledged, in its public Reply, that it short sold Banc stock. *Muddy Waters* Dkt. No. 11 at 1 n. 1 ("MWC was never net long in Banc

securities, and any equity purchases were made to cover short positions.")

The Court ruled that certain requests were "relevant to several of Sugarman's defenses, especially his presumptive loss causation argument that Banc's stock plummeted due at least in part to aggressive investor short-seller rather than the allegedly misleading proxy statement." Dkt. 623-3 at 3-4. In response to Muddy Waters's confidentiality concerns, the Court ordered that "the documents be designated attorneys' eyes only pursuant to the existing protective order in the underlying case." *Id*. at 5.

In compliance with the Court Order, Muddy Waters produced documents "reflecting Muddy Waters' transactions in securities of the Banc" and "documents reflecting Muddy Waters' decision to enter into any transactions in securities of the Banc." Dkt. 623-3 at 3. The Court noted that these documents would "shed light on what Muddy Waters knew when they entered into their trades, how they obtained the information and why they made the trades at issue." *Id*. These documents were relevant to Sugarman's defenses that the market knew the contents of the blog and the decline in value was due to short-sellers like Muddy Waters. The production was marked "Attorney's Eyes Only" ("AEO") and was never shown to Sugarman. Declaration of Steven Sugarman ("Sugarman Decl.") Sugarman Decl., ¶¶ 2-3.

Latham retained Professor Charles Lee to issue an opinion and write an expert report about what caused the stock price decline on the date of the Blog (the "Lee Report"). Dkt. 625, Ex. 1 at ¶ 7. Lee came to the same conclusion that Sugarman did prior to serving the subpoenas, certain traders anticipated the publication of the Blog and timed their trading accordingly. *Id*, ¶¶ 12-13. Lee's conclusion was also consistent with the publicly filed expert declaration of Torben Voetmann submitted in support of Sugarman's Opposition to Muddy Waters's Motion to Quash. *Muddy Waters* Dkt. No. 9. Muddy Waters's document production was one of the 248 sources that Professor Lee considered in preparing his report. *Id*, Ex. 1 at IX (B). The Lee Report was issued on February 22, 2019 and was designated "CONFIDENTIAL" by Latham. *Id*; Declaration of Mona Hanna ("Hanna Decl.") ¶ 3, Ex.

5

1 at 6 ("Latham designated the Lee Report Confidential based on a good faith and reasonable belief that the Report did not meet the criteria for AEO designation."); Sugarman Decl., ¶ 3. Sugarman never read the entire Lee Report and understood it to be consistent with what he already knew from the FINRA production, production of certain broker-dealers, cooperation of certain broker-dealers and Voetmann's declaration. Sugarman Decl., ¶ 4. Less than two weeks after the Lee Report was issued, the Court imposed a moratorium on future filings and the parties focused their efforts on settlement. Dkt. 551. Thereafter, the matter settled. Dkt. 588.

Following the end of the litigation, Sugarman complied with Section IX of the Protective Order and, returned or destroyed all documents he received from a designating party. Sugarman Decl., ¶ 5. Since the Lee Report was prepared by *his* expert, Sugarman had no reason to believe the Lee Report fell under Section IX's return or destroy requirements and, instead, understood it to be *his* confidential document which could be used or discussed for any reason. Sugarman Decl., ¶¶ 5-6. Under Section IV of the Protective Order, the parties agreed that nothing in the Protective Order would be "interpreted to prohibit or prevent the producing party from using or discussing its own" confidential or AEO "material in any way it sees fit or to so use or discuss that material for any reason." Dkt. No. 83, 4:10-15.

**B.** **Levine Receives the Lee Report as Background Information in Connection with a Request for Comment by a Reporter**

After this matter settled, Sugarman and Muddy Waters continued to litigate claims involving Muddy Waters's trading practices and knowledge of the blog in two other lawsuits.[2] On or around June 26, 2020, Levine was hired as a consultant by Sugarman's attorneys, Anderson Kill P.C. ("Anderson Kill"), to assist with Sugarman's legal

---

[2] *Sugarman et al. v. Muddy Waters Capital LLC et al.*, Case No. 19-cv-04248-MMC, (N.D. Cal. July 24, 2019), latter transferred to the Central District of California as Case No. 2:31-cv-1453 and; *Sugarman et al. v. Muddy Waters Capital, LLC et. Al*, Court File No. 27-CV-21-11850 (Fourth Judicial Dist., Hennepin Cty., Minn. 2021).

representation. Sugarman Decl., ¶ 7. On July 1, 2020, Levine executed a Non-Disclosure Agreement ("NDA") and agreed to keep confidential all information received from Sugarman and Anderson Kill. *Id*.

On or around February 4, 2022, reporter Michelle Celarier contacted Sugarman about a story she was doing for the Institutional Investor relating to short sellers and Banc of California, the related litigation, and a probe by the Department of Justice of short sellers including Muddy Waters. Sugarman Decl., ¶ 13. One of Celarier's sources for the story was Carson Block. *Id*. Levine requested to work with Sugarman's attorneys at Anderson Kill to respond to the reporter. Sugarman Decl., ¶ 14. After confirming an NDA was in place, Sugarman allowed Levine to access information from the litigation so that he would have the necessary background information. *Id*. Sugarman understood his communications to be protected by attorney-client privilege. *Id*.; Dkt. 623-10. Sugarman did not authorize Levine to distribute the report. Sugarman Decl., ¶¶ 16-17. Levine contacted the Institutional Investor and argued the story should not be published as Block was unreliable and provided incorrect information. Sugarman Decl., ¶ 15. Ultimately, after speaking with Levine, the Institutional Investor decided not to run the story. *Id*.

**C.** **Levine's Relationship with Sugarman Turns Hostile, Resulting in a Workplace Violence Restraining Order and Litigation**

Levine applied for and was hired as TCC's Chief of Staff beginning March 1, 2021. Sugarman Decl., ¶¶ 10-11. As Chief of Staff, he was responsible for press relations and public relations. *Id*. In or around December 2022, Levine began acting hostile following receipt of a final written warning arising from a verbal altercation with a TCC employee due to Levine calling Hispanic workers "a bunch of monkeys." Sugarman Decl., ¶ 18; Hanna Decl., ¶ 8, Ex. 8 at ¶¶ 7-8. Following the written warning, Levine began acting hostile and erratic, causing many TCC employees to raise complaints about Levine. Sugarman Decl., ¶ 19; Hanna Decl., ¶ 7, Ex. 3 at ¶¶ 3-4, Ex. 4 at ¶ 4, Ex. 5 at ¶¶ 3-4. By way of example, Levine: (1) threatened Mr. Sugarman by stating on a phone call with TCC's

general counsel, "My mother is scared about what the f*** I am going to do to [Mr. Sugarman]," (2) threatened the safety of all those in TCC's office building by informing general counsel of TCC that he would "burn the place down" or "blow the f******* building up," (3) screamed and used profanity in speaking to TCC employees, including stating TCC's General Counsel was "the biggest piece of s***" and asking whether he was "going to cry to f****** baby, are you going to cry you f****** p****...", and (4) engaged in verbal altercations with employees, resulting in one employee becoming so fearful she needed to move from her apartment (with the help of TCC) to hide from Levine. Sugarman Decl., ¶ 19; Hanna Decl. ¶ 7, Ex. 3 at ¶¶ 4-7, Ex. 4 at ¶¶ 12-15, Ex. 5 at ¶¶ 5-6.

On March 2, 2023, Levine was placed on leave as the result of numerous employee complaints that required immediate investigation by TCC. Sugarman Decl., ¶ 20. While on leave, Levine's hostile and threatening behavior continued to the point that TCC had no choice but to engage a professional security contractor to protect itself and its employees from Levine's irrational behavior. *Id*. Levine continued to come to TCC's office, attempting to harass and intimidate the security officers. For example, Levine was seen by former police officer and current security officer Arthur Robinson ("Mr. Robinson"), on many occasions, standing across the street from the office watching Mr. Robinson's every move and the comings and goings of TCC's employees. Hanna Decl., ¶ 7 and Ex. 6 at ¶¶ 4-9. Levine continued to do so even after a temporary restraining order was issued ordering him to, among other things, stay at least 100 yards away from the TCC Offices. Hanna Decl., ¶ 7 and Ex. 6 at ¶ 9.

On April 21, 2023, a WVRO was issued against Levine again prohibiting him from harassing or stalking certain TCC employees. Sugarman Decl., ¶ 22 and Exhibit A.

### D.   Levine Continues His Harassing and Threatening Behavior Towards Sugarman

Even after the WVRO was granted, Levine has continued to harass and intimidate Mr. Sugarman. Sugarman Decl., ¶¶ 24-33.

First, three months after his termination, on July 16, 2023, Levine logged onto Mr. Sugarman's OneHub account and downloaded a number of Sugarman's private files including, but not limited to, attorney-client communications.[3] Sugarman Decl., ¶¶ 26-28. As some of these documents involved Mr. Sugarman's litigation with Muddy Waters, it is clear Levine was seeking to further disseminate Mr. Sugarman's confidential information. Notably, Levine downloaded these documents after he contacted Carson Block, Muddy Waters's founder, and informed him of the allegations that now underly Muddy Waters's motion. Dkt. 623-2 at ¶¶ 13-16. Second, Levine has sought to extort TCC and Mr. Sugarman out of millions of dollars by threatening to release illegally obtained documents/recordings as well as fabricated documents in a manner to falsely skew the content adverse to TCC (i.e., manufacturing claims). For example, on August 3, 2023, Levine contacted Martice Mills, a former TCC executive, and informed Mills that he would release confidential information he stole while employed at TCC if TCC did not provide Levine with a settlement payment. Sugarman Decl., ¶ 25. Levine also told a TCC investor that he would "sell [his] cloak and buy a sword … Father forgive him, for he knows not what he does" and that he is "locked and loaded – [TCC] mediates this week or we go." *Id.* and Exh. B. Similarly, Levine has also contacted TCC Board Members and stated that if he was not paid, he would send TCC into a "death spiral" by making allegations to their lenders and destroy TCC. *Id*, ¶ 25.

This is not the first time Levine attempted to extort a former employer. Prior to working for TCC, Levine was employed by TPG Global, LLC ("TPG") and subsequently sued for the "blatant misuse and unlawful retention of confidential and proprietary

---

[3] Levine and Sugarman are currently involved in three pending cases in California Superior Court (*Adam Levine v. The Change Company CDFI, LLC*, Orange County Case No. 30-2023-01331710-CU-WT-CJC; *The Change Company CDFI LLC v. Adam Levine*, Los Angeles County Case No. 23STRO01946; *The Change Company CDFI LLC v. Adam Levine*, L.A. County Case No. 23SMCV0487) and one case pending in New York Supreme Court (*The Change Company CDFI, LLC v. Yeti Global Strategies, LLC*, Westchester County Index No. 69744/2023).

9

information belonging to TPG" and efforts "to extort millions of dollars from TPG" by threatening to release the confidential and proprietary information. Hanna Decl., ¶ 9, Ex. 10. A final judgment was issued against Levine by a federal district court judge in Texas enjoining him from using or exploiting any confidential or property information and ordering Levine to return any such information and confirm that any non-employee he disclosed the information to has destroyed or returned the information. *Id*, Ex. 11.

Lastly, Levine has repeatedly attempted to harass and intimidate Mr. Sugarman via social media. Levine also has frequently referred to Mr. Sugarman and his family as a "crime family" through his "burner" twitter account "Predatory AF."[4]  Sugarman Decl. ¶ 29-31. Almost every time Levine makes such claims, he tags Mr. Sugarman's personal and/or business account so that he is aware of the bullying. *Id*. These tweets include: (1) a picture of Sugarman's mother, Hilda Sugarman, with the statement that "Steven Sugarman uses 'statutorily required community advisory board' and his Company Chairman @mayorVillaraigo to further his Mother Hilda Sugarman's racism." and; (2) retweeting a Muddy Waters Research account tagging Steven Sugarman, Jason Sugarman, TCC, and saying "#ShadyAF" and "SugarmanCrimeFamily." *Id*.

**E.** **Four Days After the WVRO Is Issued, Levine Provides Block with The Lee Report and Fabricates the Existence of a Smear Campaign**

According to Carson Block, "[t]oward the end of April 2023" — at which point the temporary restraining order was issued — Levine told Block that Sugarman demanded Levine leak the Lee Report as part of an alleged smear campaign against Muddy Waters. Dkt. 623-2 at ¶ 13. On April 25, 2023, ***four days after the WVRO was issued***, Levine sent Block the Lee Report. Dkt. 623-2 at ¶ 16; Dkt. 623-4.

Contrary to Levine's claims, Sugarman did not direct Levine to disseminate the Lee Report to reporters, nor did he authorize its distribution to Muddy Waters. Sugarman Decl.,

---

[4] While still employed by TCC, Levine represented to Mr. Sugarman that he used a "burner" twitter account with the handle "Predatory AF." (Sugarman Declaration, ¶ 16.)

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

¶¶ 16-17. Moreover, there is no evidence that the Lee Report was ever reported on. For instance, the only reporter who Levine can identify as receiving the Lee Report, Evan Hughes, makes no mention of the Lee Report in his resulting article. Dkt. 623-6 at ¶ 16.[5] Sugarman did not direct Levine to send the Lee Report to Mr. Hughes and he was not cc'd on or forwarded Levine's email to Mr. Hughes. Sugarman Decl., ¶ 17. Sugarman has never seen this email. Sugarman Decl. ¶ 17. Muddy Waters also cites to several stories about an investigation by the Department of Justice into short sellers such as Muddy Waters as further evidence of an alleged violation of the Protective Order. Dkt. 623-1. 11:1-2 n. 4, 12:4-8 n. 5-7. None of these stories discuss, cite, or reference the Lee Report. *Id.* Moreover, Sugarman never provided anyone, including anyone at the Department of Justice, with any of Muddy Waters's document production since Sugarman never received such documentation. Sugarman Decl. ¶ 2.

In an attempt to corroborate his claims, Levine also produces a transcript of a "February 2022" interview between Sugarman and an unnamed Reuters reporter. Levine Ex. B. The interview does not reveal any AEO information as evidenced by the fact that Muddy Waters did not seek to seal or redact any portion of the interview. *Id*. Additionally, Levine includes one brief text chain where Levine sends Sugarman an article from the Wall Street Journal entitled *Carson Block's Latest Short Target is a Columbia Law Professor* and Levine writes "Fantastic for us - not a single mention." Dkt. 623-9. There is no evidence that the author, Liz Hoffman, received the Lee Report or cited the Lee Report in her story. *See generally* Dkt. 623-6.[6] In response, Sugarman simply wrote "Interesting follow up

---

[5] *See* Evan Hughes, *The Man Who Moves Markets*, THE ATLANTIC (Feb. 2, 2023), https://www.theatlantic.com/magazine/archive/2023/03/wall-street-muddy-waters-activist-short-sellers-tesla-gamestop/672774/.

[6] *See* Liz Hoffman and Melissa Korn, *Carson Block's Latest Short Target is a Columbia Law Professor*, THE WALL STREET JOURNAL (Mar. 19, 2022), https://www.wsj.com/articles/carson-blocks-latest-short-target-is-a-columbia-law-professor-11647658318.

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

article [from] Liz at [Wall Street Journal] today?"[7] Dkt. 623-9. In fact, the email clearly demonstrates that Sugarman was simply trying to stay out of the press and not get dragged into Carson Block's campaign to publicly smear Sugarman.

### F.   Muddy Waters Refuses to Utilize the Protective Order's Procedures for Unauthorized Disclosures

On or about August 17, 2023, Muddy Waters' counsel Dilan Esper advised Latham and Sugarman that it would be seeking sanctions based on information obtained from Levine. Hanna Decl. ¶ 3. In response, Latham denied any willful violation of the Protective Order and noted that roughly 250 out of the approximately 27,000 words in the Lee Report referred to Muddy Waters's production from 5 years ago. *Id*, Ex. 1. Latham also noted that "[t]hese portions do not disclose materially new information beyond what was already known through other sources" prior to Muddy Waters's production. *Id*, Ex. 1. Nonetheless, Latham offered to "follow the procedures outlined in Section VI of the Protective Order with respect to the disclosure of the Lee Report without redactions to Mr. Sugarman." *Id*, Ex. 1. Specifically, Latham noted it would notify Mr. Sugarman that portions of the Lee Report included information that Muddy Waters contends is AEO, "using best efforts to retrieve all such portions of the Lee Report, informing persons who received such unauthorized portions of the Lee Report of the terms of the Order, and using reasonable efforts to have such persons execute Exhibit A of the Protective Order." *Id*, Ex. 1. During meet and confer calls, Sugarman's attorneys likewise offered to follow Section VI of the Protective Order. *Id*, ¶ 5.

On September 8, 2023, Mr. Esper responded, "[r]egarding your inquiry with respect to invoking the procedures in the parties' stipulated protective order for the retrieval of

---

[7] Roughly a month earlier the reporter, Liz Hoffman, published a story about Federal prosecutors investigating short sellers and reported that Block was served with a search warrant by the FBI. *Liz Hoffman et al.*, "Justice Department Targets 'Spoofing' and 'Scalping' in Short Seller Investigation", THE WALL STREET JOURNAL (Mar. 19, 2022), https://www.wsj.com/articles/justice-department-is-pursuing-wide-ranging-investigation-of-short-sellers-sources-say-11645019122.

confidential information, I would say the following: this is, at this point, a matter of litigation." Hanna Decl. ¶ 4, Ex. 2 at 4. Mr. Esper acknowledged that "ordinarily" he would request the designated material be returned but claimed he could not do so because "the damage is done and we need all parties to preserve and protect the state of the evidentiary record for the contempt proceeding." *Id*. Mr. Esper also refused Latham's request that Muddy Waters return or destroy all copies of the Lee Report which Muddy Wates now asserts contains material designated under the protective order by Sugarman and Latham. *Id* at n. 3.

When it became clear that the basis for Muddy Waters' position was based upon Levine's theft of documentation from Sugarman (including attorney client communications). Hanna Decl. ¶ 5. Sugarman demanded the return of his documentation. *Id*. Muddy Waters refused and instead brought this Motion. *Id*.

## III.   LEGAL ARGUMENT

### A.   Muddy Waters Has Not Shown Clear and Convincing Evidence of Contempt

As the party alleging contempt, Muddy Waters must show by clear and convincing evidence that: (1) the parties violated the Protective Order; (2) "beyond substantial compliance" and; (3) "not based on a good faith and reasonable interpretation of the" Protective Order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig*., 10 F.3d 693, 695 (9th Cir. 1993) (hereinafter *Dual-Deck*). "Any doubts as to whether these requirements have been met in a particular case must be resolved in favor of the party accused of the civil contempt." *O'M & Assocs., LLC v. Ozanne*, 2011 WL 2160938, at *4 (S.D. Cal. June 1, 2011 (citing 7 James Wm. Moore et al., *Moore's Federal Practice* § 37.51[7], at 37–109).

"[O]nce it has been demonstrated that a party has violated a specific and definite court order, the burden shifts to the party sought to be held in contempt to prove that it "took all reasonable steps within [its] power to insure compliance." *Phillips v. Goodyear Tire & Rubber Co.*, 2008 WL 755913, at *4 (S.D. Cal. Mar. 18, 2008) (citing *Hook v. Arizona*

*Dept't of Corrections*, 107 F.3d 1397 (9th Cir. 1997).

### 1. There Is No Clear and Convincing Evidence That Sugarman Violated the Protective Order

Each of the five alleged violations of the Protective Order identified by Muddy Waters are unsupported and inaccurate. First, Muddy Waters asserts that Sugarman violated Magistrate Judge's Order denying Muddy Waters's motion to quash and ordering production pursuant to the existing Protective Order. Dkt. 623-1, 15:24-26. No such violation occurred as Muddy Waters designated its production AEO and Sugarman never saw a single document produced by Muddy Waters. Sugarman Decl., ¶ 2. As evidenced by Sugarman's Opposition to Muddy Waters's Motion to Quash, Sugarman's understanding of Muddy Waters's unusual trading activities came from other sources — *e.g.*, data produced by FINRA, Bloomberg, and broker dealers (including through cooperation), as well as other sources — not Muddy Waters's production. *Muddy Waters* Dkt. 7.

Second, Muddy Waters relies on the Declaration of Adam Levine to argue that Sugarman instructed Levine to disseminate the Lee Report and thereby violated Section IV of the Protective Order. Dkt. 623-1 at 15:27-16:5. Levine, however, is an unreliable witness with a history of violence and extortion towards Sugarman. *See, supra*, Section II(C). Levine's behavior and threats rose to such a level that WVRO was issued against him. Sugarman Decl., ¶ 22 and Exh. A. Just four days after the WVRO was issued, as part of an ongoing campaign of harassment, Levine sent Block the Lee Report. Dkt. 623-2 at ¶ 16; Dkt. 623-4; Sugarman Ex. A [WVRO]. In a footnote, Muddy Waters attempts to dismiss the "serious allegations of criminal conduct against Levine" by arguing that Levine must be telling the truth because his claims "are corroborated by the documentary evidence." Dkt 623-1 at 12-13 n. 8. Emails attached to Levine's declaration show that Levine, not Sugarman, provided the Lee Report to one reporter, Evan Hughes. Levine, Ex. A. Further, Sugarman only provided Levine with access to Lee's Report because Levine was bound by an NDA executed in connection with his engagement as a consultant to Sugarman's legal

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**

team. Sugarman Decl. ¶¶ 7-9. There is no documentary evidence of Sugarman instructing Levine to disseminate the Lee Report to Hughes or anyone else. Sugarman is not cc'd or forwarded any of Levine's communications with Hughes. *See* Levine Ex. A, D and E. Levine was acting independently and without authorization when he contacted Mr. Hughes. Sugarman Decl., ¶¶ 16-17.[8]

Likewise, Muddy Waters's reliance on one text chain between Levine and Sugarman fails to substantiate the alleged smear campaign. In the text chain, Levine forwards a Wall Street Journal Article about Block's efforts to discredit Columbia Professor Johsua Mitts[9] and writes "Fantastic for us – not a single mention." This only demonstrates that Sugarman did not want to be pulled into the article and be in a public relations fight. Muddy Waters asks the Court to interpret Sugarman's response of "Interesting follow up article [from] Liz at [Wall Street Journal] today?" as somehow confirming that Sugarman tasked Levine with disseminating the Lee Report in order to smear Muddy Waters. No such assumption is warranted. First, there is no evidence that Liz Hoffman, the Wall Street Journal reporter, received or was even aware of the Lee Report. Second, it is illogical to assume, as Muddy Waters suggests, that Levine's comment "not a single mention for us" is evidence of Sugarman celebrating not being named as a source. Even assuming *arguendo* Sugarman was a source, he would know whether he gave permission to be named and presumably would want the information he shared included. There is no prohibition on Sugarman talking to reporters, exercising first amendment rights, or acting as a source. The only issue would be if he disseminated documents marked AEO or Confidential by another party, which he did not.

Muddy Waters also cites a "February 2022" transcript between Sugarman and an

---

[8] Moreover, Muddy Waters fails to identify any AEO material disclosed in the purported "February 2022" transcript with Reuters as evidenced by the fact that it was publicly filed without redactions.

[9] Mitts was reportedly aiding the U.S. Justice Department in its investigation of short sellers and had published papers critical of short sellers. *See, supra*, N. 5.

unnamed Reuters reporter as corroborating evidence. Again, Muddy Waters offers evidence of nothing. None of the statements allegedly made by Sugarman contained confidential information as evidenced by Muddy Waters's decision to publicly file the transcript. By filing the document publicly, Muddy Waters waived any rights it had to restrict the transcript's future use. *Littlejohn v. Bic Corp.*, 851 F.2d 673, 680 (3d Cir. 1988) (citing National *Polymer Products v. Borg–Warner Corp.*, 641 F.2d 418, 421 (6th Cir.1981).)

Muddy Waters's third contention that Levine was not authorized under Section IV of the Protective Order to receive the Lee Report also fails. Section IV of the Protective Order states "Nothing in this Order shall be interpreted to prohibit or prevent the producing party from using or discussing its own 'CONFIDENTIAL'" or AEO "material in any way it sees fit or to use or discuss that material for any reason." Dkt. 83 at 4:10-14. The Lee Report was ***Sugarman's*** Confidential Document and, as a result, could be used or discussed for any reason. In this instance, Sugarman provided the Lee Report to Levine as background information after Sugarman was contacted by a reporter that, using Block as a source, was going to report on Sugarman's litigation history. Sugarman Decl., ¶ 14. Additionally, Levine was subject to an NDA as a consultant to Sugarman's attorney. Sugarman Decl. ¶ 7.

Lastly, Muddy Waters asserts that Sugarman failed to follow Section VI and Section IX of the Protective Order which set forth the remedial procedures for unauthorized disclosures and the return or destruction of designated materials, respectively. As noted above, Sugarman's disclosure of the Lee Report to Levine in connection with his role as a consultant was not improper under the Protective Order. Regardless, during the parties' meet and confer efforts in connection with this motion, Sugarman offered to treat his own expert report as being governed by Section VI of the Protective Order but Muddy Waters insisted on litigation. Hanna Decl. ¶ 5. Moreover, Section IX requires the parties to "return all designated material ***to the designator*** or destroy such material including all copies . . . and any other format reproducing or capturing any designated material." Dkt. 83, IX. Sugarman was the designator of the Lee Report and, based on Latham's designation, did

1  not believe it captured any AEO material. Sugarman Decl., ¶¶ 3-6. As such, there was no

2  requirement that Sugarman destroy or return the report to Muddy Waters.

3          **2.**    **<u>Sugarman Substantially Complied with the Protective Order and</u>**

4                 **<u>Any Technical Violation Was Based on A Good Faith and</u>**

5                 **<u>Reasonable Interpretation</u>**

6        "'Substantial compliance' with the court order is a defense to civil contempt and is

7  not vitiated by 'a few technical violations' where every reasonable effort has been made to

8  comply." *Dual-Deck*., 10 F.3d at 695 (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics,*

9  *Inc.,* 689 F.2d 885, 891 (9th Cir.1982)). "[A] person should not be held in contempt if his

10  action appears to be based on a good faith and reasonable interpretation of the court's

11  order." *Id*.

12        In *Dual-Deck*, the Protective Order at issue prohibited the parties from using all

13  information produced in discovery, including Confidential Information, for any purpose

14  other than "the preparation for trial and/or trial of the" underlying antitrust action. *Dual-*

15  *Deck*., 10 F.3d at 694. Plaintiff obtained information in discovery showing antitrust

16  violations not plead in the complaint and, after its motion for leave was denied, filed a new

17  antitrust lawsuit. *Id*. The Ninth Circuit rejected Defendants' contention that the filing of the

18  second lawsuit violated the Protective Order. *Id*, 695. The Ninth Circuit reasoned that the

19  order was clearly "designed to protect commercial secrets" and there was no indication that

20  any commercial secrets were disclosed. *Id*. Moreover, the Ninth Circuit noted that plaintiff

21  "went to great lengths to avoid revealing in the public filings anything it had learned in

22  discovery" and substantially complied the order. *Id*.

23        Sugarman substantially complied with the protective order and acted based on a good

24  faith and reasonable interpretation of the Protective Order. Sugarman never saw any

25  materials designated AEO and, like the plaintiff in *Dual-Deck*, went to great lengths to

26  respect the confidentiality of the designated documents. Sugarman destroyed all materials

27  received from a designating party and also took steps to ensure that Levine signed an NDA

28

before receiving any of his confidential documents. Sugarman Decl., ¶ 7-9. Upon learning that the Lee Report contained AEO information, Sugarman offered to follow the procedure outlined in Section VI of the Protective Order. Hanna Decl. ¶ 5.

Moreover, Sugarman's actions were based on a good faith and reasonable interpretation of the Protective Order. Sugarman understood the Lee Report to be *his* confidential document because it was his expert's report. Sugarman Decl., ¶¶ 3-6. As discussed above, Sugarman believed he could discuss the Lee Report with a consultant (Levine) hired by his attorneys because the Protective Order provided that the parties may use or discuss their own designated materials for any purpose. Dkt. 83 IV.1; Sugarman Decl., ¶¶ 7-9.

**B.   Neither Compensatory nor Coercive Sanctions Are Appropriate**

"A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2) 'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (collecting cases). "Coercive sanctions are payable to the court and should be designed to bring about the desired result and to reflect the character and magnitude of harm if that result is not achieved." *TriPharma, LLC v. First Fruits Bus. Ministry*, 2013 WL 12131288, at *1 (C.D. Cal. Jan. 4, 2013). "Compensatory awards are limited to "actual losses *sustained as a result of the contumacy.*" *Gen. Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1380 (9th Cir. 1986) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146-47 (9th Cir. 1983) (emphasis in original). Here, neither coercive nor compensatory sanctions are justified.

There is no need to coerce compliance because, as discussed above, Sugarman has willingly complied with the Protective Order and is willing to treat the applicable sections of the Lee Report as AEO. During the meet and confer efforts prior to this motion both Latham and Sugarman offered to follow the procedures set forth in Section VI of the Protective Order for unauthorized disclosure of designated material. Hanna Decl. ¶¶ 3-4,

18

Ex. 1. ***Muddy Waters dismissed this request and, instead, filed the instant motion seeking the exact same relief that Latham and Sugarman offered***. Dkt. 623 at 2:22-25. Given that the parties already agreed on the procedure for unauthorized disclosures, there is nothing more for the Court to coerce. *See Vans, Inc. v. Walmart, Inc.*, 2022 WL 17371058, at *2 (C.D. Cal. Oct. 24, 2022) (denying motion for contempt where there was "no further compliance with the injunction that could be coerced from Defendants in these circumstances."),

Moreover, compensatory sanctions are inappropriate because there is no evidence that Muddy Waters sustained any "actual losses … *as a result of the contumacy*." *Shuffler*, 720 F.2d at 1146-47. As discussed above, there is no evidence that Sugarman disseminated the Lee Report or that any alleged dissemination of the Lee Report damaged Muddy Waters. Moreover, there is no evidence that Muddy Waters incurred attorney's fees and costs as a result of the alleged contumacy. *Id*. Muddy Waters could have resolved this dispute informally through a stipulation of the parties to treat the expert report as being governed by Section IV of the Protective Order but, instead, Muddy Waters insisted on litigation. Hanna Decl. ¶¶4-5, Ex. 1 at 4; *Dual-Deck*, 10 F.3d at 696 (denying request for attorneys' fees where "only claimed injuries were self-inflicted" by moving party's "own spare-no-expense punitive expedition" not the alleged violations.)

### C. Sanctions Under Rule 37 Should Be Denied

Muddy Waters also cites Federal Rule of Civil Procedure 37 as grounds for sanctions. "Rule 37 does not explicitly provide for monetary sanctions as Defendant requests. It instead allows a court to hold a disobedient party in contempt." *Fuentes v. Maxim Healthcare Servs., Inc.,* 2019 WL 1751822, at *3 (C.D. Cal. Feb. 8, 2019) (citing Fed. R. Civ. P. 37(b)(2)(A)(vii)). As discussed above, Muddy Waters has not shown the requisite clear and convincing evidence of contempt. Accordingly, Muddy Waters's request under Rule 37 fails as well.

### D.   The Court Should Not Permit Discovery

Contempt proceedings may "proceed in a more 'summary fashion' than in an independent civil action.'" *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locs. 21 & 4*, 721 F.3d 1122, 1130 (9th Cir. 2013) (citing *FTC v. Kuykendall* 371 F.3d 745, 752 (10th Cir. 2004)). Appropriate discovery may be permitted if "significant questions regarding noncompliance have been raised[.]" *California Dep't of Soc. Servs. V. Leavitt*, 523 F.3d 1025, 103 (9th Cir. 2008) "Where the evidence of compliance and noncompliance has already been 'thoroughly aired' and the remaining evidence sought through discovery is 'barely relevant,' the denial of a discovery request is not an abuse of discretion." *Fed. Trade Comm'n v. Mytel Int'l, Inc.,* 2015 WL 13935988, at *4 (C.D. Cal. July 8, 2015).

The requested discovery is a fishing expedition based on unfounded suspicions and is unnecessary given the parties' offers to utilize the Protective Order's procedures for unauthorized disclosure. First, Muddy Waters requests discovery into "Sugarman obtaining from Latham or any other party" the Lee Report and/or any other document from Muddy Waters's production. The Lee Report was designated "Confidential" and, as a result, there is nothing improper about Latham providing Sugarman a copy. Moreover, there is no reason to suspect that a third party gave Sugarman a copy of his own expert's report. Second, Muddy Waters requests discovery into "Latham's decision to designate the Expert Report as 'Confidential' instead of 'AEO' and provide it to Sugarman." Latham has already explained its reasoning for the designation and any discovery into this issue seek protected attorney work product.

Third, Muddy Waters seeks discovery into "Sugarman and Latham transmitting or otherwise revealing the contents of the" Lee Report or any other Muddy Waters document to "any unauthorized third party." As discussed above, there is no evidence Sugarman or Latham ever engaged in such actions. Moreover, *Levine* is the one who allegedly transmitted the Lee Report and has already provided Muddy Waters with whatever "evidence" he has. Fourth, Muddy Waters seeks discovery on Sugarman's alleged instructions to "any third

20

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S
MOTION FOR SANCTIONS AND CONTEMPT ORDER**

party" to transmit or reveal the Lee Report or any Muddy Waters document to another third party. The only "third party" Sugarman is alleged to have instructed is Levine who, as discussed above, is unreliable and unable to substantiate this claim. To be clear, Sugarman did not instruct anyone to disseminate the report and only provided the report to Levine under the attorney-client privilege and an NDA. For these same reasons, Muddy Waters's request to take the "depositions of Sugarman and one or more Latham attorneys" is unwarranted.

However, if the court permits discovery, Sugarman respectfully requests discovery on the following: (1) Muddy Water's prior public disclosures of information in the Lee report, including reporters and; (2) Muddy Water's communications with Adam Levine relating to this motion as it is clear this was a part of a coordinated attack.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Sugarman requests the Court deny Muddy Waters's Motion for Sanctions and Contempt Order.

Dated: November 22, 2023               **MICHELMAN & ROBINSON, LLP**

By:   _/s/ Marc R. Jacobs_
MONA Z. HANNA
MARC R. JACOBS
JESSE J. CONTRERAS
SAMANTHA A. DRYSDALE
Attorneys for Defendant
STEVEN A. SUGARMAN

**DEFENDANT STEVEN A. SUGARMAN'S OPPOSITION TO NON-PARTY MUDDY WATERS CAPITAL LLC'S MOTION FOR SANCTIONS AND CONTEMPT ORDER**